UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

D.F. PRAY, INC.                                      )
                                                     )
      Plaintiff,                              )
                                                     )
v.                                                   )          Civil Action No. 1:21-cv-12077-DPW
                                                     )
FK CONSTRUCTION FUNDING, LLC,                        )
                                                     )
      Defendant.                              )
                                                     )
_____)

## AMENDED COMPLAINT AND JURY DEMAND

### INTRODUCTION

1.    Frank Skelly ("Skelly"), the self-proclaimed factor king, operates what he calls a cash management and funds control business under the name FK Construction Funding, LLC ("FK"). Through FK, Skelly induces financially struggling subcontractors, including Amps Electric, Inc. ("Amps"), to sell their accounts receivable at a significant discount in exchange for immediate payment. D.F. Pray, Inc. ("Pray"), a general contractor, retained Amps to complete a $2.85 million subcontract but then Amps sold its $2.85 million in accounts receivable to FK. In an effort to secure payment for FK, Amps drafted, signed and certified inflated applications for payment falsely representing that it either had or would pay vendors, suppliers and the Union (for labor on the project). On information and belief, FK reviewed the applications for payment before submission, knew that these representations were false, knew that Amps had failed to pay its vendors, suppliers and the Union, purchased the applications for payment knowing that the amounts claimed by Amps were inflated, but then concealed this information from Pray and, instead, demanded payment directly from Pray for these previously purchased payment

applications. Pray relied upon the false representations of payment and paid Amps and FK more than $1.7 million, but FK failed to pay the vendors, suppliers and the Union, and instead diverted some of the money for its own purpose. As a result of the false representations and diversion of funds, Amps defaulted under its subcontract, Pray paid $1.484 million to complete Amps' remaining work (and pay the unpaid vendors and suppliers), and anticipates incurring more than $400,000 to complete the remaining work on the project. Through this Action, Pray seeks to recover its damages from FK.[1]

## PARTIES

2.      Pray is a Rhode Island corporation with a principal place of business at 25 Anthony Street, Seekonk, Massachusetts. Pray is a regional general contractor that performs multi-family, ground-up construction. Brighton Gardner Properties LLC, a local Massachusetts developer (the "Owner"), retained Pray to complete a mixed-use 129 unit, 120,000 square-foot complex located at 89 Brighton Avenue, Boston, Massachusetts (the "Project").

3.      FK is a limited liability company with a principal place of business at 218 US Highway One Tequesta, Florida. On information and belief, FK's members reside in states other than Massachusetts. On information and belief, Skelly owns and operates FK and was previously convicted of defrauding thousands of investors of more than $80 million in a so-called "pump and dump" scheme.

## JURISDICITON

4.      This Court has original subject matter jurisdiction over this action on the basis of 28 U.S.C. § 1332. Specifically, there is complete diversity between Pray, a Rhode Island

---

[1]      Pray previously commenced a separate action against Amps that is pending in Massachusetts Superior Court (the "Amps Action").

corporation with a principal place of business in Massachusetts, and FK, a Florida limited liability company, whose members are, on information and belief, residents of Florida, and the amount in dispute exceeds $75,000.

## FACTUAL BACKGROUND

5.     Skelly, a self-proclaimed factoring expert with more than 37 years' of experience, operates FK. FK is engaged in the business of "factoring," which is a type financing designed to allow struggling companies sell a portion or all of their outstanding invoices (or accounts receivable) to a third party factoring company in exchange for a discounted immediate payment. After payment, the factor assumes the risk associated with collection.

6.     Through FK, Skelly buys accounts receivable at a discount (and assumes the risk of delayed or unpaid accounts) but markets his services to struggling (and unsuspecting) subcontractors, like Amps, as "E-Z cash management, funds control and risk mitigation."

7.     On November 1, 2019, the Owner retained Pray to complete the Project.

8.     By Subcontract dated March 10, 2020 (the "Subcontract"), Pray retained Amps to perform electrical work on the Project of an original sum of $2.85 million (the "Subcontract"). Subcontract, a copy of which is attached as **Exhibit A**.

9.     The Subcontract expressly restricted the use of any funds received for work performed on the Project. In particular, the Subcontract:

- required Amps to use "***any money it shall receive in payment for Work performed under this Subcontract…to discharge its financial obligations to those who furnish labor, materials and equipment to the Project or otherwise arising from the Project***. Upon payment by the Contractor, the Subcontractor shall promptly pay its sub-contractors, suppliers and vendors the amounts to which they are entitled;" and

- obligated Amps to defend, indemnify and hold harmless Pray from and against claims and damages "arising out of or resulting from performance of the Subcontractor's Work;" and for any "liens, claims demands arising from the Work of the Subcontractor or others claiming by, through or under the

3

Subcontractor" "for payment of any labor performed or material or equipment furnished in connection with improvements to real property or related to the Project, or "for any breach of contract by Subcontractor ."

(Emphasis added).

10. With the Subcontract signed, by Factor and Security Agreement dated June 10, 2020 (the "Factor Agreement"), Amps (as "Seller") granted a right to FK (as "Purchaser") to purchase accounts receivable. Factor Agreement, a copy of which is attached as **Exhibit B**. The Factor Agreement granted FK access to and the right to inspect "work papers, management reports and other information" related to Amps," shifted the risk of loss from any account purchased to FK, and required that Amps provide:

> a contractor's payment affidavit…identifying all of [Amps'] subcontractors, sub-subcontractors, suppliers and vendors individuals on [Amps'] payroll, individuals and entities to whom [Amps] owes any union dues and any other third party who has lien rights against a Factored Job, and the amount of money, if any owed to each and (ii) such documentation supporting and evidencing the Account as Purchaser shall from time to time request.

11. FK knew at the time it purchased the accounts receivable from Amps that payment was subject to the terms and conditions of the Subcontract and that it was obligated "[u]pon payment" by Pray to "promptly pay" Amps' "sub-contractors, suppliers and vendors the amounts to which they are entitled."

12. Through the Factor Agreement, Amps transferred control of its operations to FK. In particular, FK, on information and belief:

- reviewed, approved and/or authorized periodic applications for payment, lien waivers and change orders;

- operated, maintained and transferred money from Amps' bank accounts; and

- paid vendors, suppliers and Union laborers.

13. To complete the work under the Subcontract, Amps:

4

- retained labor from IBEW Local 103 (the "Union") and was obligated to pay Local 103 Health Fund, IBEW 103 Pension Fund, and IBEW Local 103 Deferred Income Fund (the "Funds");

- signed vendor agreements with suppliers including Turtle & Hughes, Inc. ("T&H); and

- entered into rental agreements with Sunbelt Rentals, Inc. for equipment to complete the work.

14.     Through its active involvement with Amps, FK had knowledge of Amps' assets, liabilities, and revenue. Specifically, FK monitored Amps' financial status and, for each application for payment purchased, contacted the vendors and suppliers to confirm the outstanding balance.

15.      Moreover, FK directed all of Amps' revenue to an account it controlled. With sole access to and control of Amps' revenue, FK distributed the revenue to itself and select vendors and suppliers of Amps.

16.     After giving control of its revenue to FK, and with FK's knowledge, Amps completed and signed Applications and Certifications of Payment that it sold to FK, as well as change orders and other contract documents, and submitted them to Pray for approval and payment.

17.     In particular, Amps drafted, completed and certified Applications for Payment:

- dated February 28, 2021 in the amount of $105,450;

- dated March 31, 2021 in the amount of $274,977; and

- dated April 30, 2021 in the amount of $315,679.

18.     With each Application for Payment, Amps completed and signed a lien waiver and certified that:

   The Work covered under this Application for Payment has been completed in accordance with the Contract Documents, *that all amounts have been paid by the Contractor for Work for which*

5

> *previous Certifications for Payment were issued* and payment
> received from the Owner and that current payment amount shown
> herein is now due.

19.     Amps signed the Lien Waiver with, on information and belief, FK's knowledge, to induce Pray to pay the Applications to FK.

20.     Unbeknownst to Pray, these representations were false. Amps and FK  knew that vendors, suppliers and the Funds were owed significant amounts of money but neither disclosed the existing debts to Pray. Indeed, no later than April 2021, FK knew that Amps had a deficit and lacked sufficient funds to pay all of the expenses (including labor and materials) Amps incurred in April 2021 and beyond.

21.     Nevertheless, in an effort to secure payment, Amps represented to Pray that all vendors, suppliers and the Funds were paid or would be paid in full up through the date of the Application of Payment. Then, with knowledge of these false representations and that Amps was in breach of the Subcontract, FK (through a series of Payment Verification Requests) demanded payment from Pray.

22.     Pray relied upon the false representations and made payment to FK.

23.      Amps subsequently, with FK's knowledge, submitted:

•     an Application for Payment dated May 31, 2021in the amount of $507,667.24; and

•     an Application for Payment dated June 30, 2021 in the amount of $144,058.40.

24.     At the time these Applications were submitted Amps was operating at a deficit, and FK knew that vendors, suppliers and the Funds were owed significant amounts of money but neither Amps nor FK disclosed the existing debts to Pray. Specifically, Amps and FK knew that Amps' vendors, suppliers and the Funds were owed more than $2 million and that Amps had insufficient funds to complete the work on the Project.

6

25.     Instead, to induce Pray to make payment, Amps with, on information and belief, FK's knowledge, certified each application for payment representing "*that all amounts have been paid by the Contractor for Work for which previous Certifications for Payment were issued.*"

26.     Amps and FK knew that the certifications were false.

27.     Pray relied upon the false certifications and issued a payment dated June 11, 2021 in the amount of $315,679.65 and a payment dated July 8, 2021 in the amount of $507,667.25.

28.     On information and belief, FK directed these payments and others to costs and expenses unrelated to the Project and for its own purposes, including to pay its "fee."

29.     On information and belief, FK did not pay the vendors and suppliers all the amounts that were owed for the materials and labor supplied.

30.     On information and belief, FK exercised dominion and control over at least $200,000 of the Subcontract proceeds without right.

31.     On July 13, 2021, FK deposited the July 8, 2021 check in the amount of $507,667.25.

32.     On July 14, 2021, Amps abandoned the Project. On information and belief, Amps abandoned the Project in part based upon FK's diversion of Amps' revenue.

33.     Pray subsequently terminated the Subcontract and retained a completion subcontractor to complete Amps' work.

34.     In the interim, the Funds recorded a Notice of Contract on the Project claiming that Amps owed $498,787 "in unpaid fringe benefit, contributions, working dues, holiday and vacation amounts deducted from employees' wages for labor furnished and performed;" and then on August 13, 2021, filed an Involuntary Petition for Bankruptcy against Amps claiming more

than $1.4 million. Notice of Contract, a copy of which is attached as **Exhibit C**; Bankruptcy Petition, a copy of which is attached as **Exhibit D**.[2]

## CAUSES OF ACTION

### COUNT I
### AIDING AND ABETTING FRAUD

35.     Pray repeats and realleges paragraphs 1 to 34 as if fully set forth herein.

36.     Amps, with FK's knowledge and assistance, made false representations of material fact intended to induce Pray to make payment.

37.     In particular, Amps certified the Applications for Payment that it sold to FK, representing to Pray that all vendors, suppliers and the Funds had been paid up through the application for payment.

38.     Amps and FK knew that these representations were false. Specifically, FK monitored Amps' financial status, for each application for payment purchased, contacted the vendors and suppliers to confirm the outstanding balance, and knew Amps was operating at a deficit. Further, FK had control of Amps' revenue.

39.     FK actively assisted with and concealed Amps' fraud by failing to disclose to Pray the outstanding amounts due to the vendors, suppliers and the Funds, distributing the revenue to itself and select vendors and suppliers of Amps, and then demanding payment for the false Applications for Payment.

40.     Pray relied upon these representations and paid Amps and FK more than $1.7 million.

---

[2]     FK has filed an action against Pray pending in Massachusetts Superior Court alleging *inter alia* breach of contract and promissory estoppel related to Pray's alleged failure to pay an Application for Payment in the amount of approximately $144,000. Pray has moved to dismiss the Complaint.

41.     As a result of FK's conduct, Pray has sustained and continues to sustain damages.

**COUNT II**
**INSTRUMENTALITY/JOINT VENTURE**

42.     Pray repeats and realleges paragraphs 1 to 41 as if fully set forth herein.

43.     FK assumed and exercised actual, participatory dominion and control over Amps

by, among other things:

- managing and directing business operations, including reviewing, approving and/or authorizing contract documents including change orders and applications for payment;

- controlling Amps' funds and managing Amps' revenue for its own purposes;

- directing all of Amp's revenue to a specific FK controlled account, directing and controlling payments of Amps' creditors, suppliers, laborers (including the Funds) and vendors;

- diverting funds for its own purpose and for purposes unrelated to the Project;

- actively communicating to Pray and others (including specific vendors and suppliers) that FK intended to pay with Amps' funds; and

- negotiating with Pray and other (including specific vendors and suppliers) in an effort to leverage its control over Amps' funds for its own direct benefit.

44.     FK misused and abused its control of Amps by diverting funds from the Project

and paying itself and other specific creditors to advance FK's own interest.

45.     By virtue of its actual, participatory dominion and total control of Amps and its

misuse and abuse of its control, FK is liable to Pray.

**COUNT III**
**UNJUST ENRICHMENT**

46.     Pray repeats and realleges paragraphs 1 to 45 as if fully set forth herein.

47.     Pray conferred a benefit upon FK through, *inter alia*, payment of the fraudulent

Applications and Certifications for Payment and Lien Waivers.

48.     FK had knowledge of the benefit conferred by Pray.

49.     Retention of the benefit under the circumstances is inequitable where, *inter alia*, Pray was induced to make payment through Amps' misrepresentations and FK's concealment, FK failed to pay the subcontractors, vendors and suppliers as represented in the Applications, Certifications, and Lien Waivers and in accordance with the terms of the Subcontract, and Pray incurred significant costs to complete Amps' work and pay the unpaid suppliers and vendors.

<div align="center">

**COUNT IV**
**<u>VIOLATION OF CHAPTER 93A, §§ 2, 11</u>**

</div>

50.     Pray repeats and realleges paragraphs 1 to 49 as if fully set forth herein.

49.     All times material and relevant, Pray and FK were engaged in trade or commerce in the Commonwealth of Massachusetts as defined by Chapter 93A, §§ 2 and 11 and the interpretive regulations and case law related thereto.

50.      The actions of FK which constitute violations of Chapter 93A include without limitation:

- inducing Pray to make payments by assisting Amps in submitting false payment applications and certifications with the intent of obtaining payment for FK;

- concealing from Pray that vendors, suppliers and the Funds had not been paid in breach of the Subcontract and were owed substantial sums, but nevertheless demanding payment of the false pay applications and then diverting the money for its own benefit; and

- intentionally diverting Amps' revenue, which caused Amps to default under the terms of the Subcontract and rendering it essentially insolvent.

51.     As a result, Pray has incurred and continue to incur damages.

**REQUEST FOR RELIEF**

WHEREFOR, Pray requests that the Court:

      (a)      enter judgment in its favor and against FK on Counts I to III awarding

Pray its damages, attorneys fees and costs;

      (b)      enter judgment in its favor and against FK on Count IV awarding Pray no

less than double and no more than treble its actual damages, attorneys fees and costs; and

      (c)      award such other and further relief that is just and equitable

**PRAY DEMAND A JURY TRIAL ON ALL COUNTS SO TRIABLE**

           D.F. PRAY, INC.

           By its attorney,

           */s/ Richard E. Briansky*
           Richard E. Briansky (BBO# 632709)
           Amy B. Hackett (BBO# 676345)
           PECKAR & ABRAMSON PC
           28 State Street
           18TH Floor
           Boston, MA  02109
           Tel: (617) 342-6824
           Fax: (617) 342-6899
           Email: rbriansky@pecklaw.com
                   ahackett@pecklaw.com

Dated: January 19, 2022

## **CERTIFICATE OF SERVICE**

I, Richard E. Briansky, hereby certify that on this date I caused a copy of the foregoing document to be electronically filed with this Court which effectuated service of this document via this Court's CM/ECF system upon all parties registered to receive such notice in this case.

/s/ Richard E. Briansky

Dated:  January 19, 2022

# EXHIBIT A

**D.F. PRAY, INC.**
**STANDARD SUBCONTRACT AGREEMENT**

**SUBCONTRACT NO.2329-016-001**
COST CODE: 16-001
VENDOR NO. 807
JOB NO. DF-02329

AGREEMENT made as of the  10th day of  March in the year 2020 ("Agreement").

Between the Contractor:

D.F. Pray, Inc.
25 Anthony St.
Seekonk, Massachusetts 02771

and the Subcontractor:

AMPS ELECTRIC INC.
86 WEST STREET
WALTHAM, MASSACHUSETTS 02451
Contact:  CHRISTOPHER BIANCHI
Email:  cbianchi@amps-elec.com
Phone:  781-467-6900

The Contractor has entered into an Agreement for construction of the following Project:

89 BRIGHTON AVE., ALLSTON
89 BRIGHTON AVENUE
ALLSTON, MASSACHUSETTS 02134

with the Owner:

BRIGHTON GARDNER PROPERTIES LLC C/O EDEN BRIGHTON GARDNER LLC
107 BRIGHTON AVENUE, SUITE 4
BOSTON, MASSACHUSETTS 02134

which Agreement is hereinafter referred to as the Prime Contract and which provides for the furnishing of labor, materials, equipment and services in connection with the construction of the Project.

**DEFINITIONS**

| | |
|---|---|
| Architect: | PCA, |
| | 221 HAMPSHIRE STREET; , |
| | CAMBRIDGE, MASSACHUSETTS 02139 |
| Scope of Work: | |
| (the "Work") | all as set forth in Exhibit A – Scope of Work Rider. |
| Contract Documents: | The documents listed in Exhibit B – Contract Documents Rider |
| Subcontract Sum: | $2,850,000.00 / TWO MILLION EIGHT HUNDRED FIFTY THOUSAND DOLLARS AND ZERO CENTS |
| Alternates: | $ |
| Unit Prices: | $ |
| Mark-up on Change Orders: |  10 % |
| Retainage: | 5% |
| Anticipated Project Schedule: | Attached as Exhibit C |
| Designated Subcontractor Contact: |  Christopher Bianchi |
| Designated Subcontractor Safety Person: |  Christopher Bianchi |

**EXHIBITS**

Exhibit A -          Scope of Work Rider
Exhibit B -          Contract Document Rider
Exhibit C -          Project Schedule
Exhibit D -          Insurance Rider
Exhibit E -          Change Estimate/Change Order Procedure
Exhibit F -          Application for Payment Procedure
     Exhibit F-1     Subcontractor's Application and Certificate for Payment
     Exhibit F-2     Subcontractor's Application and Certificate for Payment Continuation Sheet
     Exhibit F-3A    Subcontractor Periodic Payment Certification and Release
     Exhibit F-3B    Sub-Subcontractor/Supplier Periodic Payment Certification and Release
     Exhibit F-4A    Subcontractor Final Payment Certification and Release
     Exhibit F-4B    Sub-Subcontractor/Supplier Final Payment Certification and Release
Exhibit G -          Design/Build Services Rider (if applicable)
Exhibit H -          Massachusetts Rider (if applicable)
Exhibit I -          Other State Rider (if applicable)
Exhibit J -          California Rider and Release Forms (if applicable)
Exhibit K -          Competent Person Form

The Contractor and the Subcontractor agree as follows:

## ARTICLE 1.     THE CONTRACT DOCUMENTS

**1.1**      The Contract Documents consist of (i) this Agreement and all exhibits; (ii) the Prime Contract; (iii) all documents identified in the Contract Document Rider – Exhibit B, and (iv) Modifications or Change Orders issued after execution of this Agreement. These form the Subcontract, and are as fully a part of the Subcontract as if attached to this Agreement or repeated herein. The Subcontract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral.

**1.2**      The Contract Documents shall not be construed to create a contractual relationship of any kind (1) between the Architect and the Subcontractor, (2) between the Owner and the Subcontractor, or (3) between any persons or entities other than the Contractor and Subcontractor.

**1.3**      The Subcontractor shall be furnished copies of the Prime Contract and all enumerated Contract Documents as defined therein upon request, but the Contractor may charge the Subcontractor for the reasonable cost of reproduction. A copy of the Prime Contract and all enumerated Contract Documents as defined therein are available in the Contractor's home office.

## ARTICLE 2.     MUTUAL RIGHTS AND RESPONSIBILITIES

**2.1**      The Contractor and Subcontractor shall be mutually bound by the terms of this Agreement and, to the extent that the provisions of the Prime Contract (and enumerated Contract Documents as defined therein) apply to the Work, the Contractor shall assume toward the Subcontractor all obligations and responsibilities that the Owner, under the Contract Documents, assumes toward the Contractor, and the Subcontractor shall assume toward the Contractor all obligations and responsibilities which the Contractor, under such documents, assumes toward the Owner and the Architect. The Contractor shall have the benefit of all rights, remedies and redress against the Subcontractor which the Owner, under such documents, has against the Contractor, and the Subcontractor shall have the benefit of all rights, remedies and redress against the Contractor which the Contractor, under such documents, has against the Owner, insofar as applicable to the work under this Subcontract. Where a provision of such documents is inconsistent with a provision of this Agreement, this Agreement shall govern.

**2.2**      Subject to the requirements of Subparagraph 4.1.9, the Subcontractor shall enter into agreements with sub-subcontractors performing portions of the Work by which the Subcontractor and the sub-subcontractor are mutually bound, to the extent of the Work to be performed by the sub-subcontractor, assuming toward each other all obligations and responsibilities which the Contractor and Subcontractor assume toward each other and having the benefit of all rights, remedies and redress each against the other which the Contractor and Subcontractor have by virtue of the provisions of this Agreement.

## ARTICLE 3.     CONTRACTOR

**3.1**      Time is of the essence of this Agreement. The Contractor shall provide the Subcontractor with information concerning and copies of the applicable Project schedule. The Contractor shall provide to the Subcontractor notice regarding the required mobilization of the Subcontractor in accordance with the applicable Project schedule. The Subcontractor shall be notified by

the Contractor of schedule changes as they occur. The Subcontractor agrees and acknowledges that the Contractor has the right, in its sole discretion, to make revisions, changes, adjustments, and sequencing alternations to the Project schedule from time to time as necessary and the Subcontractor expressly agrees and acknowledges that it shall be bound to, and abide by, such revisions, changes, adjustments, and sequencing alterations to the Project schedule, and that it will adjust and conform its work accordingly, at its cost, to meet all completion dates of this Subcontract as set forth herein.

## 3.2    CONTRACTOR'S REMEDIES

**3.2.1.**    Notwithstanding anything to the contrary set forth herein, and without waiving or prejudicing any of its other rights conferred herein or otherwise, should the Subcontractor at any time refuse or neglect to supply a sufficient number of properly skilled workmen or materials of the proper quantity, and quality, or fail in any respect to prosecute its Work promptly and diligently for any reason, or fail to perform any of the obligations on its part herein contained, or cause by any act or omission the stoppage, impediment, obstruction, hindrance or delay of or interference with or damage to the Work, or the work of any other contractors or subcontractors on the Project, or fail in the performance of any of the terms and provisions of this Agreement or of the Contract Documents, or should the Owner and/or Architect determine that the Work or any portion thereof is not being performed in accordance with the requirements of the Contract Documents, then, in any such event, the Contractor shall be permitted, after twenty-four (24) hours' written notice to the Subcontractor, to assume control of all or portions of the Work and to provide any such labor or materials or both, enter upon the Project premises and take possession, for the purpose of completing the Work, of all materials, equipment, scaffolds, tools, appliances and other items thereon, all of which the Subcontractor hereby transfers, assigns and sets over to the Contractor for such purpose, and deduct the cost thereof from any money due or thereafter becoming due to the Subcontractor.

**3.2.2.**    The Subcontractor shall be liable to the Contractor for all costs the Contractor incurs as a result of the Subcontractor's failure to perform this Subcontract in accordance with its terms. The Subcontractor's failure to perform shall include the failure of its suppliers and/or sub-subcontractors of any tier to perform. The Subcontractor's liabilities shall include, but not be limited to (a) damages and other delay costs payable by the Contractor to the Owner, including all or a portion of any liquidated damages assessed by the Owner against the Contractor in proportion to the Subcontractor's share of the responsibility for such delay; (b) the Contractor's increased costs of performance, such as extended general conditions increased performance costs resulting from Subcontractor-caused delays or improper Work (plus overhead markup of 15%); (c) warranty and re-work costs (plus overhead markup of 15%); (d) liability to third parties; (e) attorneys fees, consultant fees and related costs incurred by the Contractor in any proceeding against the Subcontractor or its sureties to enforce any of the Contractor's rights as provided herein (including, without limitation, the attorneys fees and related costs arising from trial/arbitration, confirmation of such arbitration by the appropriate court, and enforcement of the confirmation and/or any judgments); and (f) costs of compliance, expense and damages, including but not limited to fines and penalties assessed against the Contractor incurred as a result of violations of safety or any other laws rules, codes or regulations by the Subcontractor.

**3.2.3.**    Should the Subcontractor default in or breach any of its obligations under the Contract Documents, and/or if the Contractor exercises its rights under the Subcontract to terminate the Subcontractor's performance under the Subcontract, the Contractor shall have the right and the option, to be exercised in the Contractor's sole discretion at any time, to satisfy, in whole or in part, any damages incurred by, or amounts due or to become due to, the Contractor as a result of said default, breach and/or termination from amounts that would otherwise be due or become due to the Subcontractor on any other project for which the Contractor has engaged the Subcontractor to perform work. The rights, duties and obligations conferred under this paragraph shall survive any termination of the Subcontract.

**3.2.4.**    Each of the Subcontractor's liabilities, as set forth in this Paragraph or otherwise arising herein shall be equally binding against Subcontractor's surety in connection with any surety bonds issued in relation to the Project.

## ARTICLE 4.    SUBCONTRACTOR

## 4.1    EXECUTION AND PROGRESS OF THE WORK

**4.1.1.**    The Subcontractor shall complete the Work in a first class manner equal in all respects to the best standards of practice and to the full satisfaction of the Contractor in strict conformity with the Contract Documents. The Subcontractor shall supervise and direct the Work, and shall cooperate with the Contractor in scheduling and performing the Work to avoid conflict, delay in or interference with the work of the Contractor, other subcontractors, or the Owner's own forces. The Subcontractor shall provide all labor, materials, equipment, tools, equipment and other facilities and services necessary for the performance and completion of the Work as an independent contractor. No exclusion or changes from the drawings, specifications or bid instructions contained in the Contract Documents will be permitted unless first submitted in writing and accepted in writing by the Contractor. All claims by Subcontractor for any such exclusions or changes must be submitted in accordance with, and are subject to, Article 5 of this Subcontract.

**4.1.2.**     The Subcontractor shall pay for, and its remuneration hereunder shall include, all applicable taxes, including but not limited to any and all sales and use taxes that may accrue in any of the United States on account of the materials furnished by the Subcontractor hereunder, and shall provide Contractor with such proof of payment as the Contractor may request, including, but not limited to a Certificate of Compliance or other similar document from the applicable taxing authority. Without limiting the foregoing, the Subcontractor shall provide a detailed accounting of all sale tax paid by Subcontractor in connection with any application for payment as well as, at Contractor's request, all materials as may be requested by Contractor in connection with any reporting and/or audit requirements concerning the payment of taxes (including, without limitation, sales taxes). Out of state subcontractors are responsible for providing any and all sales tax, use tax, or other applicable tax bonds or deposits in accordance with local law. Subcontractor shall similarly provide the Contractor with the proof of such payments, bonds or deposits as the Contractor may request. The Contractor may condition final payment under this Subcontract on the same. The Subcontractor agrees to indemnify and hold harmless the Contractor and Owner from any liability associated with taxes that are the Subcontractor's obligation hereunder, which indemnity shall survive the termination of this Subcontract. The Subcontractor shall also pay for, and its remuneration hereunder shall include, fees, permits, hoisting, scaffolding, rigging, access, clean-up, supervision, coordination, overhead, etc. to perform the Work.

**4.1.3.**     The Subcontractor will be responsible for all layout, lines and grade and coordination required to complete his scope of work.

**4.1.4.**     The Work shall proceed continuously and progressively until full completion of the Project.

**4.1.5.**     The Subcontractor shall promptly submit shop drawings, product data, samples and similar submittals required by the Contract Documents with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of the Contractor or other subcontractors. By submitting shop drawings, product data and samples, the Subcontractor thereby represents that it has determined and verified all measurements, field construction criteria, materials, catalog numbers and similar data, and that it has checked and coordinated each shop drawing and sample with the requirements of the work and of the Contract Documents.

**4.1.6.**     Within five days of executing this Subcontract, the Subcontractor shall provide to the Contractor a Submittal Log detailing all products and portions of the Work requiring submission of shop drawings, product data, samples and similar submittals and stating lead time for all such products and portions of the Work.

**4.1.7.**     The Subcontractor shall provide to the Contractor seven full sets of all shop drawings, product data, samples and similar submittals or two full sets of such documents more than are called for by the Contract Documents, whichever is more.

**4.1.8.**     Prior to starting work, the Subcontractor shall submit to the Contractor a schedule of values allocated to the various parts of the Work, aggregating the Subcontract Sum, made out in such detail as the Contractor and/or Owner requires, and supported by such evidence as the Contractor and/or Owner may require. In applying for payment, the Subcontractor shall submit statements based upon this schedule.

**4.1.9.**     Prior to starting any activates related to or constituting the Work, the Subcontractor shall submit to the Contractor a written schedule of sub-subcontractors, suppliers and vendors identifying and listing each and every person, firm, corporation, trustee, union, governmental authority, or other entity the Subcontractor intends to utilize or to whom Subcontractor expects to incur a liability for or in connection with its performance of any part of the Work, including on such schedule their name, business address, telephone number, fax number, email address, name of primary contract person and scope of work, and identifying which items or categories of Work (including references to the Contractor's schedule of values) the sub-subcontractor, supplier or vendor will provide. Receipt of such a schedule shall be an express condition precedent to the Contractor's obligation to make any payment to the Subcontractor. The Subcontractor shall submit to the Contractor an updated schedule of sub-subcontractors, suppliers and vendors promptly after making any change or addition to the persons or entities it intends to utilize or to which it expects to incur liability. The Subcontractor shall not sub-subcontract any Work hereunder without written notice to and prior written approval by the Contractor. The Subcontractor shall incorporate by reference all terms of this Agreement into any sub-subcontract or purchase order and shall provide the Contractor with a copy of any such sub-subcontract or purchase order within fifteen (15) days of its execution or issuance or three (3) business days before any employee of such sub-subcontractor enters the Project site, whichever occurs first.

**4.1.10.**     The Subcontractor shall furnish to the Contractor information and data, including, when requested, periodic progress reports on the Work, including information on the status of materials and equipment which may be in the course of preparation, manufacture or transit.

**4.1.11.**     The Subcontractor agrees that the Contractor, the Owner and the Architect will each have the authority to reject Work which does not conform to the Contract Documents. The Architect's decisions on matters relating to aesthetic effect shall be final and binding on the Subcontractor.

**4.1.12.** The Subcontractor shall pay for all materials, equipment, services and labor used in connection with the performance of this Subcontract, through the period covered by previous payments received from the Contractor, and shall furnish satisfactory evidence, when requested by the Contractor, to verify compliance with the above requirements.

**4.1.13.** The Subcontractor shall take necessary precautions to protect properly the Work of other subcontractors from damage caused by operations under this Subcontract.

**4.1.14.** The Subcontractor shall cooperate with the Contractor, other subcontractors and the Owner's own forces whose work might interfere with the Subcontractor's Work. The Subcontractor shall participate in the preparation of coordination drawings or the like in areas of congestion, specifically noting and advising the Contractor of potential conflicts between the Work of the Subcontractor and that of the Contractor, other subcontractors or the Owner's own forces.

**4.1.15.** The Subcontractor shall furnish a competent superintendent at the Project (who shall be subject to the approval of the Contractor) to supervise the Work; provided, however, any worker or other person involved in the performance of the Work who, in the opinion of the Contractor, is incompetent or careless in the execution of the Work, or otherwise unsatisfactory, shall be forthwith removed upon the request of the Contractor and such person shall not again be employed at the Project without the written consent of the Contractor. The Subcontractor shall, upon execution of this Subcontract, designate in writing an official representative of the Subcontractor, who shall have full authority to act on any and all matters pertaining to the execution of this Subcontract and whose acts will be binding upon the Subcontractor.

**4.1.16.** The following shall apply to the Subcontractor and its sub-subcontractors at whatever tier:

**4.1.16.1.** No individual independent contractors shall be employed by the Subcontractor on the Project. All subcontractors shall be incorporated entities.

**4.1.16.2.** All subcontractors shall abide by all relevant state and federal laws and regulations with regard to their work on the Project including, but not limited to, those laws and regulations relating to:

    a.   The employment eligibility of all employees of Subcontractor and all employees of any sub-subcontractor to Subcontractor. Subcontractor shall acquire, assess, and maintain I-9 forms of all such employees and take reasonable measures to ensure that such employees are eligible to work lawfully in the United States;

    b.   Proof of Worker's Compensation insurance coverage for all individuals working on the Project for the duration of Subcontractor's work on the Project.

**4.1.16.3.** All subcontractors shall:

    a.   Maintain a weekly record of the hours worked per day by their employees who work on the Project;

    b.   Make payments to unemployment insurance based on the earnings of all employees;

    c.   Pay Project employees by check;

    d.   Deduct from employee paychecks those withholdings required by state and federal law;

    e.   Pay overtime at one and one half their regular wage rate to employees who are not exempt from the overtime requirements of the wage and hour laws for all hours worked over 40 hours in a workweek.

**4.1.16.4.** All subcontractors shall be registered to do business in the state in which the Project is located.

**4.1.16.5.** The Subcontractor shall defend, indemnify, and hold the Contractor harmless against any liability, fines and damages it may incur as a result of the failure of the Subcontractor or any of its sub-subcontractors of any tier to comply with the provisions of this Paragraph 4.1.16. The Subcontractor shall provide verification of compliance with the foregoing obligations by submitting to the Contractor and/or the Owner, when requested to do so, certified payroll records providing the name, address, dates and hours worked by all tradespeople performing any Project work for the Subcontractor on the Project as well as proof of the Subcontractor's compliance with all requirements set forth above.

**4.1.16.6.** Failure to provide proof of compliance with the requirements set forth above immediately upon request by the Contractor or to comply with any of these provisions shall constitute an event of default, and the Subcontractor shall be subject to any and all rights and remedies available to the Contractor pursuant to this Subcontract, including but not limited to any right of termination.

**4.1.17.** The Subcontractor shall bear the risk of loss or damage from any cause whatsoever to machinery, tools, equipment, building supplies or materials, temporary structures and any equipment of like nature used or to be used by the Subcontractor, its agents, suppliers and/or sub-subcontractors, or its or their employees in the performance of the Subcontract.

**4.1.18.** The Subcontractor shall communicate solely with the Contractor concerning the Project, and shall not have direct verbal or written communication with the Architect, the Architect's consultants or the Owner absent prior written approval of the Contractor. The parties agree that this subparagraph 4.1.18 is a material condition of the Subcontract.

**4.2      LAWS, PERMITS, FEES AND NOTICES**

**4.2.1.** The Subcontractor shall give notices and comply with laws, ordinances, rules, regulations and orders of public authorities bearing on performance of the Work. The Subcontractor shall secure and pay for permits and governmental fees, licenses and inspections necessary for proper execution and completion of the Subcontractor's Work, the furnishing of which is required of the Contractor by the Prime Contract.

**4.2.2.** The Subcontractor shall comply with Federal, state and local tax laws, including, but not limited to, any laws concerning sales tax social security acts, unemployment compensation acts and workers' compensation acts insofar as applicable to the performance of this Subcontract, including, but not limited to, those laws set forth in Articles 4.1.2 and 4.1.16, above.

**4.3      SAFETY PRECAUTIONS AND PROCEDURES**

**4.3.1.** The Subcontractor shall be primarily responsible for the safety of its own employees and its sub-subcontractor's employees. The Subcontractor shall take reasonable safety precautions with respect to performance of this Subcontract, shall comply with safety measures initiated by the Contractor and with applicable laws, ordinances, rules, regulations and orders of public authorities for the Safety of persons and property in accordance with the requirements of the Prime Contract. The Subcontractor shall immediately (and no later than 24 hours) report to the Contractor an injury to an employee or agent of the Subcontractor which occurs at the Project site.

**4.3.1.1.** The Subcontractor shall at all times comply with all federal, state and local rules and regulations pertaining to safety and/or the maintenance of a safe worksite. The Subcontractor shall familiarize its supervisory employees with the Contractor's general safety program for the Work. Copies of the Contractor's written safety program shall be available for review at all times by the Subcontractor at the Project and at the Contractor's home office. The Subcontractor shall designate in writing at the start of the Project its competent on-site safety representative.

**4.3.2.** If hazardous substances, of a type of use of which an employer is required by law to notify its employees, are being used or to be used on the site by the Subcontractor, the Subcontractor's sub-subcontractors or anyone directly or indirectly employed by them, the Subcontractor shall, prior to use of such substance by any employees on the site, give written notice of the chemical composition thereof to the Contractor in sufficient detail and time to permit compliance with such laws by the Contractor, other subcontractors and other employers on the site.

**4.3.3.** If reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Subcontractor, the Subcontractor shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Contractor in writing. When the material or substance has been rendered harmless, the Subcontractor's Work in the affected area shall resume upon written agreement of the Contractor and Subcontractor.

**4.4      CLEANING UP; SIGNAGE**

**4.4.1.** The Subcontractor shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations performed under this Subcontract. The Subcontractor shall not be held responsible for unclean conditions caused by other contractors or subcontractors.

**4.4.2.** If the Subcontractor fails to clean up as provided in the Contract Documents, the Contractor may charge the Subcontractor for the Subcontractor's appropriate share of cleanup costs.

**4.4.3.** In no event shall Subcontractor place any signage advertising the Subcontractor, the Work, or any other signage whatsoever on or around the Project, including, without limitation on any perimeter fence screening any portion of the Project.

**4.5      WARRANTY**

**4.5.1.** The Subcontractor shall strictly comply with all warranty requirements of the Contract Documents applicable to the Work. In addition, the Subcontractor warrants to the Owner, Architect and Contractor that materials and equipment furnished

under this Subcontract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. This warranty shall be in addition to and not in limitation of any other warranty or remedy required by law or by the Contract Documents.

## 4.6     INDEMNIFICATION

**4.6.1.**     To the fullest extent permitted by law, the Subcontractor shall defend, indemnify and hold harmless D.F. Pray Inc., the Owner, Architect, Architect's consultants, any other parties as required by D.F. Pray or the Owner, any of their affiliates, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Subcontractor's Work caused, in whole or in part, by the acts or omissions of the Subcontractor, the Subcontractor's sub-subcontractors, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or otherwise reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Paragraph 4.6.

**4.6.2.**     In claims against any person or entity indemnified under this Paragraph 4.6 by an employee of the Subcontractor, the Subcontractor's sub-subcontractors, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under Subparagraph 4.6.1 shall not be limited by a limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor or the Subcontractor's sub-subcontractors under workers' compensation acts, disability benefit acts or other employee benefit acts.

**4.6.3.**     To the fullest extent permitted by law, the Subcontractor agrees to indemnify Contractor from any and all costs, including attorney's fees, incurred by Contractor defending a claim by Owner or any other party to the dispute if such claim relates to or arises from Subcontractor's Work.

**4.6.4.**     To the fullest extent permitted by law, the Subcontractor agrees to indemnify, defend, and hold harmless, the Owner, the Contractor, and the Contractor's surety (if any) from all liens, claims and demands, and all expenses incurred, including attorneys' fees and costs of defense with counsel acceptable to the Contractor, for or on account of or in any way arising from (a) the Work of the Subcontractor or others claiming by, through or under the Subcontractor, (b) for payment of any labor performed or material or equipment furnished in connection with improvements to real property or related to the Project, or (c) for any breach of contract by the Subcontractor or any sub-subcontractor and/or supplier and/or vendor of the Subcontractor. In addition, at the Contractor's option and direction, the Subcontractor shall be obligated to obtain and record and/or file, within fifteen (15) days after demand by the Contractor, a bond discharging any lien claim asserted by any party claiming by, through or under the Subcontractor in accordance with applicable law.

**4.6.5.**     To the fullest extent permitted by law, the Subcontractor agrees to indemnify, defend, and hold harmless, the Owner, the Contractor, and the Contractor's surety (if any) from and against all disputes, claims, demands, fines, penalties, assessments, costs and expenses, including but not limited to attorney's fees and costs, arising from or attributable to any violation by Subcontractor, or anyone for whom Subcontractor is responsible, of any law or regulation applicable to the Work, including but not limited to sales tax, use tax or other tax laws or regulations, any employment, labor, immigration and safety laws and regulations, any building and environmental codes, and the regulating of any state safety agency and/or the federal Occupational Safety and Health Administration.

**4.7**     Subcontractor shall defend, indemnify and hold Contractor and Owner harmless from all claims, damages or losses, including reasonable attorney's fees, arising out of or related to any errors or omissions in design or engineering services performed or provided by Subcontractor.

## ARTICLE 5.     CHANGES IN THE WORK AND CLAIMS

**5.1**     The Owner may make changes in the Work by issuing Modifications to the Prime Contract. Unless otherwise directed by the Contractor, the Subcontractor shall not thereafter order materials or perform Work which would be inconsistent with the changes made by the Modifications to the Prime Contract.

**5.2**     The Subcontractor may be ordered in writing by the Contractor, without invalidating this Subcontract, to make changes in the Work within the general scope of this Subcontract consisting of additions, deletions or other revisions, including those required by Modifications to the Prime Contract issued subsequent to the execution of this Agreement, the Subcontract Sum and the Subcontract Time being adjusted where applicable. Additional award of Subcontract Time and Subcontract Sum shall only be made upon a fully executed Change Order. The parties expressly acknowledge and represent that no communications or course of dealing between them by any person, whether written, oral, or otherwise, will alter this contractual requirement in any way. In this regard, and absent a fully executed Change Order, the Contractor may, in its sole

discretion and at any time, rightfully and without prejudice or liability to the Contractor, reevaluate any previous acknowledgement of extra Work and/or agreement to award additional Subcontract Time or Subcontract Sum for the same. The Subcontractor, prior to the commencement of such changed or revised Work, shall submit promptly to the Contractor written copies of a claim for adjustment to the Subcontract Sum and Subcontract Time for such revised Work in a manner consistent with requirements of the Contract Documents and in accordance with the Change Estimate/Change Order Procedure set forth in Exhibit E.

**5.3** Change Directives: In the absence of language contained in the Contract Documents, if the Contractor and the Subcontractor are unable to agree upon the terms of a Change Order and therefore fail to execute a Change Order in connection with same, the Contractor may, without invalidating this Agreement, order Changes in the Work, consisting of additions or deletions, by issuing a Change Directive setting forth a proposed method for adjustment in the Work, the Subcontract Time, the Subcontract Sum, or any other term or condition of the Contract Documents for such Change.

**5.3.1.** Upon receipt of a Change Directive, the Subcontractor shall promptly proceed with the Change. If the Subcontractor accepts the Contractor's adjustments to the Work, the Subcontract Time, the Subcontract Sum and any other term or condition of the Contract Documents set forth in a Change Directive, the Subcontractor shall execute the Change Directive and it shall thereafter constitute a Change Order.

**5.3.2.** In the event that the Contractor and the Subcontractor disagree as to the proposed method of adjusting the terms of the Agreement pursuant to a Change, the method and the adjustment shall be determined by the Contractor on the basis of the actual and reasonable cost of the Work, subject to any limitations on such costs stated in the next paragraph.

**5.3.3.** The cost of such work shall be determined by the Contractor and processed in the manner set forth in the Contract Documents, including any applicable markups for overhead and profit. The Subcontractor shall keep, in such form as the Contractor may prescribe, an itemized accounting together with appropriate supporting data. Unless otherwise provided in the Contract Documents, cost shall be limited to the following: cost of materials including sales tax and cost of delivery, cost of labor including social security, old age and unemployment insurance and fringe benefits required by agreement or custom; workers or workmen's compensation insurance, bond premiums, rental value of equipment and machinery and the additional costs of supervision and field office personnel directly attributable to the change. Pending final determination of cost, payments, on account shall be made as determined by the Contractor. The amount of credit to be allowed by the Subcontractor for any Change that results in a net decrease in the Subcontract Sum will be the amount of the actual net cost as confirmed by the Contractor when both additions and credits covering related Work or substitutions are involved in any one Change, the allowance for overhead and profit shall be figured on the basis of the net increase, if any with respect to that Change.

**5.4** The Subcontractor shall furnish all notices and information within the time required under the Prime Contract to enable the Contractor to assert a claim or defense of the Subcontractor. Any notice relating to any claim of delay, disruption, interference or hindrance to the Work ("Schedule Impacts") must be delivered to the Contractor within five (5) days from the day that the Subcontractor becomes aware of any Schedule Impacts, stating the projected effect of such Schedule Impacts upon the progress of the Work, Project Schedule, Contract Price and any other pertinent details. The Subcontractor agrees that the failure to provide such written notice shall in each instance conclusively be deemed a waiver of any claim or remedy of the Subcontractor arising from or related to such Schedule Impacts. The Subcontractor shall make all claims promptly to the Contractor for additional cost, extensions of time and damages for delays or other causes in accordance with the Contract Documents. A claim which will affect or become part of a claim which the Contractor is required to make under the Prime Contract within a specified time period or in a specified manner shall be made in sufficient time to permit the Contractor to satisfy the requirements of the Prime Contract, but in any event no later than two working days preceding the time by which the Contractor's claim must be made. Failure of the Subcontractor to make such a claim timely shall bind the Subcontractor to the same consequences as those to which the Contractor is bound. The Subcontractor agrees that it shall not be entitled to any payment or reimbursement for costs, compensation, or damages for any change or alleged Schedule Impacts, or any adjustment to the Contract Price or Contract Time related to or arising from any change or Schedule Impacts, except and only to the extent that the Contractor has actually recovered corresponding payment from the Owner under the Contract Documents for such change or alleged Schedule Impacts, and then, and only then, to the extent of the amount, if any, which the Contractor on behalf of the Subcontractor, actually receives from the Owner on account of such change or alleged Schedule Impacts. Subcontractor agrees to accept such amount in satisfaction of any Schedule Impact claim. The Contractor shall have no obligation to include a claim of Subcontractor for Schedule Impacts unless payment for Schedule Impacts is permitted under the Contract Documents.

## ARTICLE 6.     DISPUTE RESOLUTION

**6.1** Any controversy or claim between the Contractor and the Subcontractor arising out of or relating to the Subcontract, or the breach thereof, shall be settled according to the dispute resolution procedures in the Prime Contract.

**6.2** For a dispute which involves the Subcontractor's work in whole or in part, the Subcontractor has the right to participate in the assertion or defense of claims related to such work in the dispute resolution procedure with the Owner and shall be bound by the outcome.

**6.3** Completion of the dispute resolution procedure in the Prime Contract shall be a condition precedent to the right of the Subcontractor to commence or continue any legal action or other dispute resolution proceeding against the Contractor.

**6.4** Notwithstanding the foregoing, and in consideration of $100 paid to the Subcontractor, the receipt whereof is acknowledged as part of the Subcontract Sum, at the sole option of the Contractor, any controversy, dispute or claim between the Contractor and the Subcontractor related in any way to this Agreement or the Project may be determined by a separate action in court or by a separate arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then pertaining, whichever the Contractor may elect in its sole discretion. The parties expressly agree that the venue of any such court action or arbitration shall be Boston, Massachusetts. Any award rendered by the arbitrator or arbitrators shall be final and judgment may be entered upon it in accordance with the applicable law in any court having jurisdiction.

**6.5** The Subcontractor agrees to continue performance of the Subcontract Work and shall proceed in accordance with the direction of the Contractor, under protest, in the event of any claim, dispute or controversy. Failure to so proceed shall constitute a material breach of this Agreement, regardless of the ultimate decision on the claim, dispute or controversy, it being understood and agreed that no claim, dispute or controversy between the parties shall be deemed a basis to delay or suspend the Work or a basis to refuse to perform any work directed by the Contractor, unless directed otherwise by the Contractor in writing.

**6.6** The Subcontractor hereby agrees to indemnify the Contractor from any and all costs, including attorneys fees, incurred by the Contractor defending a claim by the Owner or any other party to the dispute if such claim relates to or arises from the Work.

**6.7** Should the Contractor prevail in any court action or arbitration described herein, the Subcontractor further agrees to pay as damages all Contractor's attorneys' fees and expenses, including, without limitation, all costs and fees associated with any mediation, arbitration, and litigation proceeding including consultant fees, and any effort to realize or execute any such judgment or award.

**6.7.1.** The Subcontractor, on behalf of itself and its assignees, sureties and agents, if any, agrees that the dispute resolution procedure in this Article shall inure to the benefit of, and be enforceable by, the Contractor and its sureties or assignees, and that such terms shall be deemed incorporated into any payment, labor and material or other similar bond issued by or for the Subcontractor regarding the Project.

## ARTICLE 7. <u>COMPENSATION AND PAYMENTS</u>

### 7.1 TERMINATION

**7.1.1.** Notwithstanding anything to the contrary set forth herein, should the Subcontractor at any time refuse or neglect to supply a sufficient number of properly skilled workmen or materials of the proper quantity and quality, or fail in any respect to prosecute its Work promptly and diligently for any reason, or fail to perform any of the obligations on its part herein contained, or cause by any act or omission the stoppage, impediment, obstruction, hindrance or delay of or interference with or damage to the Work, or the work of any other contractors or subcontractors on the Project, or fail in the performance of any of the terms and provisions of this Agreement or of the Contract Documents, or should the Owner and/or Architect determine that the Work or any portion thereof is not being performed in accordance with the requirements of the Contract Documents, or otherwise persistently or repeatedly fail or neglect to carry out the Work in accordance with the Subcontract or the Contract Documents or otherwise fail to perform in accordance with the Subcontract for any reason and fails within three (3) days after receipt of written notice to commence and continue correction of such default or neglect with diligence and promptness, the Contractor may, without prejudice to any other remedy the Contractor may have, terminate the Subcontract and finish the Subcontractor's Work by whatever method the Contractor may deem expedient and, in doing so shall be permitted to assume control of all or portions of the Subcontractor's Work and to provide any such labor or materials or both, enter upon the Project premises and take possession, for the purpose of completing the Work, of all materials, equipment, scaffolds, tools, appliances and other items thereon, all of which the Subcontractor hereby transfers, assigns and sets over to the Contractor for such purpose, and deduct the cost thereof from any money due or thereafter becoming due to the Subcontractor. In such event, neither the Subcontractor, nor any of its sureties or assignees shall be entitled to any further payments under or concerning the Subcontract unless and until (a) all Work is complete, (b) a full accounting can be rendered by the Contractor, (c) any sums can be determined to be due either the Contractor or the Subcontractor as a result of such accounting and arising from such termination and (d) the costs, liabilities and expenses incurred by or on behalf of the Contractor in exercising its rights under this subparagraph are less than the amounts earned by but unpaid to the Subcontractor. If the amount otherwise to be paid under

this Subcontract shall be exceeded by the costs, liabilities and expenses incurred by or on behalf of the Contractor in exercising its rights under this subparagraph, then the Subcontractor and it sureties, if any, shall pay the difference to the Contractor. Such costs, liabilities and expenses shall be deemed to include not only the costs and expenses of completing the Work to the satisfaction of the Owner and/or the Architect and of performing and furnishing all labor, services, materials, equipment, and other items required therefor, but also any and all losses, damages, liabilities, costs and expenses, (including legal fees and disbursements incurred in connection with the Contractor's exercise of its rights under this paragraph and under Article 3, and incurred in connection with defending claims arising from the Subcontractor's defaults and in seeking recovery of all of the Contractor's costs and expenses from the Subcontractor and/or its sureties), and disbursements made, sustained, incurred or suffered by reason of or resulting from the Subcontractor's defaults. Amounts not paid by the Subcontractor or its sureties, if any, within seven (7) days of demand shall bear interest from the date of demand at the rate applicable to judgments in the jurisdiction where the Project is located. Should the Contractor take action by effectuating the provisions of this subparagraph, and should it subsequently be finally determined that a termination effectuated under this subparagraph was improper, such termination shall be treated as a termination for convenience pursuant to subparagraph 7.1.2 hereunder and the Subcontractor shall be limited, as its exclusive remedy, solely to the amounts recoverable under said subparagraph 7.1.2.

**7.1.2.**    The Contractor may at any time terminate the Subcontract for the convenience of the Contractor for any reason without any default under the Contract Documents. In the event of such a termination for convenience and notwithstanding any other provision of the Subcontract to the contrary, provided the Subcontractor is not in default, the Subcontractor shall receive, as its entire and sole compensation, its actual, necessary and reasonable costs of performing the Work to date of termination, as determined by audit of the Subcontractor's records, plus a reasonable pro-rata mark-up for overhead and profit, but in no event shall such amount paid and payable hereby exceed the total Subcontract Sum prorated to the percent of completion. The Subcontractor shall make its books and records available at reasonable times and places for the Contractor's audit in the event this paragraph is invoked.

**7.1.3.**    Should the owner terminate the Prime Contract or any part of the Prime Contract including the Subcontractor's work, this Subcontract shall also be terminated and the Subcontractor shall immediately stop the work. In the event of such termination by the Owner, the Contractor's liability to the Subcontractor is limited to the amount received by the Contractor from the Owner on the Subcontractor's behalf under the Contract Documents, pursuant to all other terms and conditions hereunder.

**7.1.4.**    Upon receipt of written notice of termination under this Article, the Subcontractor shall, at the Subcontractor's own expense, cease operations as directed by the Contractor in the notice and take actions necessary, or that the Contractor may direct, for the protection and preservation of the Work.

**7.1.5.**    All obligations of the Subcontractor shall survive the termination of this Agreement.

**7.1.6.**    If the Contractor wrongfully exercises any option under this Article, the Contractor's liability to the Subcontractor shall be strictly limited to the amounts recoverable under a termination for convenience. In no event shall the Subcontractor be entitled to any indirect, consequential or incidental damages arising from such wrongful exercise.

## 7.2    SUSPENSION

**7.2.1.**    The Contractor may, without cause, order the Subcontractor in writing to suspend, delay or interrupt the Work in whole or in part for such period of time as the Contractor may determine.

## 7.3    ASSIGNMENT

**7.3.1.**    In the event of termination of the Prime Contract by the Owner, or at the election of the Contractor, upon written notice to the Subcontractor, the Contractor may assign this Subcontract to the Owner or the Owner's designee, with the Owner's agreement, subject to the provisions of the Prime Contract and to the prior rights of the surety, if any, obligated under bonds relating to the Prime Contract. In such event, the Owner shall assume the Contractor's rights and obligations under the Contract Documents, the Subcontractor shall thereafter be bound to the Owner as set forth in such written notice to the Subcontractor and in accordance with the terms and conditions of the Subcontract and the Subcontractor shall have no further recourse against the Contractor.

**7.3.2.**    The Subcontractor shall not assign the Work without the written consent of the Contractor nor subcontract the whole of this Subcontract without the written consent of the Contractor, nor further subcontract portions of this Subcontract without written notification to the Contractor.

<p style="text-align:center"><strong>ARTICLE 8.    THE WORK OF THIS SUBCONTRACT</strong></p>

**8.1**     The Subcontractor shall execute that portion of the Work described in the Scope of Work Rider Exhibit A and as shown in the Contract Documents identified in the Contract Document Rider Exhibit B, including all labor, materials, equipment, services and other items required to complete such portion of the Work, except to the extent, if any, specifically indicated in the Contract Documents to be the responsibility of others.

It is understood that the Contract Documents do not necessarily indicate or describe all of the work required for complete and full performance of the Work in this Contract. It is further understood that the Contract price includes whatever is necessary to effect the full installation of the work; for a complete and operational system.

Do not begin installation until substrates have been properly prepared; notify Contractor of any unsatisfactory conditions prior to proceeding. If substrate preparation is the responsibility of another installer, notify Contractor of unsatisfactory preparation before proceeding. Proceed with work only after conditions have been corrected and approved by all parties, otherwise application of coatings will be considered as an acceptable surface condition.

## ARTICLE 9.     DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

**9.1**     The Subcontractor agrees and acknowledges that the Contractor has the right, in its sole discretion, to make revisions, changes, adjustments, and sequencing alternations to the Project schedule from time to time as necessary and the Subcontractor expressly agrees and acknowledges that it shall be bound to, and abide by, such revisions, changes, adjustments, and sequencing alterations to the Project schedule, and that it will adjust and conform its work accordingly, at its cost, to meet all completion dates of this Subcontract as set forth herein. Upon notice from the Contractor, the Subcontractor agrees to commence, proceed with and complete the Work promptly and diligently under the direction of the Contractor, in compliance with all job schedules of the Contractor as the same may be amended from time to time. Time is of the essence of this Subcontract. No extension of time will be valid without the Contractor's written consent. The Subcontractor may be held liable for all damages, costs, losses and expenses resulting directly or consequentially from its failure to meet required time limits.

## ARTICLE 10.     SUBCONTRACT SUM

**10.1**     The Contractor shall pay the Subcontractor in current funds, when and if required herein, for performance of the Subcontract the Subcontract Sum stated in the Definitions section above.

**10.2**     Unit Prices, Alternates and Mark-Up on changes, if any, are as stated in the Definitions section above only.

## ARTICLE 11.     PAYMENTS

**11.1**     Based upon applications for payment submitted to the Contractor by the Subcontractor in accordance with the Application for Payment Procedure set forth in Exhibit F and the schedule of values as required in Subparagraph 4.1.8, corresponding to applications for payment submitted by the Contractor to the Owner, the Contractor shall make payments on account of the Subcontract Sum to the Subcontractor as provided below and elsewhere in the Contract Documents.

**11.2**     The period covered by each application for payment shall be one calendar month ending on the last day of the month, in the case of progress payments, and shall be the entire period of performance in the case of final payment. The Subcontractor represents and warrants with each requisition that all applicable taxes (including, without limitation, all applicable payroll and sales taxes) and other withholding assessments have been paid, and that all employees have been properly classified for workers' compensation insurance purposes, and that the appropriate premiums have been paid to its insurance carriers. The Subcontractor is an independent contractor and the Contractor shall have no obligation with respect to payroll taxes, worker's compensation insurance, or other assessments or withholdings.

**11.3**

**11.4**     Provided an application for a progress payment is received by the Contractor not later than the 25th day of a month, the Contractor shall, unless rejected, include the Subcontractor's Work covered by that application in the next application for payment which the Contractor is entitled to submit to the Architect or Owner. Receipt of a progress payment by the Contractor from the Owner shall in each instance be an express condition precedent to the right of the Subcontractor to receive payment. The Subcontractor shall not be entitled to progress payments from the Contractor, unless, until and then only to the extent such payment has been received by the Contractor from the Owner. The Subcontractor, on behalf of itself and its assignees, sureties and agents, if any, agrees that the terms of this subparagraph 11.3 shall inure to the benefit of, and be enforceable by, any of the Contractor's surety or sureties and assignees and that such terms shall be deemed to be incorporated into any payment, labor and material or other similar bond issued by or for the Contractor by any surety or sureties regarding the Project.

**11.5**     If an application for a progress payment is received by the Contractor after the application date fixed above, the Subcontractor's Work covered by it shall be included by the Contractor in the next application for payment submitted to the Architect.

**11.6**     Applications for payment submitted by the Subcontractor shall indicate the percentage of completion of each portion of the Subcontractor's Work as of the end of the period covered by the application for payment. The Subcontractor's applications for payment shall be accompanied by copy of the schedule of sub-subcontractors, suppliers and vendors, furnished and updated under Subparagraph 4.1.9, indicating whose services, materials or equipment is included in the application and a release of liens and claims in a form satisfactory to the Contractor, signed by the Subcontractor and by each sub-subcontractor, supplier, vendor or other person whose services, materials or equipment are included in the application and who is eligible to assert a lien under applicable law, and shall also be accompanied by such other data or evidence satisfactory to the Contractor (and any applicable governmental authorities, if appropriate) that all payrolls, benefits, taxes (including, without limitation, sales taxes), contributions, bills for materials and equipment, and all indebtedness connected with the Subcontractor's Work have been satisfied. In addition to receipt by the Contractor from the Subcontractor of such documents, and without limiting the generality of the foregoing, Subcontractor shall show a detailed breakdown of all sales taxes paid by Subcontractor on the attached G703 (as the same may be modified pursuant to the state-specific rider), and such accounting (as well as such documents) shall be an express condition precedent to the Contractor's obligation to make a progress and/or final payment to the Subcontractor.

**11.7**     Applications for payment submitted by the Subcontractor shall indicate the percentage of completion of each portion of the Subcontractor's Work as of the end of the period covered by the application for payment. The Subcontractor's applications for payment shall be accompanied by copy of the schedule of sub-subcontractors, suppliers and vendors, furnished and updated under Subparagraph 4.1.9, indicating whose services, materials or equipment is included in the application and a release of liens and claims in a form satisfactory to the Contractor, signed by the Subcontractor and by each sub-subcontractor, supplier, vendor or other person whose services, materials or equipment are included in the application and who is eligible to assert a lien under applicable law, and shall also be accompanied by such other data or evidence satisfactory to the Contractor that all payrolls, benefits, taxes, contributions, bills for materials and equipment, and all indebtedness connected with the Subcontractor's Work have been satisfied. Receipt by the Contractor from the Subcontractor of such documents shall be an express condition precedent to the Contractor's obligation to make a progress and/or final payment to the Subcontractor.

**11.8**     Subject to the provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

**11.8.1.**     Take that portion of the Subcontract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Subcontractor's Work by the share of the total Subcontract Sum allocated to that portion of the Subcontractor's Work in the schedule of values, less Retainage;

**11.8.2.**     Add that portion of the Subcontract Sum properly allocable to materials and equipment delivered and suitably stored at the site by the Subcontractor for subsequent incorporation in the Subcontractor's Work or, if approved by the Contractor and Owner, suitably stored off the site at a location agreed upon in writing, less Retainage;

**11.8.3.**     Subtract the aggregate of previous payments made by the Contractor; and

**11.8.4.**     Subtract amounts, if any, calculated under Subparagraph 11.7.1 or 11.7.2 which are related to Work for which the Architect or Owner has withheld or nullified, in whole or in part, a certificate of payment for a cause which is the fault of the Subcontractor.

**11.9**     When the Subcontractor's Work or a designated portion thereof is substantially complete and in accordance with the requirements of the Prime Contract, the Contractor shall, upon application by the Subcontractor, make application for payment for such Work, subject to any other requirements of the Prime Contract. "Substantial Completion" hereunder shall be as defined in and controlled by the Prime Contract.

**11.10**     Final payment, constituting the entire unpaid balance of the Subcontract Sum (including Retainage withheld pursuant to subparagraph 11.7), shall be made by the Contractor to the Subcontractor when the Subcontractor's Work is fully performed in accordance with the requirements of the Contract Documents, when all close-out requirements have been fulfilled, including but not limited to record drawings, as-builts, O&M manuals, punchlist items complete, commissioning, start-up, etc. (to the extent applicable to the Subcontractor's Work), and the Contractor has received payment from the Owner. Receipt of final payment by the Contractor from the Owner shall in each instance be an express condition precedent to the right of the Subcontractor to receive payment from the Contractor. The Subcontractor shall not be entitled to final payment from the Contractor unless, until and then only to the extent such payment has been received by the Contractor from the Owner. The Subcontractor, on behalf of itself and its assignees, sureties and agents, if any, agrees that the terms of this Subparagraph 11.9 shall inure to the benefit of, and be enforceable by, any of the Contractor's surety or sureties and assignees and that such terms shall be deemed to be incorporated into any payment, labor and material or other similar bond issued by or for the Contractor

by any surety or sureties regarding the Project. In its sole discretion, the Contractor may cause the proceeds of any payment payable hereunder to the Subcontractor to be applied to the payment of any indebtedness owed by the Subcontractor to any party who has performed Work or supplied materials or equipment used in or in connection with the performance of this Subcontract, either directly or by means of checks payable jointly to the Subcontractor and such party, provided such work or such materials or equipment have been included in any Subcontractor's application for payment previously submitted hereunder and approved for payment under the Prime Contract, unless the Subcontractor provides credible documentary evidence that is has previously paid such party therefor.

**11.10.1.** Before issuance of the final payment, the Subcontractor, if required, shall submit an updated schedule of sub-subcontractors, suppliers and vendors required under Subparagraph 4.1.9 and evidence satisfactory to the Contractor that all payrolls, bills for materials and equipment, and all known indebtedness connected with the Subcontractor's Work have been satisfied, and all lien and claim waivers and other close-out documentation required hereunder and/or by the Prime Contract have been delivered. In the event the Subcontractor fails to submit all lien and claim waivers as required, the Contractor, in its sole discretion, shall have the right to withhold final payment until such time as, in the Contractor's sole determination, all rights of any person claiming by, through or under the Subcontractor to assert, maintain or enforce a lien have expired without exercise or have otherwise been resolved to the Contractor's satisfaction, and/or any claims asserted by any person claiming by, through or under the Subcontractor have been resolved to the Contractor's satisfaction.

**11.11** In its sole discretion, the Contractor may cause the proceeds of any payment payable hereunder to the Subcontractor to be applied to the payment of any indebtedness owed or claimed or asserted by a third party to be owed by the Subcontractor, or by a sub-subcontractor or vendor of any tier to the Subcontractor, to any party who has performed Work or supplied materials or equipment used in or in connection with the performance of this Subcontract, either directly to such party or by means of checks payable jointly to the Subcontractor and such party, if, in the reasonable judgment of the Contractor, such work or such materials or equipment have been furnished on or related to the Project, unless the Subcontractor provides definitive documentary evidence satisfactory to the Contractor that it has previously paid such party therefor. In addition, if the Contractor reasonably believes that the performance by the Subcontractor of the Work to be performed hereunder has been or may be endangered because the Subcontractor will or may fail or has failed to pay for labor, fringes, materials, all sub-subcontractor taxes (including, but not limited to, sales taxes), or any other obligations of the Subcontractor, the Contractor shall have the right, at its election, but not the obligation, to make payment on account of the Subcontract Sum by means of checks payable either directly to the person, firm, corporation, trustee, union, governmental authority, or other entity to whom money is due or who claims money is due from the Subcontractor, or by check payable jointly to the Subcontractor and such person, firm, corporation, trustee, union, governmental authority, or other entity. Any and all payments made under this Subparagraph shall be deemed to have been paid for and on behalf of the Subcontractor, and for the purpose of eliminating any bond, lien and/or other claims arising from the Project. The exercise or refraining from exercise of such right by the Contractor on any one occasion shall not obligate the Contractor to exercise such right on any other occasion or waive the right to exercise such right on any other occasion; nor shall such exercise or anything herein constitute or be deemed a guarantee or assumption by the Contractor of any obligation of the Subcontractor.

**11.11.1.** The Subcontractor agrees that any monies it shall receive in payment for Work performed under this Subcontract shall be used to discharge its financial obligations to those who furnish labor, materials and equipment to the Project or otherwise arising from the Project. Upon payment by the Contactor, the Subcontractor shall promptly pay its sub-subcontractors, suppliers and vendors the amounts to which they are entitled.

**11.11.2.** If a lien is filed against the property on which the Project is located in relation to the Subcontractor's Work, then the Subcontractor agrees to have same discharged or satisfied in accordance with the requirements of Subparagraph 4.6.4.

**11.11.3.** If a payment bond claim is made against the Contractor's bond in relation to the Subcontractor's Work, then the Subcontractor agrees to have same discharged or satisfied within fifteen (15) days after demand by the Contractor.

**11.11.4.** Original Applications for Payment shall be submitted in PDF format: invoices@dfpray.com

## ARTICLE 12.   INSURANCE AND BONDS

**12.1** The Subcontractor shall purchase and maintain insurance coverage and limits of liability as shall be on stated in the Insurance Rider – Exhibit D. The Subcontractor shall disclose any items that are excluded from coverage by their insurance carrier (e.g., any exemptions, such as a residential exemption, New York work exemptions, etc.). In no event may Subcontractor's insurance include any language specifying an exclusion related to an "injury to a subcontractor employee" exclusion.

**12.2**    Coverages shall be occurrence based and shall be maintained without interruption from date of commencement of the Subcontractor's Work until date of final payment through to termination of any coverage required to be maintained after final payment to the Subcontractor.

**12.2.1.**  Any insurance policy obtained by the Subcontractor to fulfill the insurance requirements of the Subcontract shall name D.F. Pray, Inc., the Owner, Architect, Architect's consultants, any other parties as required by the Owner, any of their affiliates, and agents and employees of any of them as an "additional insured" on a primary and non-contributory basis and provide that such insurance shall be deemed primary insurance to any similar insurance the Contractor may obtain for its own benefit, which shall be excess or secondary but not contributing insurance. Each such policy obtained by the Subcontractor shall provide that the insurer shall defend any suit against the Contractor, its officers, agents, or employees even if such suit is frivolous or fraudulent, so long as such suit results from work of the Subcontractor.

**12.2.2.**  Subcontractor shall ensure that all of its sub-subcontractors and vendors, and any party engaged by it in connection with the Work (including all parties identified on the schedule required by Subparagraph 4.1.9 hereunder) maintain the same insurance coverages and terms and conditions required by Subcontractor hereunder.

**12.3**    The Subcontractor will furnish the Contractor with confirming Certificates of Insurance, for itself and for all of its sub-subcontractors and vendors and any party engaged by it in connection with the Work, and using ISO Additional Insured Endorsement CG 20 10 (11 85) or CG 2010 (10 01) AND CG 20 37 (10 01) or an endorsement providing equivalent coverage to the additional insureds, and shall also include a copy of the Additional Insured Endorsement that is actually part of the Subcontractor's Commercial General Liability Policy prior to performing any work at the Project Site. Each Certificate shall confirm that the insurance will not be cancelled, materially altered or any reduction of any limit with less than 30 days written notice by Registered Mail to the Contractor If requested by the Contractor, the Subcontractor will furnish originals or certified copies of insurance policies including all endorsements required to provide stated coverage.

**12.4**    To the fullest extent permitted by law, Subcontractor shall defend, indemnify and hold harmless D.F. Pray, Inc., Owner, Architect, Architect's consultants, any other parties as required by the Owner, any of their affiliates, and agents and employees of any of them from and against any claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from Subcontractor's failure to procure and maintain the insurance required hereunder.

**12.5**    Vendor shall not commence work and no payments shall be made to Vendor, unless Vendor's compliant COI has been received.

**12.6    PERFORMANCE BOND AND PAYMENT BOND**

**12.6.1.**  At the Contractor's sole option, the Subcontractor shall be required to furnish a separate performance bond, payment bond and, if permitted in the state where the Project is located, a lien prevention bond to secure the Subcontractor's obligations under this Agreement. See Exhibit A – Scope of Work (if required). Each of the bonds shall be in the amount of this Agreement in a form and issued by a surety satisfactory to the Contractor. In the event the Subcontractor shall fail to promptly provide such requested bonds, the Contractor may terminate this Agreement and re-let the work to another subcontractor and all Contractor costs and expenses incurred thereby shall be paid by the Subcontractor, including any price differential.

**12.7    WAIVERS OF SUBROGATION**
**12.7.1**   The Subcontractor hereby, on behalf of itself and any of its insurance carriers, successors, assignees, sub-subcontractors, suppliers and vendors, waives and relinquishes any and all rights of subrogation arising in any way from or related to this Agreement or the Project, including but not limited to claims against the Contractor, the Owner, the Architect, the Architect's consultants, any other parties as required by the Owner, any of their affiliates, separate contractors, and any of their subcontractors, sub-subcontractors, agents and employees of any of them. The Subcontractor shall require of the Subcontractor's sub-subcontractors, agents and employees, by appropriate written agreements, similar waivers in favor of the parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation provided hereunder shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

## ARTICLE 13.   TEMPORARY FACILITIES AND WORKING CONDITIONS

**13.1**    The Subcontractor shall furnish those temporary facilities, equipment and services as stated in Exhibit A - Scope of Work. The Subcontractor is responsible for its own hoisting, rigging, staging, scaffolding, storage, temporary office, and other, similar, activities reasonable and necessary to perform its Work.

**13.2**    The Subcontractor is responsible for verifying the dimensions and elevations at the site by field measurement prior to making submittals or shop drawings, ordering materials or in any way commencing to perform work.

**13.3**     The Subcontractor shall notify the Contractor in writing of any deficiencies in any work at the site prior to the commencement of the Subcontract Work. Any unreported deficiencies shall be deemed accepted by the Subcontractor and such areas become the responsibility of the Subcontractor.

## ARTICLE 14.    MISCELLANEOUS PROVISIONS

**14.1**     Where reference is made in this Subcontract to a provision of another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

**14.2**     Payments due and unpaid under this Subcontract shall bear interest after a thirty (30) day grace period at the lesser of the rate set forth in the Prime Contract for interest on late payments due to the Contractor from the Owner or the then applicable base lending rate of Bank of America or its successor.

**14.3**     If a mutual waiver of consequential damages is included in the Prime Contract, then the Contractor and Subcontractor waive claims against each other for consequential damages arising out of or relating to this Subcontract, including without limitation, any consequential damages due to either party's termination in accordance with Article 7, but only to the extent waived in the Prime Contract or in any other provision of the Contract Documents.

**14.4**     Subcontractor understands and agrees that it shall not be entitled to any payment or reimbursement for costs, compensation, or damages for any delay, obstruction, hindrance or interference to performing the Work; except to the extent that the Contractor has actually recovered corresponding payment from the Owner under the Contract Documents for such delay, obstruction, hindrance or interference, and then, and only then, to the extent of the amount, if any, which the Contractor on behalf of the Subcontractor, actually receives from the Owner on account of such delay, obstruction, hindrance or interference.

**14.5**     This Subcontract shall be governed by and construed in accordance with the laws of the state governing the Prime Contract and the Conflict of Laws provisions of or applicable to the Prime Contract shall control in all instances.

**14.6**     The Subcontractor agrees to employ labor, furnish and provide materials, and make work assignments in a manner consistent with the requirements of any collective bargaining agreements to which the Contractor is signatory, as determined by the Contractor, and to work in harmony with all other labor on the Project. With respect to trades to which the Contractor is not signatory, it is understood by the Subcontractor that subcontracts will be awarded by the Contractor and labor will be employed on the Project without discrimination as to whether employees, agents, suppliers and/or subcontractors of the Contractor or any other subcontractor, including those that may be employed by the Owner of the Project, are members or non-members of any labor or collective bargaining organization, and the Subcontractor accepts the Subcontract with this understanding.
There shall be no manifestations on the Project of any dispute between any labor organization and the Subcontractor. The Subcontractor agrees to employ personnel, employees, agents, mechanics, suppliers and sub-subcontractors who will perform the Work whether or not other employees, agents or suppliers on the Project are members of any labor or collective bargaining organization.

The Subcontractor agrees not to participate in or permit any cessation of work which may occur as a result of any labor dispute, regardless of whether said labor dispute involves the Subcontractor or any other subcontractor or employer on the Project. Should there be a work stoppage caused by a strike, picketing inability to obtain supplies, material or equipment, boycott or any voluntary or involuntary cessation of work, by employees of the Subcontractor, its agents, suppliers and/or sub-subcontractors, which in the sole judgment of the Contractor will cause or is likely to cause unreasonable delay in the progress of construction, then the Contractor shall have the right to declare the Subcontractor in default of this Subcontract, and may invoke the remedies and/or termination provisions set forth herein.

The Subcontractor and all its sub-subcontractors shall provide health insurance for their trades people employed on the Project.

Should a Reserve Gate System be established at the Project, the Subcontractor, all its sub-subcontractors and, their employees, visitors and suppliers shall abide by the requirements of that Gate system.

**14.7**     Should one or more subcontracts, now or hereinafter, exist between the parties hereto or involving any affiliated entity or either of the parties hereto, concerning this or any other construction project, then a breach by the Subcontractor (or affiliated entity) of any such other subcontract, may, at the option of the Contractor (or affiliated entity), be considered a breach of all subcontracts and, in that event, the Contractor (or affiliated entity) may terminate any or all of such subcontracts and/or may withhold monies due or to become due on any such subcontracts, and apply same towards payment of any claim or loss, liability, damage or expense suffered by the Contractor (or affiliated entity) on that or any other such subcontracts. As used herein, the term "affiliated entity" shall include, without limitation, (i) any corporation which controls, is controlled by, or is under common management with either Party hereto or 25% of whose stock is owned by any person who owns 25% of the

stock of either party hereto and (ii) any general or limited partnership or joint venture of which either party hereto (or affiliated entity) is a partner or a member.

**14.8** All previous bids, orders, proposals, letters, oral or written promises and understandings relating to the subject matter to this Subcontract are hereby declared to be null and void. This Subcontract is complete and shall not be interpreted by any reference to any previous bid, letter, proposal, document or understanding, written or oral, or other document or agreement except as specifically provided in this Subcontract.

**14.9** The Subcontractor acknowledges that the Contractor's surety or sureties, and any of its assignees, if any, shall have the benefit of each and every contractual, common law, and statutory defense of the Contractor hereunder.

**14.10** Equal Employment Opportunity: The Subcontractor agrees that with respect to the performance of the Work:

A. The Subcontractor shall not discriminate against any employee or applicant for employment because of race, religion, color, gender, national origin, disability, sexual orientation, veterans' status, or age, and the Subcontractor shall take affirmative action to insure that applicants for employment are employed and the employees are treated during employment without regard to their race, religion, color, gender, national origin, disability, sexual orientation, veterans' status, or age. Such affirmative action to be taken by the Subcontractor shall include, but not be limited, to actions with respect to the following: employment upgrading, demotion and transfer, recruitment and recruitment advertising, layoff and termination, rates of pay and other forms of compensation, and selection for training, including apprenticeship. The Subcontractor shall post in conspicuous places available to employees and applicants for employment notices.

B. The Subcontractor shall in all solicitations or advertisements for employees placed by or on behalf of the Subcontractor state that all qualified applicants will receive consideration for employment without regard to race, religion, color, gender, national origin, disability, sexual orientation, veterans' status, or age.

C. Sexual harassment or other unlawful harassment will not be tolerated. The failure of the Subcontractor to maintain control over its employees in this regard shall be grounds for termination of this Subcontract in accordance with paragraph 7.1.1 above.
The Subcontractor shall defend, indemnify, and hold harmless the Contractor and Owner against any liability, damage, claim, or loss (including, but not limited to, such costs as attorney fees) as a result of the Subcontractor's or its sub-subcontractors' failure to comply with this Paragraph 14.10.

**14.11** Design Delegation: Whenever the Contract Documents specifically require the Subcontractor to furnish, as part of its Work, design or engineering services or certifications of any kind, the Subcontractor shall cause such services or certifications to be provided by a properly licensed design professional, whose signature and seal shall appear on all drawings, calculations, specifications, certifications, Shop Drawings, and other Submittals prepared by such professional. The Contractor shall be entitled to rely upon the adequacy, accuracy, and completeness of such services. The Subcontractor shall furnish a certificate of insurance from each design professional certifying to professional liability insurance coverage for such design profession in an amount not less than $1.0 million per claim and $1.0 million aggregate or such greater amount as required by the Contract Documents. The Subcontractor shall defend, indemnify and hold the Contractor harmless from all claims, damages or losses, including reasonable attorney's fees, arising out of or related to any errors or omissions in design, or to any claim for infringement or misappropriation of any other person's intellectual property arising out of such design, in addition to any other claims for which indemnification is required hereunder.

**14.12** Confidentiality, Non-Solicitation, and Non-Competition:

A. Confidential Information: During the course and scope of this Subcontract, the Subcontractor will receive from the Contractor "Confidential Information" for the Subcontractor's use in performing its Work. As used herein the term "Confidential Information" means any information related to costs, site acquisition, design, plans and specifications, permitting and regulatory compliance, opening dates, profit margins, business plans, marketing, sales, service, product sources, business methods, and technical information related to the Work, including information which is the property of the Owner that has been furnished to the Contractor for its use in performing the Work, and any other information which would give any third party an opportunity to obtain an advantage over competitors who do not know such information, including but not limited to trade secrets of the Owner.

B. Restrictions on Use of Confidential Information: The Subcontractor shall not, either during the term of this Agreement and for a period of at least five (5) years after the expiration of this Agreement, except and as required in the conduct of the Subcontractor's duties hereunder and as authorized by the Contractor in writing, use, publish, disclose, appropriate, or communicate, directly or indirectly, any of the Confidential Information.

**14.12.1.** Non-Solicitation: The Subcontractor agrees that during the term of this Agreement and for a period of at least two (2) years after the expiration of this Agreement, it shall not, either directly or indirectly, either for itself or for any other person,

firm, or corporation, call upon, recruit, solicit, hire, or otherwise engage as an employee, consultant, or independent contractor any of the employees of the Contractor nor shall it induce or cause such persons to terminate employment with the Contractor for the purpose of joining, associating or being employed by the Subcontractor. In the event of a breach of this covenant, and in addition to any other remedy available hereunder or at law, the Subcontractor shall pay to the Contractor as liquidated damages a sum equal to two times the annual salary of any employee of the Contractor engaged by the Subcontractor in violation of this Agreement.

**14.12.2.** Non-Competition: The Subcontractor agrees that during the term of this Agreement and for a period of at least two (2) years after final or full payment under this Agreement, or termination under its terms, whichever is later, it shall not, either directly or indirectly, either for itself or for any other person, firm, or corporation, enter into a contract or any business relationship with the Owner, or any of the Owner's affiliates, as a general contractor, prime contractor, construction manager, project manager, or any similar function or arrangement in connection with any construction project in the United States (the "Prohibited Business Relationship"). In the event of a breach of this agreement and covenant, and in addition to any other remedy available hereunder or at law, the Subcontractor shall pay to the Contractor as liquidated damages a sum equal to any gross revenue received by the Subcontractor as a result of the Prohibited Business Relationship.

**14.12.3.** Enforcement: The parties agree that each of the foregoing confidentiality and non-solicitation, and non-competition covenants are important, material and confidential, and gravely affect the effective and successful conduct of the business of the Contractor and affect its reputation and good will. The parties further agree that any breach of the provisions of these covenants is and shall be a material breach of this Subcontract, and that in the event of such breach the Contractor shall be irreparably harmed and no remedy at law shall be adequate to compensate the Contractor for its losses. Therefore, the Subcontractor agrees that these covenants shall be enforced by injunctive relief and that the Subcontractor shall pay the Contractor all costs and attorneys' fees incurred by the Contractor in any legal action or proceeding.

**14.13**    The Subcontractor shall be subject to any and all audit, disclosure, accounting, record keeping, inspection and similar requirements of the Contract Documents, particularly any such requirements imposed by the Prime Contract.

**14.14**    The Subcontractor shall be subject to any and all requirements of the Contract Documents, particularly any such requirements imposed by the Prime Contract or by applicable law, statute, or regulation, relating to establishment, distribution, implementation, awareness and enforcement of a code of business ethics and conduct, internal controls, reporting and compliance therewith.

**14.15**    If any provision of this Agreement is or shall be deemed invalid or unenforceable, such invalidity or unenforceability shall not invalidate or render unenforceable the entire Agreement, but rather the entire Agreement shall be construed as if not containing the particular invalid or unenforceable provision or provisions.

## ARTICLE 15.    USE OF ELECTRONIC FILES

**15.1**    Use of Electronic Files. As a convenience to the Subcontractor, the Contractor may provide electronic files, including drawings, specification sections, and other documents, in electronic format to assist the Subcontractor in preparing shop drawings and other submittals required for the Work and for preparing as-built or record drawings. If so provided, such electronic files shall be used only as a supplement to previously issued paper Contract Documents. The furnishing of electronic files does not relieve the Subcontractor of its obligation to fully comply with the Contract Documents, including and without limitation, the need to check, confirm and coordinate all dimensions and details, take field measurements, verify field conditions and coordinate the Subcontractor's Work with that of other trades. The use of electronic files may also include use of Building Information Modeling software and related technologies ("BIM"). The Subcontractor shall participate in the use of BIM for the Work and the Project as requested and/or directed by the Contractor, and, in addition, to the full extent as may be required under the Contract Documents. The Subcontractor shall fully comply with and is bound by all requirements and terms and conditions of the Contract Documents related to BIM. Any use of BIM shall in no event and in no way, however, otherwise alter, change, limit, diminish or excuse the Subcontractor's duties and obligations under the Agreement or the Contract Documents

**15.2    No License.**    By providing electronic files, the Contractor does not convey any license or right, including copyright, in the original documents, nor any right to prepare derivative works.

**15.3    Indemnity.**    The use or re-use of any electronic files by the Subcontractor or on the Subcontractor's behalf shall be at the Subcontractor's sole risk and without liability to the Contractor. The Subcontractor shall indemnify, defend and hold the Contractor, its clients, consultants and employees harmless against all damages, liabilities, losses or expenses arising out of or relating to the Subcontractor's use of the electronic files furnished through the Contractor.

**15.4    Disclaimer.**    Unless otherwise provided in the Contract Documents, electronic files furnished pursuant to this Article are not Contract Documents. No representation is made by the Contractor as to the accuracy, completeness, or condition

of the electronic files that may be furnished pursuant to this Article 15, and differences may exist between these files and the paper Contract Documents due to corruption, viruses, or other anomalies. In the event of a discrepancy, the hard copies of Contract Documents shall govern. The Subcontractor accepts responsibility for any and all loss or damage arising from the copying, loading or use of such electronic data by the Subcontractor and agrees to waive any such claims against the Contractor.

**15.5     Use by Others.**   If during the course of performing the Work the Subcontractor transfers electronic files furnished pursuant to this Article 15 to a third-party, the Subcontractor agrees to obtain written confirmation that such third-party agrees to the terms and conditions set forth in this Article 15 prior to transfer thereof and as a condition of their use.

This Agreement is entered into and executed as a sealed instrument of the day and year first written above.

**Contractor:**                                              **Subcontractor:**

**D.F. PRAY, INC.**                                         **AMPS ELECTRIC INC.**

By: _____          By: _____

Its: Senior Project Executive                             Its: _____

Printed Name: Jason Richards                            Printed Name: _____

**D.F. Pray, Inc. Subcontract – Exhibit A**

## SCOPE OF WORK

THE SCOPE OF WORK DESCRIPTION CONTAINED HEREIN SHALL NOT BE CONSTRUED TO LIMIT THE OBLIGATION OF THE SUBCONTRACTOR TO PERFORM ALL OTHER WORK AS DESCRIBED OR IMPLIED IN, OR REASONABLY INFERRED FROM, THE CONTRACT DOCUMENTS.
PROVIDE ALL LABOR, MATERIALS AND EQUIPMENT NECESSARY TO COMPLETE THE FOLLOWING PER PLANS AND SPECS, INCLUDING BUT NOT LIMITED TO:

**Inclusions:**
N/A


Please note the following:

Regarding Insurance Certificates -
Please include the following on your insurance certificate:

Project: DF-02329 89 Brighton Ave
D. F. Pray, Inc., Brighton Gardner Properties LLC and any and all affiliates, subsidiaries, directors, officers, agents, and employees as their interests may appear, and Manager and their designees shall be named additional insured covering their liability arising out of the Work of Contractor and Subcontractors and their agents, consultants, and employees.  Additional insured status must be afforded on endorsement form CG 2010 11 85 or an acceptable equivalent form.

Submittals -
All submittals shall be received within two weeks of the date of this subcontract at the D.F. Pray office. Send submittals to Jeanine Fournier, JFournier@dfpray.com

Extras to subcontract scope -
All extra work shall be described as to work performed and location of work.  All change order requests shall be signed by the D.F. Pray Site Supervisor or Project Manager. Send change requests to either the Project Manager, to our office (located at 25 Anthony Street Seekonk MA 02771) or email to Jeanine Fournier, JFournier@dfpray.com

Close-out Documents –
All close-out documents shall be received at the D.F. Pray office before final payment is made to the subcontractor.  Send close-out documents to either the Project Manager, to our office (located at 25 Anthony Street Seekonk MA 02771) and/or email to Jeanine Fournier, JFournier@dfpray.com

Boston Resident's Construction Employment Plan-
In addition to the requirements of the Subcontract Agreement, the Subcontractor shall comply with best effort, to follow the Boston Resident's Construction Employment Plan and equal opportunity undertakings by which this Project is bound.



## Electrical

**THE CONTRACT DOCUMENTS**

89 Brighton Ave Project
February 10, 2020

1. The scope of work for this Subcontract shall include, but not be limited to all the following Specification Sections listed below. The separation of the documents into various sections is for convenience only and is not intended in any way to limit the scope of this agreement.

Division I – General Requirements
   Section 018900
   ~~Division 31 – Earthwork~~
   ~~Division 32 – Exterior Improvements~~   Division 26 – Electrical
   ~~Division 33 – Utilities~~

Drawing documents dated May 3, 2019
Addendum set dated June 19, 2019

### SPECIFIC SCOPE

The scope is defined for convenience only and is not intended to establish limits for the subcontractor, the scope and price is inclusive of all labor and materials per the contract documents, standards and the work, unless specifically noted herein. The subcontractor explicitly acknowledges and agrees and accepts this scope based upon a turnkey product and ensures the scope defined by the contract documents standards and the work is sufficient to complete the work and furthermore is in compliance with all Federal, State, Local and or other governing jurisdictions, codes, statutes etc.

## A. General

1. The Subcontractor shall comply with all OSHA rules and regulations. If this Subcontractor removes previously install OSHA barricades in order to perform your work then this Subcontractor will replace, repair or reinstall the barricades and conform to OSHA regulations for same.
2. This Subcontractor shall provide a written narrative describing methods and equipment to be used on site, showing location of stored material, space requirements, manpower expectations with associated man hour schedule, sequence of operations, inspection schedule and in conformance with the Project Schedule and coordinated with the DF Pray Superintendent.
3. Coordination Drawings will be required showing basic layout of the structure, dimension locations from closest wall, grid line, invert elevations, locations and size of all sleeves for electrical services, piping, switchgear locations, major conduit runs, house panels, light panels, meters, location of attachment rods, attachment hangers, restraints, all coordinated with other trades work. Any conflicts with other trades or conflict with documents must be presented to the Contractor with a proposed alternate solution. Fabrication and installation of any system cannot commence until Coordination Drawings have been completed.

_____CONTRACTOR

_____DATE

_JBG_ SUBCONTRACTOR

DATE
02/19/2020

Page 1 of 12



## Electrical

4. Seismic Restraint Calculation and design will be provided by this Subcontractor per the Specifications. This Subcontractor shall provide all labor, equipment, and materials to properly engineer, furnish, and install all seismic requirements as per the intent of the Contract Documents, and as required by all applicable codes.

5. This Subcontractor shall pay for any and all Permits, Fees, Connection Costs, Shut Down Fees and Burning Permits, associated with energizing your systems regardless of what Authority Having Jurisdiction may impose. NSTAR costs by other.

6. This Subcontractor will be responsible to all hoisting, delivery, offloading, distribution, rigging, flagmen, and police details, fire watches, fixtures, equipment of any kind and inventory of any equipment or materials supplied and installed by same. *Use of Elevator Permitted – for hook up only if any hoisting of materials to paid for operat. likeall other suss.*

7. All core drilling, drilling of any type through wood, steel or concrete floor assemblies etc. will be by this Subcontractor and holes will be fire caulked by this Subcontractor. This Subcontractor shall be responsible for acoustical ceiling and fire-safing, of all piping which passes through holes, sleeves, and framed openings in drywall and masonry partitions, and floor slabs in accordance with the more stringent requirements of all local codes, sound ordinances, and the Contract Documents.

8. ~~All access panels required to complete your work will be supplied by this Subcontractor for incorporation into the specific wall type and UL Rating.~~

9. This Subcontractor shall provide details, coordination, size requirements, install anchoring requirements for all equipment pads needed for installation of your systems. Pads will be provided by others. *Carpenters work Amps supply Carpenters install*

10. This Subcontractor will attend all coordination meeting and or special meetings required to coordinate your work.

11. This Subcontractor shall provide Electrical Systems as indicated by the contract drawings, specifications, code and local requirements. Include all clarifications and interpretations included in this scope of work.

12. This Subcontractor shall review the electrical documents for compliance with NEC, FHA, MAAB, State, Federal and the local Authorities Having Jurisdiction. This review will consists of verification for heights and locations of all devices (electrical, CATV, phone, data, intercom, switches, etc), locations and height for house panels, distance from corners, kitchen and bathroom layouts, door swings, accessible routes and device locations. Should any discrepancies, conflicts or scope changes occur between the contract documents and the Regulatory Agencies listed above will be reviewed with the General Contractor and Owner.

13. ~~Any omissions within the contract documents that could have been reasonably anticipated to be required by the local Building Officials shall be included in this scope of work.~~

14. The Amenities in this project are not typical and require specific devices in specific locations. This subcontractor to be responsible for all notes related to these areas. Read carefully for proper interpretations as no changes will be

____CONTRACTOR

____DATE

*JBG* SUBCONTRACTOR

____DATE
02/10/2020



## Electrical

**89 Brighton Ave Project**
**February 10, 2020**

issued for work that is shown and detailed. Do not assume the Owner will deal with this work.

15. Complete a full review of the specification; these specs are not generic, they are specific to this project. A great deal of information has been provided, incorporate all the work included in these documents.

16. ~~Contractor~~ *Contractor to provide Portapotties + Dumpsters for Duration of project* JP

### B. Schedule

1. All normal temp power requirements apply when project foundation work begins.
2. Underground electrical activities begin on March 24, 2020. Rough electric in the units October 1, 2020.

### C. Temp Power

1. Provide a 400amp primary service onsite, exiting meter socket and panels exist. Cables and temp conduit will be required to provide power to the building. This is estimated, we ask for input to the final submission of this service. We need enough power to sustain the 130 units, temp elevators and a tower crane service (which may require 480v service).
2. All temporary power to be fed to the building. All excavation and backfill by other.
3. This Subcontractor shall provide any coordination with the Utility Company (NSTAR) for the installation of the Temporary Service and pay for any ~~connection fees,~~ permit fees, meter installation fee etc. for a fully install Temporary Service. NSTAR engineering fees by Owner. *Connection Fees by owner* JP
4. Installation and coverage throughout building in accordance with OSHA guidelines. Include temp lighting in each unit, do not expect this by others. ~~Task lighting by others~~ *Complete temp electric expected* JP
5. Relocate (as necessary or directed) and remove (at project completion)
6. This Subcontractor shall furnish and install any and all temporary power wiring, posts and masts, conduits, conductors, switches, disconnects enclosures, GFCI receptacles, devices and appurtenances on each and every floor and wing of the Building. JP
7. Sufficient quantities and locations as directed by the General Contractor to safely support power usage by all trades for their tools and equipment. *
8. All installations to be coordinated with the DF Pray Superintendent.
9. Include disconnecting of the office tailer and all temp power at the end of the project as directed by DF Pray Superintendent.
   *General outlets only, Supplemental or Specical equipment hookups by others*

### D. Temporary Lighting

1. Furnish, install, maintain all temporary lighting for the duration of the project in all areas including but not limited to, common areas, units, garage, elevator shaft utility spaces etc. *General disconnect of power from trailer to panel to pole.*
2. This subcontractor shall be responsible for furnishing and changing all burnt out and or damaged light bulbs/lamps for the duration of the project (maintain temporary light systems per OSHA). *Negligence or Vandalism is not included.* JP

_____CONTRACTOR

_____DATE

JPBS SUBCONTRACTOR

_____DATE
02/19/2020



## Electrical

3. Stair lights to be located on each floor.
4. Relocation and or removal shall be at the direction of the Project Superintendent.
5. When and where possible subcontractor shall utilize the permanent wiring and devices to provide temporary lighting in order to minimize the cutting and patching of walls and ceilings.

### E. *Primary service*
1. Primary cable and hookup to the transformer will be by utility company. Cable from the transformer to the transclosure is by Nstar as well. Subcontractor work begins at the transclosure.
2. This contractor to install all primary raceways from the street to each transformer. E&B by others. JR
3. Coordinate all town / 3rd party inspection of the conduit for full acceptance before backfill.
4. Coordinate precast pad for transformers with utility company. Supplied by others. JR
5. Primary conduits are 5", secondary is 4"

### F. *Secondary service*
1. This contractor to include all piping and cable to appropriate load centers.
2. Include conduits, conductors, connections, accessories and appurtenances; excavation and backfill by others.
3. Ductbank support shall be spaced no more than 4'0" apart.
4. Routing of the Secondary lines to be coordinated with all other underground piping on the project.

### G. *Site electrical*
1. Provide sizes and quantities of concrete for any concrete pads or bases required for Subcontractor's work and provide shop drawings embedded items such as bases, bolts, etc. for equipment pads. - Precast supplied by others JR
2. Provide all coring required for the electrical scope of work. Proper notification will be given via foreman's meetings to coordinate these types of penetrations while structure is built.
3. Furnish and install all site lighting, fixtures and lamps including all required timers and/or photo cells. There is 3 existing poles that need to be removed, stored, new precast bases will be ordered by other. Provide templates, anchor bolts, anchor bolt templates, conduits and conduit sweeps to others for casting into precast bases. Rigid conduit will be required to be installed 5'0" from all precast light pole bases before transition to approved PVC.
4. Include all hand holes noted on the documents.

### H. *Grounding systems*
1. Provide a complete service and equipment grounding system per plans JR
2. All parts including but not limited to transformers, switchboards, ceiling mount transformers, distribution panels, all electrical circuits, raceways, cabinets,

_____CONTRACTOR

_____DATE

JBG SUBCONTRACTOR

DATE
02/19/2020



## Electrical

motors, boxes, devices, equipment, battery racks and non-current carrying metallic parts grounded according to MA Electrical Code.

3. All buried connections shall be made by the Cadweld process; all exposed connections between different metals shall be sealed with no-oxide paint, Grade A.

I. **Switchgear and Low Voltage Distribution**
1. Furnish and install all switch gear, equipment, accessories and appurtenances
2. This Subcontractor shall provide and install all low voltage distribution including but not limited to busways, circuit breakers, enclosures, fuses, load centers, wiring/terminations, switchboard, motor controllers, magnetic motor starters, manual starters, panel boards, nameplates, meter centers, sizing of housekeeping pads, Power System Studies and Short Circuit Ratings per the contract documents.
3. This Subcontractor shall provide equipment layout rooms drawn for all the electrical equipment laid out including dimensions, Code clearance etc., The rooms are, Main Electric Room, Main emergency electric room, all satellite normal and emergency rooms and closets. Equipment shop drawing will not be reviewed without the room/equipment layouts.

J. **Emergency Generator**
1. Furnish and install 1 60KW / 75KVA 120/208v generator.
2. Include all transfer switches, controllers, low voltage and associated work for a compliant emergency system.
3. Include coordination of the natural gas hook up. *Gas hookup by others* ᴊᴿ
4. Size and model are described in the specification section
5. Generator set shall be mounted in a walk-in, sound attenuated, weatherproof enclosure.
6. This Subcontractor shall provide dimensions for the concrete pad installation by others and install all related conduit, anchors, anchor bolts, grounding, grounding rods etc. to complete the pad.
7. This Subcontractor shall provide an engineered equipment layout drawing showing locations of all equipment.
8. This Subcontractor will furnish and install all control wiring between the ATS, engine start circuit and generator.
9. This Subcontractor shall provide a recessed remote alarm annunciator (per NFPA 99) and shall be installed in the Building fire alarm closet.
10. This Subcontractor will furnish and install steel enclosure for wall mounting of battery charger.
11. This Subcontractor will pay for all related start-up fees associated with the generator supplier or any Authorities Having Jurisdiction; Scheduling of system start-up, acceptance testing, training, load testing per the specifications will be coordinated and paid for by this Subcontractor.

_____CONTRACTOR

_____DATE

*JBG* SUBCONTRACTOR

_____ DATE
02/19/2020



## Electrical

**89 Brighton Ave Project**
**February 10, 2020**

12. This Subcontractors shall coordinate, diagram the routing of the conduits from the generator to the electrical room.

### K. Devices

1. Furnish and install all meter banks, sockets, main service panels, equipment, accessories and appurtenances, including the installation of all necessary backboards and structure for same. *Per plans*

2. Provide lighting control panels as described in the specifications.

3. This subcontractor to include all disconnects switches not integral to motor starters or motor controllers.

4. EC ~~installs~~ *wires* all starters and control devices provided by HVAC and PC. *Installed by others* *(JP)*

5. Furnish and install all labels, markings and name plates Bathroom Fans furnished by HVAC, installed and wired by EC.

6. N/A

7. Include all wiring for life Safety sytems, power and control.

8. Furnish and install disconnect switches at furnaces, condensers and roof top units.

9. Include power and control wiring for the gas powered outdoor fireplace on the 6th level roof deck area.

10. All motor starters to be furnished by other and ~~installed~~ *wired* by this subcontractor. *Installed by others.* *(JP)*

11. Including but not limited to switches, dimmers and receptacles, their accessories and appurtenances. Subcontractor shall be responsible to ensure that all device heights are accurate and per applicable code requirement.

12. Furnish and install all electrical cabling, accessories and appurtenances, including but not limited to, metal clad cable (BX), EMT, non-metallic sheathed cable (Romex), stranded and solid conductors etc.

13. This Subcontractor shall furnish and install all conduits and cabling under the floor slabs and shall furnish and install all required support, support systems, hangers, fasteners, etc.

14. Furnish and install all device, junction, pull and other boxes, accessories and appurtenances.

15. Any reasonable change in location of outlets boxes prior to roughing due to discrepancies in the contract drawings shall not involve additional expense. The term "Reasonable" shall be interpreted as moving outlet locations a maximum of 10'0" in any direction from the location indicated on the drawings. ~~Changes must be made before petab commences~~ *This is your choice, Minor changes always to be and to be expected. (JP)*

16. This Subcontractor shall be responsible for coordinating openings in brick, tile and all types of construction blocks at outlets.

17. All conduits passing through fire partitions shall be provided with 10 gauge steel pipe sleeves and fire stopped.

18. Install electric unit heaters provided by other, floor and wall mounted or otherwise. Electric Unit Heaters are reflected within schedules shown on the documents.

\_\_\_\_CONTRACTOR

\_\_\_\_DATE

*JBC* SUBCONTRACTOR

DATE
08/19/2020



## Electrical

**89 Brighton Ave Project**
**February 10, 2020**

L. *Power*
1. This subcontractor is responsible for coordination with local electrical utility company and shall keep DF Pray informed on a weekly basis with the status of the new incoming power from the street.
2. Coordination with local utilities to obtain services in accordance with the construction schedule and testing requirements is included.
3. This subcontractor acknowledges that a crew of electricians will need to work hand-in-hand with the façade subs for any conduit, devices, etc. in the grouted block, brick and wall panels. Provide knock-outs or any cutting of material for the devices as the walls go up in the early stages of the project.
4. Furnish and install all circuit breakers and fuses
5. Furnish and install all power and lighting branch circuitry wiring, accessories and appurtenances
6. Furnish and install all conduit, connectors, accessories and appurtenances, including but not limited to spare conduits, pull wires etc.
7. Furnish and install all cable trays, troughs, accessories and appurtenances.

M. *Receptacles*
1. This shall also apply to light switches and other devices where finish work is not completed so as to prevent anyone from obtaining access to open boxes that may contain energized circuits.
2. Further, subcontractor shall install a GFCI outlet or outlets in common and other areas as directed by the General Contractor for the same purpose. *Per electrical plans* JP
3. Review the unit layouts in the Architecturals to confirm consistanty with the Electrical documents.
4. Note that the drawings indicate different color receptacles in common spaces (Black, Gray

N. *Firestopping*
1. Furnish and install all temporary and permanent firestopping/firesafing/foam. *for our scope only*
2. Provide fire-stopping for all work under the contract. This Subcontractor is responsible to install all fire-stopping to fill from (sleeve to pipe) and (sleeve to dissimilar material). *for our scope only* JP

O. *Related Electrical work with other Subcontractors*
1. Conduit and wiring for elevator cab telephones. Include temp power with permanent characteristics.
2. All wiring, control wiring (not included in HVAC). *Per EL plans; Power only* JP
3. This subcontractor to provide power connection for all components furnished under this subcontract. *Per plans*
4. Subcontractor shall ensure that appliance connections/hookups are completed per the General Contractors schedule or by direction of the Project Superintendent. Cord extensions to be furnished by other, installed by this contractor. Include extensions for garbage diposals. *Appliance Install by others* JP

_____CONTRACTOR

_____DATE

JBG SUBCONTRACTOR

DATE
02/19/2000



## Electrical

**89 Brighton Ave Project**
**February 10, 2020**

5. All safety disconnect switches shown on the electrical drawings shall be furnished, installed and power wired in this scope.
6. Trash chute and compactors; ensure the correct power is provided. Request approved shop drawing for power requirements before any rough-in work is done for this equipment.
7. Furnish and install all required elevator disconnects at top and bottom of elevator shaft.
8. Include details on E6-1 for the fire pump details. Include all disconnects shown.
9. Include power and lighting requirements for the bike shelter. This shelter has been value engineered to be separate from the main structure. Separate coordination will be needed to include all the requirements shown.
10. Power disconnects to be provided for the car lift system provided by Owner. Location of these to be cleared with manufacturer of lift system.
11. Include Electric Car chargers shown on E2-1. 5 chargers are shown in the garage.
12. A Package concierge system is noted in the 1st floor lobby. This system comes in units. Understand the wiring will be needed to connect every unit together. We estimate there to be about 14 units.

### P. Heat Trace   F+I

1. ~~Furnish and~~ install a complete UL listed, CSA certified, or FM approved system of heating cables, components, and controls for all piping specifically indicated and shown on the drawings.
2. Include all heating cables ~~and install only~~
3. The self-regulating heating cable shall consist of ~~two (2)~~ 16 AWG nickelcoated copper bus wires embedded in a self-regulating polymer core that varies its power output to respond to temperature along its length, allowing the cable to be crossed over itself without overheating. The heating cable shall operate on 208volts or 120 volt.
4. ~~Furnish and~~ install all controllers, auxiliaries, banding, junction boxes.
5. Include all feeders to panel boards.
6. Runs and locations can be reviewed on the plumbing and electrical documents, both drawings are to be used for complete scope. Coordinate the exact locations with plumbing trade and the General Contractor.

### Q. Fire Alarm

1. The subcontractor shall furnish and install fire alarm system per contract drawings and specifications and as required to meet local code requirements including but not limited to the ability to perform the following functions, fire and smoke detection, audio and visual notification, In-Building Radio System-Boston Fire Department, system supervision, trouble indications, control functions such as, elevator recall, egress door release, magnetic hold open release, smoke controls including smoke supply and exhaust fans. Status

____CONTRACTOR

____DATE

JPG SUBCONTRACTOR

____DATE
08/19/2020



## Electrical

**89 Brighton Ave Project**
**February 10, 2020**

monitoring of non-system equipment such as, Emergency Generator, Sprinkler standpipe system, reporting alarm to municipal fire department.

2. This subcontractor must file documents to obtain approval from applicable authorities for the fire alarm system as required.

3. This Subcontractor shall fully coordinate all requirements of the Boston Fire Department, MassPort, Boston ISD, State, Federal and local Authorities Having Jurisdiction into this system.

4. Install temporary monitoring for NFPA 241 standpipes located in the building. Work includes a temporary dial system tied to the fire alarm panel, activated with wireless capabilities.

5. This Subcontractor shall furnish and install the Fire Command Center comprised of the following components according to the specifications. Include fire rated equipment in any Fire command closet; this includes any fire rated printers required for reports and testing within the command closets. *Per plans*

6. This Subcontractor shall furnish and install the In-Building Radio System (BFD) acknowledges the scope of work in its entirety. *EC. installs*

7. This Subcontractor shall furnish and install all duct smoke detectors, accessories and appurtenances including but not limited to control wiring, HVAC interface, Fire Alarm interface, remote alarm indicator etc.

8. Furnish and install all fire alarm system equipment, devices, cabling, accessories and appurtenances, including but not limited to, transformers and batteries, panels and cabinets, Knox boxes, ISMA cabling and connections, misc. cabling, smoke detectors, duct smoke detectors, heat detectors, pull stations, exit signs, horns and bells, visual strobes, strobes, master box, master box cable, exterior beacons, air handling system interface, carbon monoxide detectors, etc.

9. This Subcontractor will furnish and install carbon monoxide detectors with full integration into the FACP and coordination with the HVAC contractor. *Per plans*

10. This Subcontractor shall wire all including but not limited to tamper and flow switches, dampers, smoke dampers, pressurization fans, recall action etc. into the F.A. system, Fire Prevention System, HVAC System, Hoisting, or any work provided by other contractors that need integration into the Fire Alarm System for a complete, tested and approved system. *Per plans*

11. This Subcontractor shall furnish and install a remote test station for all duct mounted smoke detectors.

12. Include alarm panel and boards in the garage water pump rooms.

13. EC to finish and install any required fire alarm annunciation devices.

14. Included all related monitoring requirements for the fire pump. Participate in all testing on or off hours.

R. **Tele-Data Systems - Video Intercom System, CCTV and Wireless, Security System**

1. Include all conduits shown in the T drawings. Specific sizes and routing are clearly shown.

2. Include full security system as shown. All cameras and equipment/ software to be included.

_____ CONTRACTOR

_____ DATE

JBG SUBCONTRACTOR

DATE
02/19/2020



### Electrical

*cleary shown and required* JR

89 Brighton Ave Project
**February 10, 2020**

3. ~~Equipment rack shown on T1.1. all this equipment to be included.~~ *~~per JR's~~*

4. All the personal viewing devices locations in the fitness room to be coordinated with Architect. *Location of hookup.*

5. Communication work included in this scope is raceway and J bars from main building tie-in to tele data closets to unit panel to specific areas in unit. Include microduct and pull strings. All wiring by others.

6. ~~In the 6th floor residential lounge, include all the TV and AV connections including the TV.~~ *include all connections exclude TVs JR*

7. Include recessed entertainment boxes for each unit as detailed on T5.1.

**S. Sealants**

1. Furnish and Install all joint, acoustical and fire caulking between similar and dissimilar materials to complete your work.

**T. Lighting fixtures**

1. This Subcontractor shall furnish and install all permanent lighting including all fixture and battery operated battery packs, layout, mounting hardware, anchors, anchor systems, hoisting, etc. *per plans JR*

2. Include all trim and lenses. Relamp prior to acceptance. *if not working.*

3. This subcontractor shall assume all responsibility for the safe handling of all lighting fixtures, accessories and lamps until the final inspection has been made by the engineer. *excluding negligence or vandalism by others* JR

4. Include exit lighting required. Emergency lighting and exit signs required for temporary Certificate of Occupancy are included. *per plans JR*

5. Ballasts, dimmer ballasts, lamps, accessories and appurtenances in accordance with the latest contract documents, including but not limited to, unit lighting, common area lighting, emergency lighting, utility room lighting, garage lighting, exterior lighting, exterior building lighting, retail lighting, attic lighting, lobby/leasing lighting, laundry lighting, trash room lighting, stairwell lighting, elevator pit lighting, etc.

6. Lighting fixtures are located in various rated ceilings or walls. This subcontractor to include a UL approved fire rated enclosure. Elco fire box or equal. *Subcontractor to use putty packs.* *equal fire, just maintain rating JR*

7. Dimmers as required for the LED fixtures. *per plans JR*

8. See architectural plans for exact locations and mounting heights.

9. The unit fixture schedule is complete, provide fixtures detailed in fixture schedule. *or equal*

**U. Miscellaneous**

1. Participate in MEP coordination; work will include Auto CAD capabilities for coordination and As-built turnover at project completion. PDF format when submitting for approval.

2. Coordination should also include notification of any concrete, wood or steel penetrations when notified by the General Contractor during the shop

_____CONTRACTOR

_____DATE

JBG SUBCONTRACTOR

_____DATE
08/19/2020



## Electrical

**89 Brighton Ave Project**
**February 10, 2020**

drawing review. Any field penetrations required after notification will be this subcontractor responsibility.

3. Include all seismic and vibration requirements for installations.
4. Include an extended 10 year warranty for the Transient voltage surge suppression systems. *Per manufacturers warranty* JP
5. The bi-directional antenna type system shall consist of the following components: Bi-directional radio amplifier, Radiating coaxial cable (if required), Coaxial cable, Antennas (if required), Terminators, T-taps (if required), Other components and interconnecting circuitry as required, UPS Power systems. It is the intent that where a BDA system is required, a complete fully functioning system will be designed, approved and tested before an Occupancy Permit is issued.

**\*END of SCOPE\***

_____CONTRACTOR

_____DATE

JBG SUBCONTRACTOR

_____DATE
02/19/2020



**Electrical**

# *Bid Response Form*

## BID TOTAL:

**Unit Costs / Alternates:**

**Total Electrical BASE BID:** $ ~~2900,000.00~~

$2,850,000 🔵

1. Deduct to take fire caulking out of the scope of work    $ 35,500.00

2. Studio Units alternate pricing for inverter ac units. AC-A1 & AC-A2 shall be the alternate price for ac units with HWC-1 & HWC-2    $ 3800.00

3. Alternate to provide Cantenary lights at trellis    $ 4500.00

## HOURLY RATES (WAGE RATES):

*Please list your specific trade description and provide the associated hourly rate fully loaded for each respective trade, i.e. foreman, carpenter, mechanic, laborer, etc. Once approved, these rates shall be incorporated into the subcontract should your firm be awarded the project and shall remain unchanged for the duration of the project.*

| Trade classification | Wage Rates (fully loaded) |
|---|---|
| Foreman | $ 120.00 Per Hour |
| Electrician | $ 115.00 Per Hour |
| Apprentice | $ 95.00 Per Hour |

Bid submitted by: JOHN Gill    Date: 02/19/2020

Company Name: AMPS ELECTRIC INC.

Print Name: JOHN Gill

Title: SR. PROJECT MANAGER & LEAD ESTIMATOR

Tel: 781-474-2800    Fax:

E-Mail: jgill@amps-elec.com    Cell: 978-836-6679

____CONTRACTOR

____DATE

JBG SUBCONTRACTOR

____DATE
02/19/2020

**D. F. Pray, Inc. Subcontract – Exhibit B**

**LIST OF CONTRACT DOCUMENTS**

WORK NOT PARTICULARLY DETAILED, NOTED OR SPECIFIED, SHALL BE THE SAME AS SIMILAR PARTS THAT ARE DETAILED, NOTED OR SPECIFIED. IT IS THE BURDEN OF THE SUBCONTRACTOR IN EVERY INSTANCE TO REQUEST INFORMATION FOR CLARIFICATION PRIOR TO STARTING WORK.

- Drawing Log Attached

- Boston Residents Job Policy

- MA OSC Compliance Packet (IF APPLICABLE)

D.F. PRAY
GENERAL CONTRACTORS
#: DF-02329 89 B    A ., A
89 B    A
A    ,
02134

| | | | |
|---|---|---|---|
| G0.00 | C    - D | 6/19/2019 | A   #1 |
| | | | |
| | | | |
| A0.10 | G                B | 5/3/2019 | |
| A0.20 | C  DE        A  & EG E      A | 5/3/2019 | |
| A0.21 | C  DE        A  & EG E      A | 5/3/2019 | |
| A0.22 | C  DE        A  & EG E      A | 5/3/2019 | |
| A0.30 | A   A  E   B  E  E   E | 5/3/2019 | |
| A0.31 | A   A  E   B  E      E | 5/3/2019 | |
| A0.32 | F      A   E   B   E | 5/3/2019 | |
| A0.33 | AB &    F  A   E   B   E | 5/3/2019 | |
| A0.40 | C | 5/3/2019 | |
| A1.1A | 1  F       A | 6/19/2019 | A   #1 |
| A1.1B | 1  F      EDGE  F   AB | 6/19/2019 | A   #1 |
| A1.2A | 2  D F       A | 6/19/2019 | A   #1 |
| A1.2B | 2  D F      F  A     G  A | 6/19/2019 | A   #1 |
| A1.2C | 2  D F      EDGE  F   AB   A | 6/19/2019 | A   #1 |
| A1.3A | 3  D F       A | 6/19/2019 | A   #1 |
| A1.3B | 3  D F      F  A     G  A | 6/19/2019 | A   #1 |
| A1.4A | 4   F       A | 6/19/2019 | A   #1 |
| A1.4B | 4   F      F  A     G  A | 6/19/2019 | A   #1 |
| A1.5A | 5   F       A | 6/19/2019 | A   #1 |
| A1.5B | 5   F      F  A     G  A | 6/19/2019 | A   #1 |
| A1.6A | 6   F       A | 6/19/2019 | A   #1 |
| A1.6B | 6   F      F  A     G  A | 6/19/2019 | A   #1 |
| A1.7A | F  A | 6/19/2019 | A   #1 |
| A1.81 | 1   F      EF EC  ED CE    G  A | 6/19/2019 | A   #1 |
| A1.82 | 2  D F      EF EC  ED CE    G  A | 6/19/2019 | A   #1 |
| A1.83 | 3  D F      EF EC  ED CE    G  A | 6/19/2019 | A   #1 |
| A1.84 | 4   F      EF EC  ED CE    G  A | 6/19/2019 | A   #1 |
| A1.85 | 5   & 6   F      EF EC  ED CE    G  A | 6/19/2019 | A   #1 |
| A2.10 | B   D  G E E  A | 6/19/2019 | A   #1 |
| A2.11 | B   D  G E E  A | 5/3/2019 | |
| A2.12 | B   D  G E E  A | 5/3/2019 | |
| A2.20 | E  A   A  E  A  D F BE  CE  E | 5/3/2019 | |
| A2.30 | B   D  G  EC | 5/3/2019 | |
| A2.30.1 | B   D  G  EC | 5/3/2019 | |
| A3.10 | A   EC      ( 1,  2 &  3) | 5/3/2019 | |
| A3.11 | A   EC      ( 4,  5,  6 &  7) | 5/3/2019 | |
| A3.12 | A   EC      ( 8,  9,  10 &  11) | 5/3/2019 | |
| A3.13 | A   EC      ( 12,  13,  14,  15 &  16) | 5/3/2019 | |
| A3.14 | A   EC | 6/19/2019 | A   #1 |
| A3.15 | A   EC      ( 21,  22,  23,  24,  25,  26 &  27) | 5/3/2019 | |
| A3.16 | A   EC      ( 28,  29,  30 &  31) | 5/3/2019 | |
| A4.10 | E   A GED       A   &  C  (   A,    B &    C) | 5/3/2019 | |
| A4.11 | E   A GED       A   &  C  (   D,     E &    F) | 5/3/2019 | |
| A4.12 | E   A GED       A   &  C  (       G,    B  :    A &    B) | 5/3/2019 | |
| A4.13 | E   A GED       A   &  C  (   B  :    C, D    E) | 5/3/2019 | |
| A4.14 | E   A GED       A   &  C  (   B  :    F, G    ) | 5/3/2019 | |
| A4.15 | E   A GED       A   &  C | 6/19/2019 | A   #1 |
| A4.16 | E   A GED       A   &  C  (   B  + D  : C, D    E) | 5/3/2019 | |
| A4.17 | E   A GED       A   &  C  (   B  + D  : F    G, 2   :    A) | 5/3/2019 | |
| A4.18 | E   A GED       A   &  C  (2    :    B, C    D) | 5/3/2019 | |
| A4.19 | E   A GED       A   &  C | 6/19/2019 | A   #1 |
| A4.20 | E   A GED       A   &  C  (     :     ) | 5/3/2019 | |
| A4.31 | E   CA  C  C  A | 6/19/2019 | A   #1 |
| A4.32 | E   CA  C  C  A | 5/3/2019 | |
| A4.33 | E   CA  C  C  A       D | 5/3/2019 | |
| A4.40 | E   A GED  A    A  4       6 | 5/3/2019 | |
| A4.41 | E   A GED B  E A  EA &  E . E      CA | 5/3/2019 | |
| A4.42 | E  E     E  G  A (2  D) & (6   ) & G | 5/3/2019 | |
| A5.10 | E  E     A  DE  A | 6/19/2019 | A   #1 |
| A5.11 | E  E     A  DE  A   (1      16) | 5/3/2019 | |
| A5.12 | E  E     A  DE  A   (1      14) | 5/3/2019 | |
| A5.20 | E  E     E  CA  DE  A   (1      14) | 5/3/2019 | |
| A5.21 | E  E     E  CA  DE  A   (1      15) | 5/3/2019 | |
| A5.22 | E  E     E  CA  DE  A   (1      15) | 5/3/2019 | |
| A5.23 | E  E     E  CA  DE  A   (1      10) | 5/3/2019 | |
| A5.24 | E  E     E  CA  DE  A   (1      15) | 5/3/2019 | |
| A5.25 | E  E     E  CA  D       D   DE  A | 6/19/2019 | A   #1 |

#: DF-02329 89 B    A ., A<br>89 B<br>A , 02134

| Code | Description | Date | | |
|------|-------------|------|---|---|
| A5.26 | E A & EC DE A (1 13) | 5/3/2019 | | |
| A5.27 | E A & EC DE A (1 7) | 5/3/2019 | | |
| A5.28 | E A & EC DE A (1 10) | 5/3/2019 | | |
| A5.29 | EF & D C ED E | 5/3/2019 | | |
| A5.40 | D C ED E A D DE A | 5/3/2019 | | |
| A6.10 | E A GED C E A & E E A | 5/3/2019 | | |
| A6.20 | E A GED BA A | 5/3/2019 | | |
| A6.21 | E A GED .C. E | 5/3/2019 | | |
| A6.30 | E A GED BB , E E A A D G FF CE | 6/19/2019 | A | #1 |
| A6.40 | E A GED E DE GE, F E & A | 5/3/2019 | | |
| A6.50 | C D , E E A BB E & E | 6/19/2019 | A | #1 |
| A6.60 | E F C ED E | 5/3/2019 | | |
| A6.61 | F A A G B A E | 5/3/2019 | | |
| A6.62 | F A B F B + D A G | 5/3/2019 | | |
| A6.63 | F A B A | 5/3/2019 | | |
| | | | | |
| | | | | |
| AD.10 | DE A | 5/3/2019 | | |
| | | | | |
| | | | | |
| G 1.0 | B AB E A E A - 1 F | 5/3/2019 | | |
| G 2.0 | B AB E A E DE A | 5/3/2019 | | |
| | | | | |
| | | | | |
| C-1 | EGE DA D GE E A E | 5/3/2019 | | |
| C-2 | A A D A E A | 5/3/2019 | | |
| C-3 | G AD GA D D A AGE A | 5/3/2019 | | |
| C-4 | A | 5/3/2019 | | |
| C-5 | DE A | 5/3/2019 | | |
| C-6 | DE A | 5/3/2019 | | |
| | | | | |
| | | | | |
| 1.1 | 1 F | 5/3/2019 | | |
| 1.2 | 2 D F A , A E A A D G AD G A | 5/3/2019 | | |
| 1.4 | 4 F A , A E A & G AD G A | 5/3/2019 | | |
| 1.5 | 5 F A , A E A & G AD G A | 5/3/2019 | | |
| 1.6 | 6 F A , A E A & G AD G A | 5/3/2019 | | |
| 1.7 | E F G A | 5/3/2019 | | |
| 2.1 | 1 F | 5/3/2019 | | |
| 2.2 | 2 D F A G A | 5/3/2019 | | |
| 2.4 | 4 & 5 F A G A | 5/3/2019 | | |
| 3.1 | E DE A | 5/3/2019 | | |
| 4.1 | A G DE A | 5/3/2019 | | |
| 4.2 | A G DE A | 5/3/2019 | | |
| | | | | |
| | | | | |
| 0.1 | GE E A E | 5/3/2019 | | |
| 0.2 | CA DE A | 5/3/2019 | | |
| 0.3 | CA DE A | 5/3/2019 | | |
| 0.4 | CA DE A | 5/3/2019 | | |
| 1.1A | F F . F A G | 6/19/2019 | A | #1 |
| 1.1B | F F F A G | 5/3/2019 | | |
| 1.2A | EC D F . F A G | 6/19/2019 | A | #1 |
| 1.2B | EC D F F A G | 5/3/2019 | | |
| 1.2C | CA & E G A F A G A & EC | 5/3/2019 | | |
| 1.3A | D F . F A G | 6/19/2019 | A | #1 |
| 1.3B | D F F A G | 5/3/2019 | | |
| 1.4A | F F . F A G | 6/19/2019 | A | #1 |
| 1.4B | F F F A G | 5/3/2019 | | |
| 1.5A | F F F . F A G | 6/19/2019 | A | #1 |
| 1.5B | F F F F A G | 5/3/2019 | | |
| 1.6A | F . F A G A | 6/19/2019 | A | #1 |
| 1.6B | F / F F A G A | 5/3/2019 | | |
| 1.7 | F F A G A | 6/19/2019 | A | #1 |
| 2.1 | C C ED E & B AC G E E A | 5/3/2019 | | |
| 3.1 | EC | 6/19/2019 | A | #1 |
| 3.1A | EC | 6/19/2019 | A | #1 |
| 3.1B | EC | 6/19/2019 | A | #1 |
| 3.2 | EC (1 23) | 5/3/2019 | | |

**D.F. PRAY**
GENERAL CONTRACTORS

#: DF-02329 89 B   A .,A
89 B   A
A  ,  02134

| | | | |
|---|---|---|---|
| 3.3 | EC | 6/19/2019 A | #1 |
| | AD  G D AG  A | 6/19/2019 A | #1 |
| | | | |
| | | | |
| F 0-0 | F  E     EC     EGE D &    E | 5/3/2019 | |
| F 0-1 | F  E     EC     DE A | 5/3/2019 | |
| F 0-2 | F  E     EC      E D AG  A | 5/3/2019 | |
| F 1-1 | F          G     F     A | 5/3/2019 | |
| F 1-2 | F  E     EC     EC   D F      A | 5/3/2019 | |
| F 1-3 | F  E     EC      D F     A | 5/3/2019 | |
| F 1-4 | F  E     EC     F     F     A | 5/3/2019 | |
| F 1-5 | F  E     EC     F F   F     A | 5/3/2019 | |
| F 1-6 | F  E     EC          F     A | 5/3/2019 | |
| F 1-7 | F  E     EC       F  A | 5/3/2019 | |
| F 5-1 | F  E     EC     .     A     A  (        A     G) | 5/3/2019 | |
| F 5-2 | F  E     EC     .     A     A  (   B       A     G) | 5/3/2019 | |
| F 5-3 | F  E     EC     .     A     A        E,    B      F,  & &      + D       A & B | 5/3/2019 | |
| F 5-4 | F  E     EC     .     A     A     B   + D       C    G | 5/3/2019 | |
| F 5-5 | F  E     EC     .     A     A     B       A    F | 5/3/2019 | |
| F 5-6 | F  E     EC     .     A     A     B       F    G | 5/3/2019 | |
| | | | |
| | | | |
| 0-1 | B  G  EGE D, C ED   E ,& GE E A      E | 5/3/2019 | |
| 0-2 | B  G DE A      & GE E A      E | 5/3/2019 | |
| 0-3 | B  G DE A   ,  C ED   E, &   E | 5/3/2019 | |
| 0-4 | B   G   E | 5/3/2019 | |
| 0-5 | B   G   E | 5/3/2019 | |
| 1-0 | B  G BA E E   ,   DE G       D,&  A E         A     A | 5/3/2019 | |
| 1-1 | B  G 1   F      A | 5/3/2019 | |
| 1-2 | B  G 2 D F       A | 5/3/2019 | |
| 1-3 | B  G 3 D F       A | 5/3/2019 | |
| 1-4 | B  G 4   F       A | 5/3/2019 | |
| 1-5 | B  G 5   F       A | 5/3/2019 | |
| 1-6 | B  G 6   F       A | 5/3/2019 | |
| 1-7 | | 5/3/2019 | |
| 2-1.0 | B  G GA  1   F       A | 5/3/2019 | |
| 2-1.1 | B  G GA  1   F     A  A  E   A  E | 5/3/2019 | |
| 2-2 | B  G GA  2 D F       A | 5/3/2019 | |
| 2-3 | B  G GA  3 D F       A | 5/3/2019 | |
| 2-4 | B  G GA  4   F       A | 5/3/2019 | |
| 2-5 | B  G GA  5   F       A | 5/3/2019 | |
| 2-6 | B  G GA  6   F       A | 5/3/2019 | |
| 2-7 | B  G GA       F  A | 5/3/2019 | |
| 3-1 | B   G      A            A        D | 5/3/2019 | |
| 3-2 | B   G      A          E    G       B      A | 5/3/2019 | |
| 3-3 | B   G      A     B       B    E | 5/3/2019 | |
| 3-4 | B   G      A     B  F | 5/3/2019 | |
| 3-5 | B   G      A     B   + D        C    D | 5/3/2019 | |
| 3-6 | B   G      A     B   + D   E      G       B      A | 5/3/2019 | |
| 3-7 | B   G      A     B       B   D | 5/3/2019 | |
| 3-8 | B   G      A     B       E, G,  , | 5/3/2019 | |
| 4-1 | B  G GA     A E    EA E   E   2 D F      A | 5/3/2019 | |
| 4-2 | B  G GA     A E    EA E   E   3 D F      A | 5/3/2019 | |
| 4-3 | B  G GA     A E    EA E   E   4   F      A | 5/3/2019 | |
| 4-4 | B  G GA     A E    EA E   E   5   F      A | 5/3/2019 | |
| 4-5 | B  G GA     A E    EA E   E   6   F      A | 5/3/2019 | |
| 4-6 | B  G GA     A E    EA E   E       F  A | 5/3/2019 | |
| | | | |
| | | | |
| 0-0 | EC  A  CA  EGE D,   B    & GE E A      E | 5/3/2019 | |
| 0-1 | EC  A  CA   C ED   E | 5/3/2019 | |
| 0-1A | EC  A  CA   C ED   E  A   E   A E | 5/3/2019 | |
| 1-1 | EC  A  CA  F     F | 5/3/2019 | |
| 1-2 | EC  A  CA   EC   D F       A | 5/3/2019 | |
| 1-3 | EC  A  CA       D F       A | 5/3/2019 | |
| 1-4 | EC  A  CA  F       F       A | 5/3/2019 | |
| 1-5 | EC  A  CA  F F   F       A | 5/3/2019 | |
| 1-6 | EC  A  CA         F | 5/3/2019 | |
| 1-6A | EC  A  CA         F       A  A  E   A E | 5/3/2019 | |
| 1-7 | EC  A  CA       F  A | 5/3/2019 | |
| 1-7A | EC  A  CA       F  A  A  E   A E | 5/3/2019 | |

D.F. PRAY
GENERAL CONTRACTORS
#: DF-02329 89 B    A  ., A
89 B    A
A    ,    02134

| | | | |
|---|---|---|---|
| 2-1 | EC A CA A A | 5/3/2019 | |
| 2-1A | EC A CA A A | 5/3/2019 | |
| 2-2 | EC A CA A B | 5/3/2019 | |
| 2-3 | EC A CA A B | 5/3/2019 | |
| 2-4 | EC A CA A B | 5/3/2019 | |
| 2-5 | EC A CA A B | 5/3/2019 | |
| 3-0 | EC A CA DE A | 5/3/2019 | |
| 3-1 | EC A CA DE A | 5/3/2019 | |
| 3-1A | EC A CA D A | 5/3/2019 | |
| 3-2 | EC A CA E D AG A | 5/3/2019 | |
| | | | |
| | | | |
| E0-0 | E EC CA EGE D | 5/3/2019 | |
| E0-1 | E EC CA E | 5/3/2019 | |
| E1-1 | E EC CA G D F G G A | 5/3/2019 | |
| E1-2 | E EC CA 2 D F G G A | 5/3/2019 | |
| E1-3 | E EC CA 3 D F G G A | 5/3/2019 | |
| E1-4 | E EC CA 4 F G G A | 5/3/2019 | |
| E1-5 | E EC CA 5 F G G A | 5/3/2019 | |
| E1-6 | E EC CA 6 F G G A | 5/3/2019 | |
| E2-1 | E EC CA G D F E A | 5/3/2019 | |
| E2-2 | E EC CA 2 D F E A | 5/3/2019 | |
| E2-3 | E EC CA 3 D F E A | 5/3/2019 | |
| E2-4 | E EC CA 4 F E A | 5/3/2019 | |
| E2-5 | E EC CA 5 F E A | 5/3/2019 | |
| E2-6 | E EC CA 6 F E A | 5/3/2019 | |
| E2-6A | E EC CA 6 F E A A E A E | 5/3/2019 | |
| E2-7 | E EC CA F E | 5/3/2019 | |
| E2-7.1 | E EC CA F E | 5/3/2019 | |
| E3-1 | E EC CA G D F F E A A A | 5/3/2019 | |
| E3-2 | E EC CA 2 D F F E A A A | 5/3/2019 | |
| E3-3 | E EC CA 3 D F F E A A A | 5/3/2019 | |
| E3-4 | E EC CA 4 F F E A A A | 5/3/2019 | |
| E3-5 | E EC CA 5 F F E A A A | 5/3/2019 | |
| E3-6 | E EC CA 6 F F E A A A | 5/3/2019 | |
| E3-7 | E F A | 5/3/2019 | |
| E4-0 | E EC CA E E D | 5/3/2019 | |
| E4-1 | E EC CA E E-DA A D | 5/3/2019 | |
| E4-2 | E EC CA F E A A D | 5/3/2019 | |
| E5-0 | E EC CA A A , | 5/3/2019 | |
| E5-1 | E EC CA CA A A A G | 5/3/2019 | |
| E5-2 | E EC CA CA A A B A G | 5/3/2019 | |
| E5-3 | E EC CA CA A A B A, B, C, D, E, , | 5/3/2019 | |
| E5-4 | E EC CA CA A A B +D F G, B A, B, D, D, E, F | 5/3/2019 | |
| E5-5 | E EC CA CA A A D, F, B G, B +D C B D G | 5/3/2019 | |
| E5-6 | E EC CA CA A A B B | 5/3/2019 | |
| E6-0 | E EC CA C ED E A | 5/3/2019 | |
| E6-1 | E EC CA C ED E | 5/3/2019 | |
| E6-1A | E EC CA C ED E A A E A E | 5/3/2019 | |
| | | | |
| | | | |
| 0.1 | , A , G D | 5/3/2019 | |
| 0.2 | | 5/3/2019 | |
| 1.1 | F F + BA E E | 5/3/2019 | |
| 1.2 | EC D F A AGE | 5/3/2019 | |
| 1.3 | D F A AGE | 5/3/2019 | |
| 1.4 | F F A AGE | 5/3/2019 | |
| 1.5 | F F F A AGE | 5/3/2019 | |
| 1.6 | F A AGE | 5/3/2019 | |
| 1.7 | F A | 5/3/2019 | |
| 4.1 | E A GED A AGE | 5/3/2019 | |
| 5.1 | DE A | 5/3/2019 | |
| | | | |
| | | | |
| 000110 | C | 6/19/2019 | A #1 |
| 007355 | E A | 5/3/2019 | |
| 011000 | G | 5/3/2019 | |
| 012300 | A | 5/3/2019 | |
| 014320 | C | 5/3/2019 | |
| 014330 | - | 5/3/2019 | |
| 015639 | | 5/3/2019 | |

**D.F. Pray**
GENERAL CONTRACTORS

#: DF-02329 89 B        A ., A
                    89 B
                A      ,      A
                              02134

| Code | | Date | |
|------|---|------|---|
| 016200 | F | 5/3/2019 | |
| 017400 | C | 5/3/2019 | |
| 018110 | D            EED | 5/3/2019 | |
| 018120 | C            A      ( A ) | 5/3/2019 | |
| 018900 | | 5/3/2019 | |
| 023000 | | 5/3/2019 | |
| 033000 | C   - -      C | 5/3/2019 | |
| 033001 | C   - -      C    - | 5/3/2019 | |
| 033055 | C            C      ( ) | 5/3/2019 | |
| 033515 | C      F | 5/3/2019 | |
| 034010 | | 5/3/2019 | |
| 034500 | A            C | 5/3/2019 | |
| 035412 | G      C | 5/3/2019 | |
| 042000 | | 5/3/2019 | |
| 050800 | G            F | 5/3/2019 | |
| 051200 | F | 5/3/2019 | |
| 053000 | D | 5/3/2019 | |
| 054000 | C   -F      F | 5/3/2019 | |
| 055000 | F | 5/3/2019 | |
| 057300 | D | 5/3/2019 | |
| 061000 | C | 5/3/2019 | |
| 061500 | D | 5/3/2019 | |
| 061600 | | 5/3/2019 | |
| 062010 | F      C | 5/3/2019 | |
| 064020 | A | 5/3/2019 | |
| 064200 | | 5/3/2019 | |
| 066400 | F | 5/3/2019 | |
| 070150 | E | 5/3/2019 | |
| 071400 | C   F    -A | 5/3/2019 | |
| 071410 | F    -A | 5/3/2019 | |
| 071610 | C | 5/3/2019 | |
| 071800 | C | 5/3/2019 | |
| 071810 | | 5/3/2019 | |
| 072100 | | 5/3/2019 | |
| 072600 | | 5/3/2019 | |
| 072700 | A   B | 5/3/2019 | |
| 074200 | | 5/3/2019 | |
| 074610 | F   -C | 5/3/2019 | |
| 075400 | | 5/3/2019 | |
| 076200 | F | 5/3/2019 | |
| 077100 | | 5/3/2019 | |
| 077200 | A | 5/3/2019 | |
| 077600 | - | 5/3/2019 | |
| 078100 | A      F | 5/3/2019 | |
| 078410 | F | 5/3/2019 | |
| 078440 | F   - | 5/3/2019 | |
| 079200 | | 5/3/2019 | |
| 079201 | E            - | 5/3/2019 | |
| 079500 | E      C | 5/3/2019 | |
| 081110 | D      F | 5/3/2019 | |
| 081400 | D | 5/3/2019 | |
| 083110 | A     D      F | 5/3/2019 | |
| 083513 | F      D | 5/3/2019 | |
| 084110 | A      -F      E | 5/3/2019 | |
| 085310 | | 5/3/2019 | |
| 085413 | F            D | 5/3/2019 | |
| 086300 | F | 5/3/2019 | |
| 087100 | D | 5/3/2019 | |
| 088000 | G | 5/3/2019 | |
| 089000 | | 5/3/2019 | |
| 092110 | G     B     A | 5/3/2019 | |
| 092120 | G     B     -    A | 5/3/2019 | |
| 093000 | | 5/3/2019 | |
| 095100 | A      C | 5/3/2019 | |
| 96110 | A | 5/3/2019 | |
| 096510 | F      A | 5/3/2019 | |
| 096810 | C | 5/3/2019 | |
| 097200 | C | 5/3/2019 | |
| 098120 | A | 5/3/2019 | |
| 099000 | C | 5/3/2019 | |
| 101400 | | 5/3/2019 | |
| 102600 | D | 5/3/2019 | |
| 102800 | A | 5/3/2019 | |
| 104400 | F | 5/3/2019 | |

D.F. PRAY
G E N E R A L   C O N T R A C T O R S

#: DF-02329 89 B      A   ., A
89 B        A
A      ,        02134

| Code | Content | Date | Extra |
|---|---|---|---|
| 105500 | | 5/3/2019 | |
| 107343 | | 5/3/2019 | |
| 113100 | A | 5/3/2019 | |
| 118220 | C | 5/3/2019 | |
| 122110 | B | 5/3/2019 | |
| 122400 | | 5/3/2019 | |
| 123570 | C | 5/3/2019 | |
| 123640 | C | 5/3/2019 | |
| 124810 | E    F         F | 5/3/2019 | |
| 129300 | F | 5/3/2019 | |
| 142100 | E         E | 5/3/2019 | |
| 149100 | F    C | 5/3/2019 | |
| 21 00 01 | F | 5/3/2019 | F 05-03-19 |
| 210000 | F | 5/3/2019 | |
| 210002 | C       F | 5/3/2019 | |
| 220000 | | 5/3/2019 | |
| 220002 | C     - | 5/3/2019 | |
| 230000 | ,         A  -C | 5/3/2019 | |
| 230002 | C     -  AC | 5/3/2019 | |
| 260000 | E | 5/3/2019 | |
| 260002 | C     - E | 5/3/2019 | |
| 260540 | E     (    ) | 5/3/2019 | |
| 270000 | C | 5/3/2019 | |
| 270526 | G       B       C | 5/3/2019 | |
| 270528 | C | 5/3/2019 | |
| 270529 | C | 5/3/2019 | |
| 270553 | C | 5/3/2019 | |
| 270800 | C       C | 5/3/2019 | |
| 271100 | C       E         F | 5/3/2019 | |
| 271113 | C       E | 5/3/2019 | |
| 271116 | C       C     ,     ,F   ,   E | 5/3/2019 | |
| 271119 | C         B | 5/3/2019 | |
| 271323 | C       F    B    C | 5/3/2019 | |
| 271513 | C     C       C | 5/3/2019 | |
| 271533 | C     C       C | 5/3/2019 | |
| 271543 | C     F     C | 5/3/2019 | |
| 275123 | | 5/3/2019 | |
| 280000 | | 5/3/2019 | |
| 311000 | C | 5/3/2019 | |
| 312000 | E | 6/19/2019 | A   #1 |
| 312001 | | 6/19/2019 | A   #1 |
| 312323.43 | G       F | 5/3/2019 | |
| 312500 | E         C | 5/3/2019 | |
| 316300 | D    - | 6/19/2019 | A   #1 |
| 316600 | A | 6/19/2019 | A   #1 |
| 316614 | D | 6/19/2019 | A   #1 |
| 321100 | B     (      ) | 5/3/2019 | |
| 321216 | A | 5/3/2019 | |
| 321413 | C | 5/3/2019 | |
| 321445 | D | 5/3/2019 | |
| 321544 | G | 5/3/2019 | |
| 321610 | C | 5/3/2019 | |
| 321723 | | 5/3/2019 | |
| 329300 | | 5/3/2019 | |
| 331000 | | 5/3/2019 | |
| 333900 | | 5/3/2019 | |
| 334000 | D | 5/3/2019 | |
| 334020 | | 5/3/2019 | |



# Office of Boston Residents Jobs Policy

**43 Hawkins Street**
**Boston, Massachusetts 02114**
**(617) 918-5460**
**Fax (617) 918-5474**
**www.cityofboston.gov/brjp**

**Martin J. Walsh**
**Mayor**

**Karilyn Crockett**          **Christopher L. Brown**
**Director**                        **Manager**

# BOSTON RESIDENTS JOBS POLICY
## HISTORY AND EMPLOYMENT STANDARDS

It is the policy of the City of Boston to comply with all laws and regulations concerning the hiring of workers in the construction process regarding federally assisted, city sponsored, and privately funded developments within the City limits.

The purpose of this document is to provide compliance information to developers and contractors so that they may more easily achieve compliance regarding the Boston Construction Employment Standards.

## HISTORY

Chapter 30 of the Ordinance of l983 established the Boston Residents Jobs Policy.

The Mayor's Executive Order of July l2, l985, entitled The Executive Order Extending the Boston Residents Jobs Policy, requires the Developer to prepare, and submit, and the authority to approve, a construction employment plan.

The Boston Employment Commission has been established by an ordinance passed by City Council on July 30, l986 and signed by the Mayor of the City of Boston.  The Commission was created for the purpose of ensuring that findings may be determined with respect to compliance of the Boston Residents Jobs Policy in a manner that is comprehensive, consistent, and fair for all parties involved.

## EMPLOYMENT STANDARDS

The Boston Residents Construction Employment Standards as set forth in the Mayor's Executive Order of July, l985 entitled The Executive Order Extending the Boston Residents Jobs Policy, attached hereto as Exhibit A and adopted by the Boston Redevelopment Authority on July 26, l985.  Specifically, the Executive Order requires that the Developer's Construction Employment Plan shall ensure that on a craft by craft basis for construction employment for the Project, the following Boston Residents Construction Employment Standards are met:

(l)  at least fifty (50) percent of the total employee worker hours in each trade shall be by bona-fide Boston Residents.
(2)  at least twenty-five (25) percent of the total employee worker hours in each trade shall be by minorities; and
(3)  at least ten (l0) percent of the total employee worker hours in each trade shall be by women.

For the purpose of this Plan, employees shall include persons filling apprenticeship and on-the-job training positions.

■ **The Preconstruction Package and the Electronic Weekly Utilization Report can be downloaded from the BRJP website (http://www.cityofboston.gov/brjp) by clicking on Permits & Applications.**

Revised September 2015

**EXCERPT FROM THE BOSTON RESIDENTS JOBS POLICY**
**BOSTON EMPLOYMENT COMMISSION ORDINANCE**


**BEST FAITH EFFORTS**


Developers and Contractors may rely on traditional referral methods in the hiring of journeymen, apprentices, advanced trainees and helpers. Developers and contractors also shall implement affirmative action steps, which include the following to the extent that such steps do not conflict with any collective bargaining agreement:

## CONTRACTOR'S BEST EFFORTS

l.   The contractor shall designate and shall require each subcontractor to designate an individual to serve as a compliance officer for the purpose of pursuing the Boston Residents Construction Employment Standards.

2.   Prior to the start of construction, the contractor and each subcontractor then selected shall meet with appropriate representatives of the construction trade unions, representatives from the Boston Residents Jobs Policy Office, and the awarding or contracting authority for the purpose of reviewing the Standards and the estimated employment requirements for construction activity over the construction period of the Covered Project.

3.   Whenever any person involved in the construction of a Covered Project makes a request to a union hiring hall, business agent or contractor's association for qualified workers, the requestor shall ask that those qualified applicants referred for construction positions be referred in the proportions specified in the Boston Residents Construction Employment Standards and shall, further, contain a recitation of such Standards. However, if the requesting party's workforce composition at any time falls short of any one or more of the proportions specified in the Standards, the requesting party shall adjust his or her request so as to seek to more fully achieve the proportions as specified in the Standards. If the union hall, business agent or contractor's association to whom a request for qualified employees has been made, fails to fully comply with such a request, the requesting party's compliance officer shall seek written confirmation that there are insufficient employees in the categories specified in the request and that such insufficiency is documented on the unemployment list maintained by the hall, agent or association. Copies of any confirmation so obtained shall be forwarded to the Commission. Copies of any requests for qualified employees made at the time that the requesting party's workforce composition falls short of any one or more of such Standards shall be forwarded contemporaneously to the Boston Residents Jobs Policy Office.

Revised September 2015

## BEST EFFORTS (continued)

4. All persons applying directly to the Contractor or any subcontractor for employment in construction of a Covered Project who are not employed by the party to whom application is made shall be referred by said party to the Boston Residents Jobs Policy Office, and a written record of such a referral shall be made by said party, a copy of which shall be sent to said Compliance and Enforcement Division.

5. Contractors shall maintain a current file of the names, addresses, and telephone numbers of each Boston Resident, Minority and Woman who has sought employment with respect to a Covered Project, or who was referred to the contractor by the Boston Residents Jobs Policy Office, but was not hired. The contractor shall maintain a record of the reason any such person was not hired. (Amendment inclusion 9/26/86) If the construction of a Covered Project is subject to any union collective bargaining agreements, it shall be required that the employee complies with any lawful union security clauses contained in such agreement. (Amendment inclusion 9/26/86 ends)

6. The contractor shall in a timely manner complete and submit to the Commission a projection of the workforce needs over the course of construction of the Covered Project. Such a submission shall reflect the needs by trade for each month of the construction process.

7. The contractor shall obtain from each worker employed in the construction of the Covered Project, a sworn statement containing the worker's name and place of residence.

8. One week following the commencement of construction of the project, and each week thereafter until such work is completed, the contractor shall complete and submit to the Boston Residents Jobs Policy Office for the week just ended a report which reflects (a) for each employee, the employee's name, place of residence, race, gender, trade and total number of worker hours he or she worked, and (b) the total worker hours of its total workforce.

9. The contractor and each subcontractor shall maintain records reasonably necessary to ascertain compliance with the steps detailed in clauses (l) through (8) hereof for at least one year after the issuance of a Certificate of Occupancy for the Covered Project. In its review of records of a construction project submitted to demonstrate compliance with these steps, the Commission shall take into consideration any affirmative action outreach programs and affirmative action job training programs of the particular trades participating in the Covered Project.

Revised September 2015

**BEST EFFORTS (continued)**

## DEVELOPER'S BEST EFFORTS

l.   Developers of the Covered Project shall incorporate in every general construction contract or construction management agreement an enumeration of the Standards and shall impose a responsibility upon any such general contractor or construction management to take all steps enumerated in clauses (l) through (9), and to incorporate such Standards in all subcontracts and impose upon all subcontractors the obligation to take such steps.

2.   The developer shall meet with the contractor no less frequently than weekly throughout the period of construction of the Covered Project to review the contractor's compliance with such Standards and steps. The developer shall maintain minutes of such meetings and shall forward a copy of such minutes to the Boston Residents Jobs Policy Office within ten (l0) days of such meeting.

3.   The developer shall comply with the escrow deposits as requirements of the Boston Employment Commission.

Revised September 2015

**SAMPLE LETTER INFORMING NEW SUBCONTRACTORS OF BOSTON RESIDENTS JOBS POLICY OBLIGATIONS**

Dear:

All subcontractors performing work on the above referenced project must follow the following procedures and guidelines.  This project is subject to the Boston Residents Jobs Policy, and will be monitored by the Boston Residents Jobs Policy Office and by this office to ensure that employment of 50% Boston residents, 25% minorities and l0% females is achieved and maintained.

1. Submit a letter to the union explaining that this project is subject to the Boston Residents Jobs Policy, which requires that employment of 50% Boston residents, 25% minorities and l0% females must be achieved on a weekly basis until completion of your contract with this company.

2. As your company gets ready to hire workers from the local union, keep in mind that all requests made by your job representative in your office must be done in writing.  All requests <u>must</u> include:

   The name of the representative making such request, name of persons s/he contacted at the union hall, date of contact and action taken by union representative.

3. A meeting is to take place with union business agents before your company starts any type of work on this project.

4. Records must be kept by your office for all walk-in applicants.  Records should include the name, address, and telephone number of the applicant, the position for which the applicant applied, whether the applicant is a resident, minority or female, and action taken by your office.  The result & action for all applicants must be documented.

5. A meeting will be called by the General Contractor and the Boston Residents Jobs Policy Office to discuss what other steps will be taken to help your office comply with these requirements.

Implementation of the above guidelines will help to make this project a success.

Sincerely,

cc:  Boston Residents Jobs Policy Office

Revised September 2015



# OFFICE OF BOSTON RESIDENTS JOBS POLICY
## EMPLOYMENT PLAN
## QUARTERLY WORK FORCE PROJECTION TABLE

| PROJECT: | | | |
|---|---|---|---|
| CONTRACTOR: | ADDRESS: | | |
| CONTACT: | PHONE NUMBER: | | |
| QUARTER START DATE: | QUARTER END DATE: | | |
| MONTH | | | |
| TRADE: | | | |
|   TOTAL EMPLOYEES | | | |
|   RESIDENT EMPLOYEES | | | |
|   MINORITY EMPLOYEES | | | |
|   FEMALE EMPLOYEES | | | |
| TRADE: | | | |
|   TOTAL EMPLOYEES | | | |
|   RESIDENT EMPLOYEES | | | |
|   MINORITY EMPLOYEES | | | |
|   FEMALE EMPLOYEES | | | |
| TRADE: | | | |
|   TOTAL EMPLOYEES | | | |
|   RESIDENT EMPLOYEES | | | |
|   MINORITY EMPLOYEES | | | |
|   FEMALE EMPLOYEES | | | |
| TRADE: | | | |
|   TOTAL EMPLOYEES | | | |
|   RESIDENT EMPLOYEES | | | |
|   MINORITY EMPLOYEES | | | |
|   FEMALE EMPLOYEES | | | |
| TRADE: | | | |
|   TOTAL EMPLOYEES | | | |
|   RESIDENT EMPLOYEES | | | |
|   MINORITY EMPLOYEES | | | |
|   FEMALE EMPLOYEES | | | |

COMPANY OFFICIAL'S SIGNATURE: _____ DATE: _____

Revised September 2015



# OFFICE OF BOSTON RESIDENTS JOBS POLICY
## BOSTON RESIDENT VERIFICATION FORM

This form **must be** submitted to verify the address of all Boston resident employees and to report the change of address for any Boston resident employee while working on this project.

Check if reporting an address change. ☐        Date moved: _____

Project Name: _____

Contractor Name: _____

Employee Name: _____    **SSN# (last 4 digits only)** _____

Address: _____

Race: _____    Sex: _____

**(A P.O. Box is not an acceptable address.)**

City: _____

State & Zip: _____

Phone: _____

**Race Codes**
**A.**  Asian
**B.**  Black
**C.**  Caucasian
**H.**  Hispanic
**O.**  Other
   ☐ Native American/
      Alaskan Native
   ☐ Cape Verdean

Date Arrived on Job Site: _____    **Trade:** _____

**Check if Applicable:**   ☐Non-union   ☐Union (Local)        ☐New Hire   ☐Transfer

❖ **I hereby state under the pains and penalties of perjury that the foregoing information is true.**

Signature of Employee: _____    Date: _____

**PLEASE ATTACH A PHOTOCOPY OF ONE OF THE BELOW DOCUMENTS AS PROOF OF RESIDENCY.**
**(The BRJP Office will only except the documents listed below to verify residency!)**

_____ Driver's License (Current address must be listed on front of the License)

_____ Massachusetts Identification Card (current)

_____ RMV Certificate of Registration (current)

_____ Utility Bill (Bill must be less than 6 months old)

(Accept only: gas, electric, cable and phone (land line only) bills. Submit the Entire bill, which states employee's name, address and bill date.)

Signature of Contractor

or Subcontractor: _____    Date: _____

Revised September 2015

## RACE AND ETHNIC STANDARDS

**C) <u>CAUCASIAN</u>:** A person having origins in any of the original peoples of Europe, North Africa, or the Middle East.

**B) <u>BLACK</u>:** A person having origins in any of the black racial groups of Africa.

**H) <u>HISPANIC</u>:** A person of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish/ Indian cultural origins. (This category is not to include people of European or Arabic ancestry.)

**A) <u>ASIAN OR PACIFIC ISLANDERS</u>:** A person having origins in any of the original peoples of the Far East, Southeastern Asia, the Indian Subcontinent, or the Pacific Islands. This area includes China, Japan, Korea, the Philippine Islands, Samoa, India, Pakistan, Bangladesh, Sri Lanka, Nepal, Sikhism, and Shulan.

**O) <u>NATIVE AMERICAN OR ALASKAN NATIVE</u>:** A person having origins in any of the original peoples of North America, and who maintain cultural identification through tribal affiliation or community recognition.

**O) <u>CAPE VERDEAN</u>:** A person having origins in any of the original peoples of the Cape Verde Islands.

**NOTE:** Ethnic classifications are based on section one, (11) of the 1986 Ordinance establishing the Boston Residents Jobs Policy as defined by the U.S. Bureau of the Census and promulgated by the Federal Office of Management and Budget.

## AREAS THAT COMPRISE THE CITY OF BOSTON

| | | |
|---|---|---|
| **Allston** | | **Brighton** |
| **Charlestown** | | **Chinatown** |
| **Dorchester** | | **East Boston** |
| **Fenway/Kenmore** | | **Hyde Park** |
| **Jamaica Plain** | | **Mattapan** |
| **Mission Hill/Longwood** | | **North End** |
| **Readville** | | **Roslindale** |
| **Roxbury** | | **South Boston** |
| **South End** | | **West Roxbury** |



Revised September 2015



# OFFICE OF BOSTON RESIDENTS JOBS POLICY
## WORK FORCE REQUEST DOCUMENTATION

### PROJECT: _____

**Please email this form to the BRJP Monitor when requests for new employees are made.**

| FROM: |
|---|

| DATE REQUESTED: | DATE REQUIRED: |
|---|---|

| LOCAL #: |
|---|

| **REQUEST MADE TO**: |
|---|

| NAME: |
|---|

**I.  REQUEST (S) MADE TO UNION:**
**TRADE**:

| TOTAL | RESIDENT | MINORITY | FEMALE |
|---|---|---|---|
| | | | |

**TRADE:**

| TOTAL | RESIDENT | MINORITY | FEMALE |
|---|---|---|---|
| | | | |

| **REQUEST MADE BY**: |
|---|

| NAME: |
|---|

**II.  ACTUAL EMPLOYEE (S) SENT BY UNION**:
**TRADE:**

| TOTAL | RESIDENT | MINORITY | FEMALE |
|---|---|---|---|
| | | | |

**TRADE:**

| TOTAL | RESIDENT | MINORITY | FEMALE |
|---|---|---|---|
| | | | |

| COMMENTS: |
|---|
| |
| |
| |

**When requesting workers, this form should be used for all telephone calls made to your local union representative or contractor's association.  Please have your union or contractor's association follow-up in writing with your request.  Email a copy of this form and the letter to the general contractor and the BRJP Monitor, within 7 working days.  Workforce request documentation Forms without a follow-up letter will <u>not</u> be considered as a "Best Faith Effort".**

Revised September 2015



# OFFICE OF BOSTON RESIDENTS JOBS POLICY
## APPLICANT DISPOSITION FORM

| DATE: | PROJECT NAME: | CONTRACTOR: |
|---|---|---|

| APPLICANT NAME: | ☐ BOSTON RESIDENT  ☐ MINORITY  ☐ FEMALE (Please check all that apply to you.) |
|---|---|

STREET ADDRESS:

CITY(Neighborhood)/STATE/ZIP:

TELEPHONE NUMBER:

EMAIL ADDRESS: (Email will be used to provide construction related information.)

POSITION APPLIED FOR:

☐ NON-UNION  ☐ UNION NAME: _____ LOCAL: #_____
O.S.H.A. TRAINING? (SPECIFY): _____

LIST ALL TRADES EXPERIENCED IN:

RECRUITMENT SOURCE (PLEASE SPECIFY):

RESULTS: (Please check all that apply.)

☐ HIRED

☐ NOT HIRED     REASON: _____

☐ REFERRED TO UNION: RESULT: _____

☐ REFERRED TO SUBCONTRACTOR  ☐ HIRED  ☐ NOT HIRED

   REASON NOT HIRED: _____

**ALL REFERRALS REQUIRE A FOLLOW-UP PHONE CALL EITHER TO THE LOCAL UNION, THE BOSTON RESIDENTS JOBS POLICY OFFICE AND/OR SUBCONTRACTOR TO WHOM THE REFERRAL WAS MADE TO:**

CONTACT PERSON: _____

FOLLOW-UP RESULTS: _____

_____

Revised September 2015

# CONTRACTOR GUIDELINES

## EMPLOYMENT PLAN/ QUARTERLY WORKFORCE PROJECTION

- Due two weeks prior to the start of the quarter. The quarters are as follows - 1st quarter (July, August, & September), 2nd quarter (October, November & December), 3rd quarter (January, February, & March) and 4th quarter (April, May, & June).

- For each month during the quarter, estimate the total number of workers that will be employed on site for each trade. Give a breakdown of how many workers will be residents, minorities and females.

## BOSTON RESIDENT VERIFICATION FORM

- Submit this form the first time a Boston Resident employee is reported on the payroll report. Attach a copy Of one of the following to verify Boston Residency: MASS Driver's License, RMV Certificate of Registration, MASS ID or a current utility bill. Keep-in-mind that you are verifying address stated on the payroll report.

- All documentation must be legible!

- A **P.O. Box is not an acceptable address** for a Boston Resident worker.

- Verification Form must be signed by both the Boston Resident worker and the Contractor.

- Use this form to report a change of address. Check the box, if reporting a change of address and indicate the date moved. Attach acceptable proof for a Boston address and forward documentation to general contractor with the Weekly Utilization Report.

- The following is **not** acceptable to verify a Boston Resident: expired driver's license, a temporary driver's license, a driver's license with a change of address sticker on the back, W-4 forms, I-9 forms, W-2 forms, passports, rent receipts, leases , cell phone bills water bills, notarized letters, bank statements, union cards, excise tax bills and change of address applications.

- In cases of conflicting documentation submitted to verify a worker's Boston address. The BRJP Office reserves the right to ask for additional documentation.

## WORKFORCE REQUEST FORMS

- The Work Force Request Documentation Form must be completed each time a contractor request workers through its union.

- It is important that section 2 (Actual Employees sent by the union) is completed.

- Provide support documentation from the union, if they are unable to meet your request for resident, minority and/or female workers.

- Emailed the Work Force Request Documentation Form along with support documentation to the general contractor and the assigned BRJP Monitor.

Revised September 2015

## APPLICANT DISPOSITION FORM

- Form should be completed by all individuals who apply for work at the job site. Individuals must provide their entire address and contact information. Information from this form will be entered into the data sheet for Walk-On Applicants.

- Applicants should be referred to subcontractors, the union and/or the BRJP Jobs Bank.

- The general contractor **must** follow-up with the referrals, complete the results section of the form and forward it to the Boston Residents Jobs Policy Office as required.

## ELECTRONIC WEEKLY UTILIZATION REPORT

**The required submission time for the weekly payroll is 7 working days from the week end date.**

The Payroll Format was designed specifically for the BRJP Database. **Do not change the format of the electronic Payroll Spreadsheet!!**

**Contractors will need the BRJP Project ID# (P), and their BRJP Contractor ID# (C) to complete the Payroll Spreadsheet.** The BRJP Office will provide this information to the General Contractor. Subcontractor ID#'s will be given to the General Contractor. In the event a subcontractor cannot get this information from the General Contractor, they can call the BRJP Office.

The file name for each Payroll Spreadsheet **must** be in the following format **(which consist of the BRJP Project ID# (P), the BRJP Contractor ID# (C) and the week ending payroll date (D))** **P1234C99D081709.XLS.** You will receive your BRJP Project ID# and the contractor ID# from the assigned BRJP Monitor and/or the general contractor.

## EMPLOYEE DATA INSTRUCTIONS

1. The week ending date must be in the two digit format with slashes (i.e.12/01/09).
2. Only provide the last 4 digits of workers SSN#.
3. For workers who work overtime, enter standard time and overtime hours separately.
4. The columns highlighted in green have a drop-down menu, select correct information for worker.
5. **We do not accept P.O. Box addresses for workers reported as Boston Residents.**
6. In the City column, if a worker is a Boston Resident, you must input the specific Boston Neighborhood.
7. The Minority and Resident column requires a Y or N response.
8. Gender column requires F (female) or M (Male) response.
9. **In the Race Code column, "other" refers to workers who are Native American/Alaskan Native or Cape Verdean.**
10. In the Neighborhood drop-down menu select "non-Boston" for workers who are not Boston Residents.
11. For an employee who did not perform work, leave the work hours and the hourly wage columns blank or enter a zero.
12. Only 1 week of payroll information should be reported on each Electronic Payroll Spreadsheet.

Revised September 2015

13. Omit the following individuals from the payroll, supervisory personnel including all non-working foremen, administrative staff, truck drivers, surveyors, field engineers and employees that work within the company's shop.
14. All columns must be in TEXT format.
15. Do not hide any columns or rows.
16. Keep all the information left justified.
17. A typed name is acceptable as an electronic signature.
18. Problem Payrolls will be returned to the general contractor to be amended and must be re-submitted in a timely manner.
19. Contractors who do not have the ability to complete/submit the Electronic Payroll Spreadsheet must contact the assigned BRJP Monitor and a decision will be made on how to proceed.

## **FEDERAL PREVAILING WAGE PROJECTS – Blue Section**

The Fringe Benefit Section (located on the Signature sheet) must be filled out for all Federal Prevailing Wage Projects. Check 4A or 4B in regards to Fringe Benefits Status.

Each column of the Electronic Payroll Spreadsheet must be filled out completely for each employee that worked during a pay period.

Total = FICA + Fed Taxes Withheld + State Taxes Withheld + Union Dues
Net Wages= Gross Earnings - Total

Confirm apprentice status by entering **Y** (Yes) or **N** (No).  A copy of an Apprentice Certificate must be submitted to the assigned BRJP Monitor for all workers identified as an apprentice.

If an employee worked overtime on a project you must enter his standard time and overtime work hours separately.  Enter the standard work hours first, showing the regular hourly wage, gross earning, FICA, etc. Enter overtime work hours on next row with the correct hourly wage, gross earning, FICA, etc.

The **owner** of a company who performs work on a project must report his/her work hours and should enter **999** in the hourly wage column of the spreadsheet.

### E-MAIL INSTRUCTIONS

1. Completed Weekly Payrolls must be emailed to the assigned MIS person and to the assigned BRJP Monitor.  Project Specific email instructions will be provided at the preconstruction meeting.
2. Reminder – Completed Payroll Spreadsheets must be returned in **Excel 97-2003** and the File name must be in this format **P1234C99D081709.XLS**, so that the payroll can be uploaded successfully.
3. If your company did not work during a week ending period, simply email a blank Payroll Spreadsheet stating, "No Work".
4. **Contractor must clearly identify all "revised payrolls" and state what was revised.**



# BRJP Electronic Spreadsheet

**BRJP Electronic Spreadsheet**
**(in two parts)**

Boston Residents Jobs Policy Office

Revised September 2015

## WEEKLY WORKFORCE TOTALS AND FRINGE BENEFIT SECTION

| NUMBER OF Workers | TOTAL WORK HOURS | TOTAL WORK HOURS FOR RES./MIN./FEM. | | | TOTAL PERCENTAGES FOR RES./MIN./FEM. | | |
|---|---|---|---|---|---|---|---|
| | | RESIDENT | MINORITY | FEMALE | RES. % | MIN. % | FEM.% |
| #REF! | #REF! | #REF! | #REF! | #REF! | #REF! | #REF! | #REF! |

Date: _____

I, _____
(NAME OF SIGNATORY PARTY)

_____
(CONTRACTOR OR SUBCONTRACTOR)

do hereby state:

(1) That I pay or supervise the payment of the persons employed by

_____
(TITLE)

_____ on the _____
(CONTRACTOR OR SUBCONTRACTOR)                        (BUILDING OR WORK)

; that during the payroll period commencing on the _____ day of _____, 20____, and ending the _____ day of _____, 20____,

all persons employed on said project have been paid the full weekly wages earned, that no rebates have been or will be made either directly or indirectly to or on behalf of said _____ from the full

weekly wages earned by any person and that no deductions have been made either directly or indirectly from the full wages earned by any person, other than permissible deductions as defined in Regulations, Part 3 (CFR Subtitle A), issued by the Secretary of Labor under the Copeland Act, as amended (48 Stat. 948; 63 Stat. 108; 72 Stat. 967; 76 Stat. 357; 40 U.S.C. 276c), and described below.

(2) That any payroll otherwise under this contract required to be submitted for the above period are correct and complete; that the wage rates for laborers and mechanics contained therein are not less than the applicable wage rates contained in any wage determination incorporated into the contract; that the classifications set forth therein for each laborer or mechanic conform with the work he performed.

(3) That any apprentices employed in the above period are duly registered in a bona fide apprenticeship program registered with a State apprenticeship agency recognized by the Bureau of Apprenticeship and Training, United States Department of Labor, or if no such recognized agency exists in a State, are registered with the Bureau of apprenticeship and Training, United States Department of Labor.

(4) That
(a) WHERE FRINGE BENEFITS ARE PAID TO APPROVED PLANS, FUNDS OR PROGRAMS
In addition to the basic hourly wage rates paid to each laborer or mechanic listed in the above referenced payroll, payments of fringe benefits as listed in

the contract have been or will be made to appropriate programs for the benefit of such employees, except as noted in Section 4(c) below.

(b) WHERE FRINGE BENEFITS ARE PAID IN CASH
Each laborer or mechanic listed in the above referenced payroll has been paid, as indicated on the payroll, an amount not less than the sum of the applicable basic hourly wage rate plus the amount of the required fringe benefits as listed in the contract, except as noted in Section 4 (c) below.

(c) EXCEPTIONS (In this section, state other deductions, for example, Child Support, Wage Garnishments and Bank Deductions, etc.)

| EXCEPTION (CRAFT) | EXPLANATION |
|---|---|
| | |
| | |
| | |
| | |

REMARKS

| NAME AND TITLE | SIGNATURE |
|---|---|
| | |

THE WILLFUL FALSIFICATION OF ANY OF THE ABOVE STATEMENTS MAY SUBJECT THE CONTRACTOR OR SUBCONTRACTOR TO CIVIL OR CRIMINAL PROSECUTION. SEE SECTION 1001 OF TITLE 18 AND SECTION 231 OF TITLE 31 OF THE UNITED STATES CODE

Revised September 2015

## 89 Brighton Ave - Boston
## Project Schedule

| ID | Task Name | Duration | Start | Finish | Predecessors | Successors |
|----|-----------|----------|-------|--------|--------------|------------|
| 1 | | | | | | |
| 2 | **Notice to Proceed** | 1 day | Mon 11/4/19 | Mon 11/4/19 | | 3FS+5 days,4 |
| 3 | Temp CMP measures, fencing, new pedestrian access | 5 days | Mon 11/12/19 | Mon 11/18/19 | 2FS+5 days | 6 |
| 4 | cut and cap activities | 10 days | Tue 11/5/19 | Mon 11/18/19 | 2 | |
| 5 | Abatement | 10 days | Tue 11/5/19 | Mon 11/18/19 | 54SS | |
| 6 | Demolition | 30 days | Tue 11/19/19 | Mon 12/30/19 | 3 | 8 |
| 7 | **Sitework** | 18 days | Tue 12/31/19 | Thu 1/23/20 | | |
| 8 | Demo Support Excavation | 3 days | Tue 12/31/19 | Thu 1/2/20 | 6 | 9 |
| 9 | Mass excavation for Foundation and pits | 10 days | Fri 1/3/20 | Thu 1/16/20 | 8 | 12,10 |
| 10 | Site Cuts / build ramp for piles | 5 days | Fri 1/17/20 | Thu 1/23/20 | 9 | 16 |
| 11 | **Foundations** | 363 days | Fri 1/17/20 | Tue 6/8/21 | | |
| 12 | piles | 15 days | Fri 1/17/20 | Thu 2/6/20 | 9 | 13,15SS |
| 13 | Form and Pour Pile caps and beams | 10 days | Fri 2/7/20 | Thu 2/20/20 | 12 | 14 |
| 14 | Elevator pits | 5 days | Fri 2/21/20 | Thu 2/27/20 | 13 | |
| 15 | Form and pour foundation footings / walls | 20 days | Fri 1/17/20 | Thu 2/13/20 | 12SS | 17 |
| 16 | subslab pipe vent system | 7 days | Fri 1/24/20 | Mon 2/3/20 | 10 | 17 |
| 17 | Undeslab Elec / Plumbing | 5 days | Tue 2/4/20 | Mon. 2/10/20 | 16 | 18,19 |
| 18 | Place stone/grade prep for slab | 3 days | Tue 2/11/20 | Thu 2/13/20 | 17 | 27 |
| 19 | site utilities (Storm, Sanitary, water, electrical | 15 days | Tue 2/11/20 | Mon 3/2/20 | 17 | 20 |
| 20 | perimeter drain pipe | 10 days | Thu 4/16/20 | Wed 4/29/20 | 19 | 21 |
| 21 | Site utility connctions to building | 10 days | Thu 4/30/20 | Wed 5/13/20 | 20 | |
| 22 | site concrete | 10 days | Mon 9/28/20 | Fri 10/9/20 | 54 | |
| 23 | Road base, paving, curbing | 16 days | Mon 9/28/20 | Mon 10/19/20 | 54 | |
| 24 | sidewalks | 26 days | Wed 3/31/21 | Wed 5/5/21 | 72 | 25 |
| 25 | Landscaping, hardscapes, site features | 24 days | Thu 5/6/21 | Tue 6/8/21 | 24 | |
| 26 | **Steel Framing Podium Deck** | 35 days | Fri 2/14/20 | Thu 4/2/20 | | |
| 27 | set columns | 5 days | Fri 2/14/20 | Thu 2/20/20 | 18 | 28 |
| 28 | rough frame | 15 days | Fri 2/21/20 | Thu 3/12/20 | 27 | 29 |
| 29 | connection detail work | 15 days | Fri 3/13/20 | Thu 4/2/20 | 28 | 30SS |
| 30 | install metal deck | 5 days | Fri 3/13/20 | Thu 3/19/20 | 29SS | 31 |
| 31 | place rebar and pour concrete deck | 10 days | Fri 3/20/20 | Thu 4/2/20 | 30 | 38 |
| 32 | **Gypcrete** | 54 days | Fri 11/13/20 | Wed 1/27/21 | | |
| 33 | 6th floor gyprcrete | 3 days | Fri 11/13/20 | Tue 11/17/20 | 112 | |
| 34 | 5th floor Gypcrete | 3 days | Tue 12/8/20 | Thu 12/10/20 | 128 | |
| 35 | 4th floor gyprcrete | 3 days | Thu 12/31/20 | Mon 1/4/21 | 144 | |
| 36 | 3rd floor gyprcrete | 3 days | Mon 1/25/21 | Wed 1/27/21 | 160 | |
| 37 | **CMU** | 50 days | Fri 4/3/20 | Thu 6/11/20 | | |

## D.F. Pray
### GENERAL CONTRACTORS

## 89 Brighton Ave - Boston
## Project Schedule

| ID | Task Name | Duration | Start | Finish | Predeces/Successors |
|----|-----------|----------|-------|--------|---------------------|
| 38 | Elevator shaft / Stair 2 | 18 days | Fri 4/3/20 | Tue 4/28/20 | 31 39FS-4 days |
| 39 | Stair 1 | 13 days | Thu 4/23/20 | Mon 5/11/20 | 38FS-4 d.40FS-5 days,43,42 |
| 40 | Stair 3 | 13 days | Tue 5/5/20 | Thu 5/21/20 | 39FS-5 d.41 |
| 41 | Garage mech / utility rooms | 15 days | Fri 5/22/20 | Thu 6/11/20 | 40 58 |
| 42 | **Structural Wood Framing** | **101 days?** | **Tue 5/12/20** | **Tue 9/29/20** | **39** |
| 43 | Lvl 2 Layout | 2 days | Tue 5/12/20 | Wed 5/13/20 | 39 44 |
| 44 | Lvl 2 Wall Panels | 15 days | Thu 5/14/20 | Wed 6/3/20 | 43 45 |
| 45 | Lvl 3 Floor Trusses & Plywood | 7 days | Thu 6/4/20 | Fri 6/12/20 | 44 46 |
| 46 | Lvl 3 Wall Panels | 12 days | Mon 6/15/20 | Tue 6/30/20 | 45 47 |
| 47 | Lvl 4 Floor Trusses & Plywood | 7 days | Wed 7/1/20 | Thu 7/9/20 | 46 48,56 |
| 48 | Lvl 4 Wall Panels | 12 days | Fri 7/10/20 | Mon 7/27/20 | 47 49 |
| 49 | Lvl 5 Floor Trusses & Plywood | 7 days | Tue 7/28/20 | Wed 8/5/20 | 48 50,86 |
| 50 | Lvl 5 Wall Panels | 12 days | Thu 8/6/20 | Fri 8/21/20 | 49 61,51 |
| 51 | Lvl 6 Floor Trusses and Panels | 5 days | Mon 8/24/20 | Fri 8/28/20 | 50 52 |
| 52 | Lvl 6 Wall Panels | 10 days | Mon 8/31/20 | Fri 9/11/20 | 51 54,53 |
| 53 | Lvl 6 low roof framing | 1 day? | Mon 9/14/20 | Mon 9/14/20 | 52 |
| 54 | Roof Trusses & Plywood | 10 days | Mon 9/14/20 | Fri 9/25/20 | 52 55,22,23 |
| 55 | Final Framing Inspection | 2 days | Mon 9/28/20 | Tue 9/29/20 | 54 62 |
| 56 | Wood Stairs | 55 days | Fri 7/10/20 | Thu 9/24/20 | 47 |
| 57 | **Fireproof Steel** | **38 days** | **Fri 6/12/20** | **Tue 8/4/20** | |
| 58 | columns, beams, 3 hour coat | 18 days | Fri 6/12/20 | Tue 7/7/20 | 59 |
| 59 | Underdeck monokote insulation | 20 days | Wed 7/8/20 | Tue 8/4/20 | 58 |
| 60 | **Exterior Envelope** | **157 days** | **Mon 8/24/20** | **Tue 3/30/21** | |
| 61 | Exterior Vapor Barrier | 40 days | Mon 8/24/20 | Fri 10/16/20 | 50 63SS+10 days,67SS+15 |
| 62 | Roofing | 15 days | Wed 9/30/20 | Tue 10/20/20 | 55 |
| 63 | Windows | 30 days | Mon 9/7/20 | Fri 10/16/20 | 61SS+10 64SS+5 days,17SS+1( |
| 64 | Exterior Flashings & Trims | 20 days | Mon 9/14/20 | Fri 10/9/20 | 63SS+5 d |
| 65 | Brick / Tile veneer | 50 days | Mon 10/19/2( | Fri 12/25/20 | 61 66SS+20 days,83 |
| 66 | Metal Panels | 70 days | Mon 11/16/2( | Fri 2/19/21 | 65SS+20 68 |
| 67 | Fiber cement | 20 days | Mon 11/9/20 | Fri 12/4/20 | 61FS+15 69,70,71,74SS+15 day |
| 68 | Roof Edge Metal | 10 days | Mon 2/22/21 | Fri 3/5/21 | 66 |
| 69 | Exterior Doors & Storefronts | 10 days | Mon 12/7/20 | Fri 2/18/20 0? | 67 |
| 70 | Exterior Louvers | 15 days | Mon 12/7/20 | Fri 12/25/20 | 67 |
| 71 | Exterior Caulking | 20 days | Mon 12/7/20 | Fri 1/1/21 | 67 |
| 72 | Exterior Paint | 22 days | Mon 3/1/21 | Tue 3/30/21 | 24 |
| 73 | **Bicycle Storage Shed** | **20 days** | **Mon 11/30/2( Fri 12/25/20** | | |
| 74 | Steel framing | 5 days | Mon 11/30/2( Fri 12/4/20 | | 67SS+15 75 |
| 75 | Roof | 5 days | Mon 12/7/20 | Fri 12/11/20 | 74 76 |

## 89 Brighton Ave - Boston
## Project Schedule

| ID | Task Name | Duration | Start | Finish | Predecess|Successors |
|---|---|---|---|---|---|
| 76 | Finish paint | 5 days | Mon 12/14/2( | Fri 12/18/20 | 75 | 77 |
| 77 | Equipment / Racks | 5 days | Mon 12/21/2( | Fri 12/25/20 | 76 | |
| 78 | **Elevators** | **45 days** | **Thu 9/10/20** | **Wed 11/11/2(** | | |
| 79 | Elevator 1 | 30 days | Thu 9/10/20 | Wed 10/21/2( | 87 | 80SS+15 days |
| 80 | Elevator 2 | 30 days | Thu 10/1/20 | Wed 11/11/2( | 79SS+15 | |
| 81 | **Garage Rough** | **89 days** | **Thu 9/24/20** | **Tue 1/26/21** | | |
| 82 | Install MEP equipment in Mech rooms | 30 days | Thu 9/24/20 | Wed 11/4/20 | 92 | 192 |
| 83 | Perimeter rails | 22 days | Mon 12/28/2( | Tue 1/26/21 | 65 | |
| 84 | **Interior Metal Framing & Rough** | **105 days** | **Thu 7/30/20** | **Wed 12/23/2(** | | |
| 85 | **Level 2** | **32 days** | **Thu 8/6/20** | **Fri 9/18/20** | | |
| 86 | Metal Framing & Firetops | 10 days | Thu 8/6/20 | Wed 8/19/20 | 49 | 87,91 |
| 87 | MEP/FP Rough | 15 days | Thu 8/20/20 | Wed 9/9/20 | 86 | 88,79 |
| 88 | MEP/FP Fire Stop | 5 days | Thu 9/10/20 | Wed 9/16/20 | 87 | 89 |
| 89 | Rough Inspections | 2 days | Thu 9/17/20 | Fri 9/18/20 | 88 | |
| 90 | **Level 3** | **32 days** | **Thu 8/20/20** | **Fri 10/2/20** | | |
| 91 | Metal Framing & Firetops | 10 days | Thu 8/20/20 | Wed 9/2/20 | 86 | 92,96 |
| 92 | MEP/FP Rough | 15 days | Thu 9/3/20 | Wed 9/23/20 | 91 | 93,82 |
| 93 | MEP/FP Fire Stop | 5 days | Thu 9/24/20 | Wed 9/30/20 | 92 | 94 |
| 94 | Rough Inspections | 2 days | Thu 10/1/20 | Fri 10/2/20 | 93 | |
| 95 | **Level 4** | **30 days** | **Thu 9/3/20** | **Wed 10/14/2(** | | |
| 96 | Metal Framing & Firetops | 10 days | Thu 9/3/20 | Wed 9/16/20 | 91 | 97,101 |
| 97 | MEP/FP Rough | 15 days | Thu 9/17/20 | Wed 10/7/20 | 96 | 98 |
| 98 | MEP/FP Fire Stop | 2 days | Thu 10/8/20 | Fri 10/9/20 | 97 | 99 |
| 99 | Rough Inspections | 3 days | Mon 10/12/2( | Wed 10/14/2( | 98 | |
| 100 | **Level 5** | **30 days** | **Thu 9/17/20** | **Wed 10/28/2(** | | |
| 101 | Metal Framing & Firetops | 10 days | Thu 9/17/20 | Wed 9/30/20 | 96 | 102,106 |
| 102 | MEP/FP Rough | 15 days | Thu 10/1/20 | Wed 10/21/2( | 101 | 103 |
| 103 | MEP/FP Fire Stop | 2 days | Thu 10/22/20 | Fri 10/23/20 | 102 | 104 |
| 104 | Rough Inspections | 3 days | Mon 10/26/2( | Wed 10/28/2( | 103 | |
| 105 | **Level 6** | **20 days** | **Thu 10/1/20** | **Wed 10/28/2(** | | |
| 106 | Metal Framing & Firetops | 5 days | Thu 10/1/20 | Wed 10/7/20 | 101 | 107 |
| 107 | MEP/FP Rough | 10 days | Thu 10/8/20 | Wed 10/21/2( | 106 | 108 |
| 108 | MEP/FP Fire Stop | 2 days | Thu 10/22/20 | Fri 10/23/20 | 107 | 109 |
| 109 | Rough Inspections | 3 days | Mon 10/26/2( | Wed 10/28/2( | 108 | |
| 110 | **Interior Finishes** | **159 days** | **Mon 9/21/20** | **Thu 4/29/21** | | |
| 111 | **Level 6** | **106 days** | **Wed 10/14/2(** | **Wed 3/10/21** | | |
| 112 | Drywall, Tape & Sand | 22 days | Wed 10/14/2( | Thu 11/12/20 | 176FS-5 | 113,33,128FS-5 days,1 |
| 113 | Prime Paint | 5 days | Fri 11/13/20 | Thu 11/19/20 | 112 | 115 |

Page 3

## 89 Brighton Ave - Boston
## Project Schedule

| ID | Task Name | Duration | Start | Finish | Predecessors | Successors |
|---|---|---|---|---|---|---|
| 114 | Doors & Frames | 6 days | Fri 11/13/20 | Fri 11/20/20 | 112 | 116 |
| 115 | Ceramic Tile | 10 days | Mon 12/7/20 | Fri 12/18/20 | 113 | 116 |
| 116 | Cabinets | 7 days | Mon 12/21/20 | Tue 12/29/20 | 115 | 118FS+5 days,117 |
| 117 | Finish paint | 10 days | Wed 12/30/20 | Tue 1/12/21 | 116 | |
| 118 | Countertops | 5 days | Wed 1/6/21 | Tue 1/12/21 | 116FS+5 | 119 |
| 119 | Flooring | 7 days | Wed 1/13/21 | Thu 1/21/21 | 118 | 120,121 |
| 120 | Appliances | 5 days | Fri 1/22/21 | Thu 1/28/21 | 119 | |
| 121 | MEP/FP Finish | 10 days | Fri 1/22/21 | Thu 2/4/21 | 119 | 122 |
| 122 | Carpet/Base | 5 days | Fri 2/5/21 | Thu 2/11/21 | 121 | 123 |
| 123 | Clean | 4 days | Fri 2/12/21 | Wed 2/17/21 | 122 | 124 |
| 124 | DF Pray Punchlist | 5 days | Thu 2/18/21 | Wed 2/24/21 | 123 | 125 |
| 125 | Final Clean | 5 days | Thu 2/25/21 | Wed 3/3/21 | 124 | 126 |
| 126 | Punchlist | 5 days | Thu 3/4/21 | Wed 3/10/21 | 125 | |
| 127 | **Level 5** | **90 days** | **Fri 11/6/20** | **Thu 3/11/21** | | |
| 128 | Drywall, Tape & Sand | 22 days | Fri 11/6/20 | Mon 12/7/20 | 112FS-5 | 129,34,144FS-5 days,1 |
| 129 | Prime Paint | 5 days | Tue 12/8/20 | Mon 12/14/20 | 128 | 131 |
| 130 | Doors & Frames | 6 days | Tue 12/8/20 | Tue 12/15/20 | 128 | |
| 131 | Ceramic Tile | 8 days | Tue 12/15/20 | Thu 12/24/20 | 129 | 132 |
| 132 | Cabinets | 10 days | Fri 12/25/20 | Thu 1/7/21 | 131 | 133,134FS+5 days |
| 133 | Finish Paint | 5 days | Fri 1/8/21 | Thu 1/14/21 | 132 | 135 |
| 134 | Countertops | 5 days | Fri 1/15/21 | Thu 1/21/21 | 132FS+5 | |
| 135 | Flooring | 7 days | Fri 1/15/21 | Mon 1/25/21 | 133 | 136,137 |
| 136 | Appliances | 3 days | Tue 1/26/21 | Thu 1/28/21 | 135 | |
| 137 | MEP/FP Finish | 10 days | Tue 1/26/21 | Mon 2/8/21 | 135 | 138 |
| 138 | Carpet/Base | 5 days | Tue 2/9/21 | Mon 2/15/21 | 137 | 139 |
| 139 | Clean | 4 days | Tue 2/16/21 | Fri 2/19/21 | 138 | 140 |
| 140 | DF Pray Punchlist | 5 days | Mon 2/22/21 | Fri 2/26/21 | 139 | 141 |
| 141 | Final Clean | 4 days | Mon 3/1/21 | Thu 3/4/21 | 140 | 142 |
| 142 | Punchlist | 5 days | Fri 3/5/21 | Thu 3/11/21 | 141 | |
| 143 | **Level 4** | **90 days** | **Tue 12/1/20** | **Mon 4/5/21** | | |
| 144 | Drywall, Tape & Sand | 22 days | Tue 12/1/20 | Wed 12/30/20 | 128FS-5 days,35,160FS-5 days,145,1 | |
| 145 | Prime Paint | 5 days | Thu 12/31/20 | Wed 1/6/21 | 144 | 147 |
| 146 | Doors & Frames | 6 days | Thu 12/31/20 | Thu 1/7/21 | 144 | 149 |
| 147 | Ceramic Tile | 8 days | Thu 1/7/21 | Mon 1/18/21 | 145 | 148 |
| 148 | Cabinets | 10 days | Tue 1/19/21 | Mon 2/1/21 | 147 | 149,150FS+5 days |
| 149 | Finish Paint | 5 days | Tue 2/2/21 | Mon 2/8/21 | 148,146 | 151 |
| 150 | Countertops | 5 days | Tue 2/9/21 | Mon 2/15/21 | 148FS+5 | |
| 151 | Flooring | 7 days | Tue 2/9/21 | Wed 2/17/21 | 149 | 152,153 |

Page 4

# 89 Brighton Ave - Boston
## Project Schedule

**D.F. Pray** — GENERAL CONTRACTORS

| ID | Task Name | Duration | Start | Finish | Predecessors | Successors |
|----|-----------|----------|-------|--------|--------------|------------|
| 152 | Appliances | 3 days | Thu 2/18/21 | Mon 2/22/21 | 151 | 154 |
| 153 | MEP/FP Finish | 10 days | Thu 2/18/21 | Wed 3/3/21 | 151 | 155 |
| 154 | Carpet/Base | 5 days | Thu 3/4/21 | Wed 3/10/21 | 153 | 155 |
| 155 | Clean | 4 days | Thu 3/11/21 | Tue 3/16/21 | 154 | 156 |
| 156 | DF Pray Punchlist | 5 days | Wed 3/17/21 | Tue 3/23/21 | 155 | 157 |
| 157 | Final Clean | 4 days | Wed 3/24/21 | Mon 3/29/21 | 156 | 158 |
| 158 | Punchlist | 5 days | Tue 3/30/21 | Mon 4/5/21 | 157 | |
| 159 | **Level 3** | **91 days** | **Thu 12/24/20** | **Thu 4/29/21** | | |
| 160 | Drywall, Tape & Sand | 22 days | Thu 12/24/20 | Fri 1/22/21 | 144FS+5 days | 36,161,162 |
| 161 | Prime Paint | 5 days | Mon 1/25/21 | Fri 1/29/21 | 160 | 163 |
| 162 | Doors & Frames | 6 days | Mon 1/25/21 | Mon 2/1/21 | 160 | 165 |
| 163 | Ceramic Tile | 8 days | Mon 2/1/21 | Wed 2/10/21 | 161 | 164 |
| 164 | Cabinets | 10 days | Thu 2/11/21 | Wed 2/24/21 | 163 | 165,166FS+5 days |
| 165 | Finish Paint | 6 days | Thu 2/25/21 | Thu 3/4/21 | 164,162,164 | 167 |
| 166 | Countertops | 5 days | Thu 3/4/21 | Wed 3/10/21 | 164FS+5 | |
| 167 | Flooring | 7 days | Fri 3/5/21 | Mon 3/15/21 | 165 | 168,169 |
| 168 | Appliances | 3 days | Tue 3/16/21 | Thu 3/18/21 | 167 | |
| 169 | MEP/FP Finish | 10 days | Tue 3/16/21 | Mon 3/29/21 | 167 | 170,194,195 |
| 170 | Carpet/Base | 5 days | Tue 3/30/21 | Mon 4/5/21 | 169 | 171 |
| 171 | Clean | 4 days | Tue 4/6/21 | Fri 4/9/21 | 170 | 172 |
| 172 | DF Pray Punchlist | 5 days | Mon 4/12/21 | Fri 4/16/21 | 171 | 173 |
| 173 | Final Clean | 4 days | Mon 4/19/21 | Thu 4/22/21 | 172 | 174,199 |
| 174 | Punchlist | 5 days | Fri 4/23/21 | Thu 4/29/21 | 173 | |
| 175 | **Level 2** | **80 days** | **Mon 12/7/20** | **Fri 3/26/21** | | |
| 176 | Drywall, Tape & Sand | 22 days | Mon 9/21/20 | Tue 10/20/20 | 63SS+10 | 112FS-5 days,178,177 |
| 177 | Prime Paint | 6 days | Mon 12/7/20 | Mon 12/14/20 | 176 | 179 |
| 178 | Doors & Frames | 6 days | Mon 12/7/20 | Mon 12/14/20 | 176 | |
| 179 | Ceramic Tile | 8 days | Tue 12/15/20 | Thu 12/24/20 | 177 | 180 |
| 180 | Cabinets | 10 days | Fri 12/25/20 | Thu 1/7/21 | 179 | 182FS+5 days,181 |
| 181 | Finish Paint | 6 days | Fri 1/8/21 | Fri 1/15/21 | 180 | 183 |
| 182 | Countertops | 5 days | Fri 1/15/21 | Thu 1/21/21 | 180FS+5 | |
| 183 | Flooring | 8 days | Mon 1/18/21 | Wed 1/27/21 | 181 | 184,185 |
| 184 | Appliances | 3 days | Thu 1/28/21 | Mon 2/1/21 | 183 | |
| 185 | MEP/FP Finish | 12 days | Thu 1/28/21 | Fri 2/12/21 | 183 | 186 |
| 186 | Carpet/Base | 7 days | Mon 2/15/21 | Tue 2/23/21 | 185 | 187 |
| 187 | Clean | 4 days | Wed 2/24/21 | Mon 3/1/21 | 186 | 188 |
| 188 | DF Pray Punchlist | 5 days | Tue 3/2/21 | Mon 3/8/21 | 187 | 189 |
| 189 | Final Clean | 4 days | Tue 3/9/21 | Fri 3/12/21 | 188 | 190 |

**D.F.Pray**

GENERAL CONTRACTORS

# 89 Brighton Ave - Boston
## Project Schedule

| ID | Task Name | Duration | Start | Finish | Predecessors | Successors |
|---|---|---|---|---|---|---|
| 190 | Punchlist | 5 days | Mon 3/15/21 | Fri 3/19/21 | 189 | |
| 191 | **Garage Level Finish** | **99 days** | **Mon 12/7/20** | **Thu 4/22/21** | | |
| 192 | Owner supplied car stacking system | 20 days | Mon 12/7/20 | Fri 1/1/21 | 82 | |
| 193 | **Building Commissioning** | **18 days** | **Tue 3/30/21** | **Thu 4/22/21** | | |
| 194 | Fire Alarm Testing | 10 days | Tue 3/30/21 | Mon 4/12/21 | 169 | 196 |
| 195 | HVAC Balancing and testing | 5 days | Tue 3/30/21 | Mon 4/5/21 | 169 | |
| 196 | Emergency power testing | 5 days | Tue 4/13/21 | Mon 4/19/21 | 194 | 197 |
| 197 | Fire Department review of Building Systems | 2 days | Tue 4/20/21 | Wed 4/21/21 | 196 | 198FS-1 day |
| 198 | Building inspector Review and sign off | 2 days | Wed 4/21/21 | Thu 4/22/21 | 197FS-1 | |
| 199 | **Occupancy** | **1 day** | **Fri 4/23/21** | **Fri 4/23/21** | **173** | |

**D. F. Pray, Inc. Subcontract – Exhibit C**

**PROJECT SCHEDULE**

**Per D.F. Pray project schedule.**

**D.F. Pray, Inc. Subcontract - Exhibit D**

**INSURANCE RIDER**

The Subcontractor will comply with all of the insurance requirements of the Agreement and this Insurance Rider, including the maintenance of all required insurance coverages and endorsements with companies satisfactory to D.F. Pray, Inc. The Subcontractor shall not change insurance companies during the term of the Agreement without D.F. Pray, Inc.'s approval. Failure to maintain such insurance requirements and coverages shall be grounds for termination of the Agreement for cause. The Subcontractor shall not be entitled to any increase in the Subcontract Sum due to any insurance premiums or cost of any of the insurance required hereunder. These insurance requirements do not convey a limit of liability or serve to reduce or limit any indemnification obligations of the Subcontractor and are subject to any higher limits that may be required by the Owner in the Contract that D.F. Pray, Inc. has entered into or any other Contract Documents. Any insurance limits or coverages maintained by a Subcontractor in excess of the below requirements will be available and applicable to all claims for additional insureds to the extent permitted by law and the Subcontract will be deemed to require such broader coverages and higher limits.

The Subcontractor will furnish D.F. Pray, Inc., with confirming Certificates of Insurance that include a copy of the Additional Insured Endorsement that is part of Subcontractor's commercial general liability policy, automotive liability policy and commercial umbrella policy or other policies as requested by D.F. Pray, Inc. prior to performing any work at the Project site. Each Certificate shall confirm that the insurance will not be cancelled, materially altered or any reduction of any limit made with less than 30 days written notice by Registered Mail to D.F. Pray, Inc. If requested by D.F. Pray, Inc., the Subcontractor will furnish originals or certified copies of insurance policies including all endorsements of any of the insurance coverages required hereunder.

The Subcontractor must also provide D.F. Pray, Inc. with copies of evidence of insurance provided by sub-subcontractors and suppliers to the Subcontractor for the same limits as required herein unless other limits are otherwise agreed in writing by D.F. Pray, Inc. Sub-subcontractors are not to enter the Project site until such evidence of insurance is on file in D.F. Pray, Inc.'s home office.

All certificates of insurance shall provide evidence that D.F. Pray, Inc., Owner, Architect, Architect's consultants, any other parties as required by the Owner, any of their affiliates, and agents and employees of any of them are added as additional insured on a primary, non-contributory basis for the commercial general liability, automobile liability, commercial umbrella liability, and pollution liability (if required) policies of the subcontractor. The following shall be included in the "comment" section of the certificate:

> *"Additional insured – D.F. Pray, Inc., Owner, Architect, Architect's consultants, any other parties as required by D.F. Pray or the Owner, any of their affiliates, and agents and employees of any of them shall be and is deemed an additional insured on a primary and non-contributory basis under all commercial general liability, automobile liability, commercial umbrella liability, and pollution liability (if required) policies of Subcontractor."*

In addition, D.F. Pray, Owner, Architect, Architect's consultants, any other parties as required by the Owner, any of their affiliates, and agents and employees of any of them shall be included as additional insureds using ISO additional insured endorsement CG 20 10 11/85 or CG 2010 (10/01) and CG 20 37 10/01 or endorsements providing equivalent coverages to the additional insureds, and all such endorsements shall be delivered to D.F. Pray, Inc. with the insurance certificate required above. The insurance coverage for the additional insureds shall be as broad as the coverage provided for the named insured Subcontractor, and all such insurance shall apply to the additional insureds as primary and non-contributing insurance before any other insurance or self-insurance, including any deductible maintained by, or provided to, the additional insureds.

The Subcontractor shall maintain the commercial and excess liability coverages for itself and the additional insureds for the duration of the Project and shall also maintain completed operations coverage for itself and the additional insureds through the statute of repose for the state in which the work took place beginning after Substantial Completion of the Project.

The Subcontractor shall maintain the following insurance coverage:

1. Worker's compensation insurance with statutory limits in accordance with applicable state laws (including Employer's Liability Insurance with limits totaling not less than $500,000 each accident, $500,000 policy limit, $500,000 each employee).

2. Commercial General Liability Insurance with limits totaling not less than $1,000,000 for each occurrence, $1,000,000 personal and advertising injury, $2,000,000 Products-Completed Operations Aggregate, and $2,000,000 annual aggregate. If such coverage contains a general aggregate limit, such limit shall apply separately to each project. The foregoing coverage requirements are to be maintained continuously during the duration of any and all obligations of the Subcontractor under the Subcontract, and shall include, but not necessarily be limited to, coverage for:

   (a) Premises liability.

   (b) Completed operations liability for itself and the additional insureds through the statute of repose for the state in which the work took place beginning after Substantial Completion of the Project.

   (c) Independent contractors, covering operations of any and all Subcontractors.

   (d) Contractual liability, including the Subcontractor's obligations to the Contractor, Owner and the Architect and their agents and employees as provided in paragraph 4.6 of the D.F. Pray, Inc. Standard Subcontract Agreement (or paragraph 4 of the Short Form Subcontract Agreement).

   (e) Coverage for explosion, collapse, undermining and damage to underground utilities and property when the Project involves such risk exposures.

   (f) Personal injury liability.

   (g) Elevator liability when elevators are involved in the Project.

   (h) Broad form property damage.

   (i) If work involves any of the following, no exclusion can exist on the general liability policy: Residential Operations; New York work; Exterior Insulation Finishing Systems (EIFS); Pollution; Professional; Mold; Lead; Asbestos; Silica; Operations within 50 feet of a railroad. If an exclusion does exist, an alternate policy must be procured to provide coverage for the exclusion.

3. Automobile Liability Insurance with limits of not less than $1,000,000 combined single limit or $500,000 for any person and $1,000,000 for any one accident for bodily injury including death and $500,000 for property damage or a covering:

   (a) All owned vehicles.

   (b) Hired cars and trucks.

   (c) All other non-owned vehicles.

      If scope of work includes hauling hazardous waste, an MCS 90 endorsement and CA 9948 (Pollution Liability for Business Auto) is required.

4. Contractor's Equipment Floater (covering Subcontractor's equipment) - All Risk Insurance to protect the Subcontractor against loss of, or damage to, its owned or rented capital equipment, tools, scaffolding, staging, towers and forms; including the provision for waiver of subrogation against D.F. Pray, Inc., and the Owner.

5. Commercial Umbrella Liability with limits of at least $5,000,000 Each Occurrence and $5,000,000 Aggregate. Coverage must apply over Employer's Liability, General Liability, and Automobile Liability following form

with coverages, limits, and requirements sufficient to be at least as broad as the underlying coverages and requirements stated throughout this document. This must be inclusive of additional insured and primary, non-contributory requirements which responds before any other insurance of self-insurance, including any deductible, maintained by, provided to, the additional insured, other that the Commercial General Liability, Auto Liability and Employers Liability coverages maintained by the Subcontractor.

6. <u>Pollution Liability/Environmental Coverage.</u> If any of Subcontractor's work under the Subcontract involves any environmental risks or any hazardous substances (including, without limitation, fuel substances, chemicals, asbestos, lead, pcb, or any matter or substance deemed a hazardous material under any applicable law or regulation) or the handling or treatment of any microbial matter (for example, mold), Subcontractor shall maintain Contractor's Pollution Liability Insurance or some other form of insurance satisfactory to D.F. Pray in amounts an under coverage requirements acceptable to D.F. Pray, and Subcontractor shall provide evidence of such coverage prior to the commencement of any work on the Project site; such evidence shall be physically attached to the insurance certificate(s) required hereunder. At minimum, such insurance shall provide coverage for bodily injury, sickness, disease, mental anguish or such sustained by any person including death; property damage, including physical injury to or destruction of, tangible property including the resulting loss of use thereof, clean up and remediation costs, and the loss of use of tangible property that has not been physically injured or destroyed; and defense costs and expenses, including costs, charges and expenses incurred in the investigation, adjustment or defense of such claims, including attorney's fees and costs, engineering fees and costs, and expert fees and costs. Subcontractor shall name D.F. Pray, Inc., Owner, Architect, Architect's consultants, any other parties as required by the Owner, any of their affiliates, and agents and employees of any of them as additional insureds under such coverage and shall provide evidence of such status to D.F. Pray prior to commencement of any work under the Subcontract.

If performed by the Subcontractor, the Subcontractor shall designate the disposal site and furnish a certificate of insurance from the disposal facility for environmental impairment liability insurance covering liability for sudden and accidental occurrences in the amount of not less than $1M per occurrence/$2M aggregate and shall also include liability for non-sudden occurrences in the amount of not less than $1M per occurrence/$2M aggregate
- If involved in scope of work, asbestos insurance will need to be obtained in advance of any asbestos abatement work in compliance with the per claim/aggregate limits listed above.
- 

7. All insurance required of the Subcontractor shall be in form and written with companies acceptable to D.F. Pray, Inc. All insurance shall be written on an occurrence basis unless D.F. Pray, Inc., approves in writing coverage on a claims-made basis. Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption as required hereunder.

8. Special Insurance for Delegated Design: In the event Subcontractor's work under the Subcontract includes the design of any component of the Work, prior to the start of work, Subcontractor shall provide Certificates of Insurance certifying to the procurement of professional errors and omissions insurance for those persons furnishing such design services for the benefit of Subcontractor in an amount not less than $1 million per claim and $1million aggregate or such greater amount as required by the Contract Documents.

   (a) Such insurance shall have an effective date prior to the start of all design work on this project or a prior acts endorsement.

   (b) Such insurance shall remain in full effect with the same carrier through the statute of repose for the state in which the work took place beginning after Substantial Completion of the Project.

9. Subcontractor shall provide to Contractor on an annual basis a list of all prior and subsequent claims upon such policies and an annual accounting of coverage limit available for each year.

10. Riggers Liability
In the event the scope involves rigging, moving, hoisting of property or equipment, Subcontractor must carry necessary policies to ensure proper coverage resulting from its operations.

11. Aircraft/Watercraft
   In the event the scope involves use of any aircraft/watercraft, Subcontractor must carry at least $10,000,000 per occurrence for bodily injury and property damage to ensure proper coverage resulting from its operations.

12. Hull and Protection and Indemnity (P&I)
   In the event the scope involves the use of barges or vessels, Subcontractor must carry Hull coverage for the replacement cost of the vessel and P&I in the amount of $10M. Water Pollution insurance must also be carried at a limit of $10M. Crew coverage along with Jones Act must be provided.

General Requirements:
   • In the event that D.F. Pray, Inc. accepts a certificate of insurance or does not identify a deficiency in coverage, Subcontractor shall not be relieved from its insurance obligations.
   • Subcontractor shall be responsible (at no additional cost to D.F. Pray, Inc. or any additional insured) for all deductibles or retentions that may apply by virtue of any insurance required, whether said insurance covers Subcontractor or additional insured.
   • With the exception of the Workers Compensation and Professional Liability requirements, all insurance required by this exhibit shall be endorsed if necessary to eliminate any cross liability exclusion and will stipulate that all terms, conditions, insuring agreements and endorsements – with the exception of the limits of liability – shall operate as if there were a separate policy for each insured.

**D.F. Pray, Inc. Subcontract – Exhibit E**

**CHANGE ESTIMATE/CHANGE ORDER PROCEDURE**

Change Estimates:

A Change Estimate is a formal request for a change order to your subcontract (time and/or cost) and may contain work items associated with Owner changes, Contractor changes or additions to your Scope of Work, approved emergency work, etc.

Change Estimates are to be submitted in writing for review and approval by Contractor's project manager.

Extra work will not be recognized by Contractor unless the extra work has been authorized in writing by the Divisional Vice President.

Subcontractor shall notify Contractor of any cost changes or schedule changes which are the result of drawings and/or specifications as required by the Contract Documents.

All Change Estimates must show full breakout of all labor, material and other costs together with allowable mark-ups detailed in accordance with the Subcontract. Additionally, copies of all signed time slips, material lists, and sub-subcontractor proposals or invoices should be included, if available.

Change Orders:

Once approved, a Change Estimate can be incorporated into a Subcontract Change Order, which is a formal amendment to your Subcontract.

Change Orders are the only vehicle by which payment will be made to the Subcontractor for amounts in excess of the Subcontract Sum per your original Subcontract.

Change Estimates that have been approved may be billed as part of the standard monthly invoice if and only if a Change Order to the Subcontract has been issued by Contractor. Please note that approved Change Estimates that you wish to bill in a given period must be submitted in a timely fashion prior to the date that Contractor's Application for Payment is due to Owner so that Subcontractor Change Orders can be prepared.

Time Slip Procedure:

Please note that a slip signed by a superintendent is verification of time only. Slips signed in the field are not to be construed as authorization to submit an invoice. Only the Divisional Vice President can approve added cost as part of your Subcontract on this Project.

All time and material work must be based on actual cost of labor and material (not scaled book rate) or rates agreed as unit prices per this Subcontract.

**D.F. Pray, Inc. Subcontract – Exhibit F**

**APPLICATION FOR PAYMENT PROCEDURE**

All Applications for Payment must conform to the following requirements:

1.  Original Application for Payment in the form of attached Exhibits F1 and F2 plus two (2) copies must be received no later than the 25th of each month. Application for Payment must be in proper format for billing (form attached).

1.  Original Applications for Payment shall be submitted in PDF format:
    invoices@dfpray.com

2.  All Applications for Payment shall reference the name of the designated project accountant, the project number, and the D.F. Pray, Inc. Subcontractor number.

3.  All Applications for Payment shall be accompanied by an executed Subcontractor Progress Payment Certification Waiver and Release by Subcontractor and Sub-subcontractors and material suppliers to Subcontractor, in the forms attached hereto as Exhibits F-3A and F-3B, respectively, or in the case of the Final Application for Payment, in the forms attached hereto as Exhibits F-4A and F-4B, respectively, and the Application for Payment forms at Exhibits F-1 and F-2, attached. Any Application for Payment that does not include these documents shall be null and void and payment will not be made until such waiver is furnished.

4.  Applications for Payment shall not include extra work costs unless supported by a Change Order issued by D.F. Pray, Inc.

5.  No payment will be made to any subcontractor until all required documents are received and approved by our accounting department, including without limitation, your original Insurance Certificate and required Endorsements (see Exhibit D) must be on file and must be current and your insurance must meet minimum requirements per the Subcontract.

6.  Transfer of Title must be attached on any stored or in-transit materials and separate insurance provided on stored or in-transit materials naming D.F. Pray, Inc. and Owner as "Loss Payee."

D.F. PRAY, INC. SUBCONTRACT NO. 2329-016-001

# SUBCONTRACTOR'S APPLICATION AND CERTIFICATE FOR PAYMENT

**Exhibit F-1**

**TO CONTRACTOR:**
D.F. Pray, Inc.

**PROJECT:**
89 Brighton Ave., Allston

**Distribution to:**
☐ Project Manger
☐ Accounting Field Office

**FROM SUBCONTRACTOR:**
Amps Electric Inc.

APPLICATION NO:

PERIOD TO:

PROJECT NO: DF-02329

COST CODE: 16-001
CONTRACT DATE: 3/10/2020

## SUBCONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Subcontract. Continuation Sheet is attached.

1. ORIGINAL CONTRACT SUM
2. NET CHANGE BY CHANGE ORDERS
3. CONTRACT SUM TO DATE (line 1 ± 2)
4. TOTAL COMPLETED AND STORED TO DATE (Column G on detail sheet)
5. RETAINAGE:
   a. % of completed work:
   b. % of stored material:
   Total retainage (Line 5a + 5b or total in column I of detail sheet)
6. TOTAL EARNED LESS RETAINAGE (Line 4 less Line 5 Total)
7. LESS PREVIOUS CERTIFICATES FOR PAYMENT (Line 6 from prior certificate)
8. CURRENT PAYMENT DUE:
9. BALANCE TO FINISH, INCLUDING RETAINAGE (Line 3 less Line 6)

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner: | | |
| Total approved this Month: | | |
| Totals: | | |
| Net change by change orders: | | |

The undersigned Subcontractor hereby

(1) certifies that the Work covered by this Application for Payment has been completed in accordance with the Contract Documents;

(2) certifies that the current payments shown is now due and payable;

(3) Certifies that no Notice of Contract or other lien notice has been recorded by Subcontractor or anyone claiming by or through Subcontractor for Work performed to date;

(4) certifies that it has paid its sub-subcontractors and vendors through the date of the last prior application for payment;

(5) certifies that all laborers, mechanics, and employees or others providing labor or services by or through Subcontractor have been paid in full though the date hereofand that all taxes, insurances, fringes, contributions, withholdings, and assessments required by law or by contract have been paid, and that Subcontractor is in compliance with all federal, state and local wage, hour and tax laws relating to payment of wages;

(6) waives and dissolves all rights to any liens upon the project for work performed up to the date hereof and waives and releases all past or present claims, defenses, actions, causes of action, demands, obligations, rights, damages, and costs whatsoever which it now has or may have had from the beginning of the world to date regarding payment for work and/or labor and/or material provided on or related to the above referenced Project by Subcontractor or any of its subcontractors, suppliers or agents.

(7) agrees to indemnify, defend and hold harmless Owner, Contractor, and Lender (if applicable) from all liens, claims or demands for payment, including reasonable legal fees, arising out of the work of the Subcontractor.

(8) represents and warrants that the person signing below is authorized to do so on behalf of the Subcontractor.

(9) certifies that all applicable taxes (including, without limitation, sales taxes) have been paid in full;

Signes as a sealed instrument of this day:

SUBCONTRACTOR:

By: _____ Date: _____

State of:

County of:

Subscribed and sworn to before

me this _____ day of _____

Notary Public:

My commission expires:

28

CONTINUATION SHEET    *AIA DOCUMENT G703*    Page    of    Pages    **Exhibit F-2**

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT,

Containing Contractor's signed Certification is attached
in tabulation below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply

APPLICATION NUMBER:
APPLICATION DATE:    enter date
PERIOD TO:    enter date
ARCHITECT'S PROJECT NO:

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

### D.F. Pray, Inc. Subcontract – Exhibit F-3A

**SUBCONTRACTOR PERIODIC PAYMENT CERTIFICATION AND RELEASE**

PROJECT OWNER: Brighton Gardner Properties LLC c/o Eden Brighton Gardner LLC
PROJECT: 89 Brighton Ave., Allston
LOCATION: 89 Brighton Avenue Allston Massachusetts 02134
GENERAL CONTRACTOR: D.F. Pray, Inc.
SUBCONTRACTOR: Amps Electric Inc.
APPLICATION FOR PAYMENT NO.: .            FOR WORK COMPLETED THROUGH: enter a date.

**Current Contract Amount:** .
**Amount Previously Paid:** $ .
**Total Amount Approved and Paid to Date:** .
**Total Amount of Pending Changes**
(Subject to Owner Approval) .
**Total Amount of Disputed Claims** .

In consideration of the payment of $ made by General Contractor to Subcontractor representing full and final payment due Subcontractor for all labor and/or materials and related services provided upon or concerning the above-referenced Project by Subcontractor, or anyone claiming by, through or under Subcontractor through and including, and excluding only any right to applicable retainage and also excluding only the value of any Pending Changes and Disputed Claims (hereinafter "Payment") (unless there is value listed above under Pending Changes and Disputed Claims, Subcontractor hereby certifies that none exist), Subcontractor hereby:

1. <u>CERTIFIES</u> to Project Owner and General Contractor that Subcontractor has received the sum of $ , as set forth above, representing payment in full for all labor, materials, and other items furnished in connection with the above-referenced Project through and including and that there remains only a balance of $ arising from Subcontractor's work on the Project.

2. <u>WAIVES</u>, releases, relinquishes and dissolves any and all claims or rights of or for mechanic's liens, and waives, relinquishes and dissolves all past or present claims, defenses, actions, causes of action, demands, sums of money, debts, accounts, demands, obligations, surety bond rights and claims, and all rights, damages and costs whatsoever in law and/or in equity which it now has or may have had from the beginning of the world to date regarding payment for work and/or labor and/or material and/or service provided on or related to the Project by Subcontractor or any of its sub-subcontractors, suppliers or agents through and including ., excluding only (i) any right to applicable retainage and (ii) the value of any Pending Changes and Disputed Claims listed above.

3. <u>AGREES TO INDEMNIFY</u>, defend, and save harmless the Project Owner and General Contractor from all claims and demands, and all expenses incurred, including attorneys' fees and costs of defense, for or on account of or in any way arising out of the work of the undersigned or others claiming by, through or under Subcontractor, for payment of any labor performed or material or equipment furnished in connection with improvements to real property or any other work performed on land for the Project, including any and all claims of or for mechanic's liens for the work of the undersigned through and including , excluding only (i) any right to applicable retainage and (ii) the value of any Pending Changes and Disputed Claims listed above.

4. <u>CERTIFIES</u> to the Project Owner and General Contractor that all laborers, trade subcontractors, materialmen and others providing labor, materials, services, machinery, equipment, insurance and/or supplies and all taxes, including, but not limited to, sales taxes, and contributions of any other descriptive title in connection with the work furnished for and through the undersigned up to the date hereof have been paid in full.

5. <u>REPRESENTS AND WARRANTS</u> that no other person or entity has any prior interest in the claims, demands, allegations or causes of action arising on its behalf on account of the work; that the undersigned has a sole right and authority to execute this final release and to have received the sums specified herein; and that the undersigned has not sold, assigned, transferred, conveyed, or otherwise disposed of the claims, demands or rights released hereby.

Executed as a sealed instrument this th day of , 20 .

**Contractor:**                                         **Subcontractor:**

**D.F. PRAY, INC.**                                   **AMPS ELECTRIC INC.**

By: _____                 By: _____

Its: _____                 Its: _____

Printed Name: _____           Printed Name: _____

**D.F. Pray, Inc. Subcontract – Exhibit F-3B**

**SUB-SUBCONTRACTOR/SUPPLIER PERIODIC PAYMENT CERTIFICATION AND RELEASE**

**PROJECT:** DF-02329
**GENERAL CONTRACTOR:** D.F. Pray, Inc.
**SUBCONTRACTOR:** Amps Electric Inc.
**SUB-SUBCONTRACTOR/SUPPLIER:**
**PROJECT OWNER:** Brighton Gardner Properties LLC c/o Eden Brighton Gardner LLC

In consideration of the payment of $ . made by Subcontractor to Sub-Subcontractor/Supplier ("Supplier") representing full and final payment due Supplier for all labor and/or materials and related services provided upon or concerning the above-referenced Project by Supplier, or anyone claiming by, through or under Supplier through and including . and excluding any right to applicable retainage only ("Payment"), Supplier hereby:

1.  <u>CERTIFIES</u> to Project Owner, General Contractor and Subcontractor that the Supplier has received the sum of $ ., as set forth above, representing payment in full for all labor, materials, and other items furnished in connection with the above-referenced Project through and including . less any applicable retainage, and that there remains only a balance of $ . arising from Supplier's work on the Project.

2.  <u>WAIVES</u>, relinquishes and dissolves all rights to any (i) lien (including, without limitation, liens under the mechanic's lien law of any state wherein the Project may lie) upon the property, real estate, buildings or improvement comprising the above-referenced Project; (ii) surety bond, for all labor, materials or other items supplied in connection with the Project up to the date hereof; and (iii) all past or present claims, actions, demands, rights, damages and costs whatsoever which it now has or may have had from the beginning of the world to date against the Owner, General Contractor and Subcontractor regarding payment for work and/or labor and/or material provided on or related to the above referenced Project by Supplier or any of its subcontractors, suppliers or agents through and including ., excluding any right to applicable retainage only.

3.  <u>CERTIFIES</u> to Project Owner, General Contractor and Subcontractor that all laborers, trade subcontractors, materialmen and others providing labor, materials, services, machinery, equipment, insurance and/or supplies, and that all taxes, including, but not limited to, sales taxes, and contributions of any other descriptive title in connection with the work, furnished for and through the undersigned up to the date hereof, have been paid in full and that Supplier will indemnify Project Owner, General Contractor and Subcontractor for all costs and damages related to any claims arising from the same.

4.  <u>REPRESENTS AND WARRANTS</u> that the undersigned has a sole right and authority to execute this final release and to have received the sums specified herein.

Executed as a sealed instrument this day     of                    , 20   .

**Contractor:**                                             **Subcontractor:**
**D.F. PRAY, INC.**                                      **AMPS ELECTRIC INC.**

By: _____          By: _____

Its: _____          Its: _____

Printed Name: _____          Printed Name: _____

**D.F. Pray, Inc. Subcontract Exhibit F-4A**

**SUBCONTRACTOR FINAL PAYMENT CERTIFICATION AND RELEASE**

**PROJECT:** 89 Brighton Ave., Allston
**GENERAL CONTRACTOR:** D.F. Pray, Inc.
**SUBCONTRACTOR/SUPPLIER:** Amps Electric Inc.
**OWNER:** Brighton Gardner Properties LLC c/o Eden Brighton Gardner LLC
**APPLICATION FOR PAYMENT NO.:**            **FOR WORK COMPLETED THROUGH:** enter a date.

**Final Contract Amount:**       $
**Total Amount Paid to Date:**    $
**Final Payment Due**           $

In consideration of the Final Payment referenced above in the amount of $ for work and/or labor and/or material provided on or related to the above referenced Project by ("Subcontractor") or any of its subcontractors, suppliers or agents, Subcontractor and all of its past, present and future trustees, representatives, administrators, attorneys, agents, employees, predecessors and assigns and successors, hereby:

1.  CERTIFIES to Owner and General Contractor that the Final Payment of $ constitutes payment in full for all labor, materials, and other items furnished in connection with improvements to real property or any other work performed for the above-referenced Project through and including the date hereof.

2.  WAIVES, relinquishes and dissolves all rights to any (i) lien (including, without limitation, liens under the mechanic's lien law of any state wherein the Project may lie) upon the property, real estate, buildings, or improvement comprising the above-referenced Project; (ii) surety bond, for all labor, materials or other items supplied in connection with improvements to real property or any other work performed up to the date hereof; and (iii) all past or present claims, defenses, actions, causes of action, demands, obligations, rights, damages and costs whatsoever which it now has or may have had from the beginning of the world to date regarding payment for work and/or labor and/or material provided on or related to the above referenced Project by Subcontractor or any of its subcontractors, suppliers or agents.

3.  AGREES TO INDEMNIFY, defend, and save harmless the Owner and General Contractor from all liens, claims and demands, and all expenses incurred, including attorneys' fees and costs of defense, for or on account of or in any way arising out of the work of the undersigned or others claiming by, through or under Subcontractor, for payment of any labor performed or material or equipment furnished in connection with improvements to real property or any other work performed on land for the above-referenced Project.

4.  CERTIFIES to the Owner and General Contractor that all laborers, trade subcontractors, materialmen and others providing labor, materials, services, machinery, equipment, insurance and/or supplies and all taxes, including, but not limited to, sales taxes, and contributions of any other descriptive title in connection with the work furnished for and through the undersigned up to the date hereof have been paid in full.

5.  REPRESENTS AND WARRANTS that no other person or entity has any prior interest in the claims, demands, allegations or causes of action arising on its behalf on account of the work; that the undersigned has a sole right and authority to execute this final release and to have received the sums specified herein; and that the undersigned has not sold, assigned, transferred, conveyed, or otherwise disposed of the claims, demands or rights released hereby.

Executed as a sealed instrument this       day of          , 20   .

| **Contractor:** | **Subcontractor:** |
|---|---|
| **D.F. PRAY, INC.** | **AMPS ELECTRIC INC.** |
| By: _____ | By: _____ |
| Its: _____ | Its: _____ |
| Printed Name: _____ | Printed Name: _____ |

**D.F. Pray, Inc. Subcontract Exhibit F-4B**

**SUB-SUBCONTRACTOR/SUPPLIER FINAL PAYMENT CERTIFICATION AND RELEASE**

PROJECT: 89 Brighton Ave., Allston
GENERAL CONTRACTOR: D.F. Pray, Inc.
SUBCONTRACTOR: Amps Electric Inc.
SUB-SUBCONTRACTOR/SUPPLIER:
PROJECT OWNER: Brighton Gardner Properties LLC c/o Eden Brighton Gardner LLC

In consideration for payment in the amount of $ ("Final Payment") for work and/or labor and/or material provided on or related to the above referenced Project, the undersigned sub-subcontractor/supplier ("Supplier") hereby:

1. <u>CERTIFIES</u> to Project Owner, General Contractor and Subcontractor that the Final Payment constitutes payment in full for all labor, materials, and other items furnished in connection with the above-referenced Project through and including the date hereof.

2. <u>WAIVES</u>, relinquishes and dissolves all rights to any (i) lien (including, without limitation, liens under the mechanic's lien law of any state wherein the Project may lie) upon the property, real estate, buildings, or improvement comprising the above-referenced Project; (ii) surety bond, for all labor, materials or other items supplied in connection with the Project up to the date hereof; and (iii) all past or present claims, actions, demands, rights, damages and costs whatsoever which it now has or may have had from the beginning of the world to date against the Owner, General Contractor and Subcontractor regarding payment for work and/or labor and/or material provided on or related to the Project by Supplier.

3. <u>CERTIFIES</u> to Project Owner, General Contractor and Subcontractor that all laborers, trade subcontractors, materialmen and others providing labor, materials, services, machinery, equipment, insurance and/or supplies, and that all taxes, including, but not limited to, sales taxes, and contributions of any other descriptive title in connection with the work, furnished for and through the undersigned up to the date hereof, have been paid in full and that Supplier will indemnify and hold harmless Project Owner, General Contractor and Subcontractor for all costs and damages related to any claims arising from the same.

4. <u>REPRESENTS AND WARRANTS</u> that the undersigned has a sole right and authority to execute this final release and to have received the sums specified herein.

Executed as a sealed instrument this       day of                    , 20   .

**Contractor:**
**D.F. PRAY, INC.**
By: _____

Its: _____

Printed Name: _____

**Sub - Subcontractor/ Supplier:**

By: _____

Its: _____

Printed Name: _____

**D.F. Pray, Inc. Subcontract – Exhibit G**

**DESIGN/BUILD SERVICES RIDER TO SUBCONTRACT AGREEMENT**

When the Agreement includes design and/or engineering services within the scope of the Work or as included in Exhibit A, this Rider shall apply.

1.  Subcontractor agrees to furnish the services of licensed design professionals for architectural and/or engineering design for the Work in accordance with the Contract Documents (the "Services"). Subcontractor warrants and represents that its designers, engineers, consultants and subcontractors are duly qualified, licensed, registered and authorized by law to perform the Services. Such professionals shall furnish such Services in accordance with the standard of reasonable care exercised by similarly situated professionals practicing at the highest levels of their profession on sophisticated projects in the United States.

2.  The Subcontractor shall review the information provided by Contractor, including but not limited to any existing conditions, design criteria, outline specifications, performance requirements, and budgets as required by the Contract Documents. As to the Services to be provided by Subcontractor, the Subcontractor shall owe to Contractor the same obligations and responsibilities that Contractor owes to the Owner under the Contractor's contract with the Owner.

3.  Based on the information provided to the Subcontractor and the basis of design identified in the Agreement, Subcontractor shall produce and deliver the required plans, drawings, and specifications, for approval by the Contractor, Owner, and governmental authorities, including revisions necessary to secure such approvals, setting forth in detail the requirements for construction of the Work of the Agreement and its coordination with the complete Work.

4.  When requested, the Subcontractor shall review the Contract Documents and suggest changes and alternatives to assist the Contractor in its efforts to reduce the cost of the Work while maintaining the overall quality of the Work.

5.  Approval of plans and specifications by Contractor shall not be deemed to be an assumption of responsibility by the Contractor or Owner for any error, inconsistency or omission in the drawings and specifications or other documents prepared or delivered by or through the Subcontractor.

6.  Subcontractor represents and warrants that all work product delivered by or through Subcontractor relating to the Services shall be in accordance with all applicable laws, statutes, codes, regulations, and administrative standing orders pertaining, including but not limited, to state and local building and electric codes, NFPA, public utility, and Factory Mutual and/or Underwriters Laboratory's guidelines.

7.  At each phase in the Work, if requested, the Subcontractor will make revisions to its drawings, specifications and other documents, at its cost, based upon the Contractor's review of documents produced by or through Subcontractor and others. Revisions shall be made as may be reasonably expected in connection with changing business needs and schedules of the Contractor and/or from the discovery of latent conditions in existing buildings, and/or from requirements for coordinating with others, including consultants and vendors for equipment being furnished by the Contractor, Subcontractor or others to the Project.

8.  Subcontractor will have the appropriate professional stamp and signature on all work product prepared by or through it, and it will provide such certifications as may reasonably be expected or required for permits from civil authorities or for obtaining project financing.

9.  Subcontractor will keep the as-built plans of the completed Work in CAD files and in reproducible vellum or mylar form in an orderly and retrievable manner. CAD files shall be provided in the format required by the Contract Documents.

10. Subcontractor will advise Contractor and Owner on local permitting, licensing and other compliance issues for architectural, engineering and construction services.

11. Subcontractor shall provide and prepare drawings, specifications, affidavits and other documentation and supporting data in connection with change orders and construction change directives, substitutions, and value engineering exercises.

12. All documents, including original drawings, specifications, estimates, field notes and data (collectively referred to as "Documents") are and shall remain the property of Contractor. The Subcontractor hereby assigns to the Contractor all property rights the Subcontractor may have in such Documents prepared by, through or under the Subcontractor, including all copyright rights. Any re-use of the Documents for any extension of the Project or any other Project by the Contractor will be the Contractor's or any other user's sole risk and shall be without liability or legal exposure to the Subcontractor. The Subcontractor shall use its best efforts to incorporate the foregoing provision to be inserted in each agreement or contract that it enters into with any designers, engineers, subcontractors or other consultants engaged by it in connection with the Work.

13. In addition to any liability or obligation of the Subcontractor to the Contractor that may exist under any other provision of the Agreement or the Contract Documents, or by law or otherwise, to the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Contractor and Owner and their respective principals, officers, agents, employees and subcontractors from and against claims, actions, proceedings, liabilities, losses, damages, costs and expenses, including legal fees, which the Contractor or Owner or their respective principals, officers, agents and employees may sustain as caused by or arising from, in whole or in part, any act or omission by the Subcontractor or those acting by, through or under Subcontractor, or Subcontractor's designers, engineers or other consultants, or the officers, agents, employees or subcontractors of any of them, arising out of the Subcontractor's performance of the Services.

14. Before commencing its Services and as a condition of the making of or the right to any payment under the Agreement, and in addition to any insurance requirements set forth in the Agreement and/or Contract Documents, Subcontractor and each of its designers, engineers, or other consultants shall purchase and maintain at least the following Professional Liability insurance with a company satisfactory to Contractor:

| Services | Minimum Limit | Maximum Deduction |
|---|---|---|
| Architectural | $2,000,000 | $10,000 |
| Structural | $2,000,000 | $10,000 |
| Mechanical | $2,000,000 | $10,000 |
| Electrical | $2,000,000 | $10,000 |
| Plumbing | $2,000,000 | $10,000 |
| Other | $2,000,000 | $10,000 |

The cost of any deductible shall be paid by the Subcontractor.

15. Upon request, the Subcontractor shall furnish the Contractor copies of such Professional Liability Policies. No policy shall be cancelled or modified without thirty (30) days' prior written notice to the Contractor. The Professional Liability policies shall be continued through the statute of repose for the state in which the work took place beginning after Substantial Completion of the Project.

### D.F. Pray, Inc. Subcontract – Exhibit H

## MASSACHUSETTS RIDER TO SUBCONTRACT, PURCHASE ORDER, WORK ORDER AUTHORIZATION, WORK ORDER AUTHORIZATION SERVICE AGREEMENT OR SIMILAR AGREEMENT

To the extent the subcontract, Work Order Authorization, Work Order Authorization, purchase order, service agreement or other agreement to which this Rider is attached (the "Agreement") relates to a "contract for construction" as defined from time to time by Chapter 149, Section 29E and Chapter 149, Section 29F, of the Massachusetts General Laws (the "Massachusetts Statute"),1 this Rider shall apply, shall be an integral part thereof and shall be deemed incorporated therein by reference. In the case of a purchase order, "Subcontractor" shall mean the Seller or Vendor, "application" for payment shall mean invoice, "Subcontract Sum" shall mean the total price, and "Subcontract Time" shall mean the delivery/shipment date or other schedule requirement. In the case of a service agreement, "Subcontractor" shall mean the Vendor, Consultant or Service Provider, "Work" shall mean Services, "application" for payment shall mean invoice, "Subcontract Sum" shall mean "Service Agreement Sum" and "Subcontract Time" shall mean Service Period. Unless otherwise defined in the Agreement, "Prime Contract" shall mean the contract pursuant to which the Contractor is to provide or is providing labor, material, equipment or other services for the project. "Owner" shall mean the party to the Prime Contract other than the Contractor.

## PAYMENTS

1.  Any application for a periodic progress payment the Subcontractor submits may not be submitted earlier than as directed by the Contractor and shall be submitted not later than as directed by the Contractor. An application submitted earlier or later than as directed by the Contractor shall be subject to rejection as untimely. Work covered by a rejected application for payment may only be included, if properly billable, in the next application for payment.

2.  Unless otherwise directed by the Contractor, the Subcontractor may submit its applications for payment no more frequently than every thirty (30) days, beginning with the end of the first calendar month occurring at least fourteen (14) days after the Subcontractor has commenced performance.

3.  Submission of an application for payment by the Subcontractor shall constitute a certification by the Subcontractor that the application for payment is timely, contains or is accompanied by all supporting documents required by the Agreement and is submitted in good faith. An application for payment shall not be deemed submitted unless and until actually received (a) by the person to whom the Contractor directs in writing that such documents be submitted, or (b) if the Contractor has not directed submission to a specific person, by the Contractor.

4.  It shall be grounds for rejection of an application for payment submitted by the Subcontractor if the Owner rejects an application for payment that the Contractor submits to the Owner seeking payment for Work of the Subcontractor to the extent such rejection is due to any non-performance or deficient performance of the Work or any breach by the Subcontractor of any obligation of the Agreement.

5.  The Contractor shall approve or reject a written application by the Subcontractor for a periodic progress payment, in whole or in part, within twenty-two (22) days of its submission. In the event the Contractor's Prime Contract is not with the actual project owner, the foregoing time period shall be increased by seven (7) days for each tier of contracting parties that separates the Contractor from the project owner. Notwithstanding the foregoing, in the event the Contractor does not notify the Subcontractor of its approval or rejection within the applicable time period, the Contractor may nevertheless reject it, in whole or in part, before the date payment of that application is due.

6.  The Contractor's submission of an application for payment to the next higher tier contracting party that includes amounts in a Subcontractor's application for payment shall not constitute or be evidence of approval by the Contractor of the Subcontractor's application except to the extent the Contractor expressly notifies the Subcontractor in writing that the Subcontractor's application is approved.

7. A Subcontractor's application for payment shall be subject to rejection, in whole or in part, at any time until payment of the approved amount is due, regardless of whether such approval is express, implied or "deemed to be approved" pursuant to the Massachusetts Statute.

8. Payment of an application by the Subcontractor for a periodic progress payment that has been approved shall be due forty- five (45) days after approval, unless rejected prior to that time or unless the payment is conditioned, under the Agreement, upon receipt by the Contractor of payment by the Owner but only to the extent such condition is enforceable under subsection (e) of the Massachusetts Statute.

9. Each provision of the Agreement that makes payment to the Subcontractor conditioned upon receipt by the Contractor of payment from the Owner shall be enforceable:

    a. to the extent of amounts not received from the Owner because the Subcontractor failed to perform under the Agreement and failed to cure the non-performance within the time required by any applicable provision of the Agreement after receipt of written notice as provided in the Agreement or, in the absence of such applicable cure and notice provision, failed to cure the non-performance within fourteen (14) days after receipt of written notice of the failure to perform; or

    b. to the extent of amounts not received from the Owner because the Owner is insolvent or becomes insolvent within 90 days after the date of submission of the requisition or application for which payment is sought; provided, however, that the Contractor (i) filed a notice of contract under Chapter 254 of the Massachusetts General Laws and, if the Prime Contract is not with the actual project owner and the Contractor has no direct contractual relationship with the contractor having such a direct contractual relationship, also sent a notice of identification within the time required under said Chapter 254, prior to the Contractor's submission of its first application for payment after commencement of performance at the project site and did not dissolve the lien created by the filing of such notice of contract; and (ii) within the time periods allowed by said Chapter 254 files a statement of amount due and commenced or commences a civil action to enforce the lien; and (iii) pursues all reasonable legal remedies to obtain payment from the Owner unless and until there is a reasonable likelihood the action shall not result in obtaining payment; or

    c. to the extent applicable law otherwise permits the Contractor to enforce such a provision.

10. Notwithstanding any provision herein to the contrary, the Subcontractor may submit a written application for payment of retainage as required by this Agreement within sixty (60) days after Substantial Completion (as defined in Massachusetts Statute Chapter 149 Section 29F (a) or upon final and binding resolution of a dispute. Such application shall include a written list of all incomplete or defective work items and deliverables, including any and all items that have been completed, repaired and delivered and such list shall be certified as having been made in good faith. Such payment of retainage shall be paid no later than thirty (30) days from submission of the application however such time period may be extended by an additional seven (7) days for each tier of contracting parties that separates the Contractor from the project owner.

11. Payments of retainage to the Subcontractor may be withheld by the Contractor, in those amounts permitted by Massachusetts Statute Chapter 149 Section 29F (g), provided the Contractor first submits written notification to the Subcontractor of any incomplete or defective work items, incorrect, incomplete or missing deliverables, the basis for each claim and the value attributable to each. Such written notification shall be certified as made in good faith.

12. Submission of applications for payment of retainage may be made once per calendar month.

13. Any application for payment of retainage which is subject to a dispute as to incomplete or defective work items, deliverables or claims shall be subject to the dispute resolution procedure set forth in this agreement, Notwithstanding anything herein to the contrary, a provision that provides for a delay in the commencement of the dispute resolution procedure for more than thirty (30) days from the earlier of (a) rejection of the application for payment of retainage or (b) written notice of the dispute shall be void.

14. All payments of retainage shall be governed by Massachusetts G.L. c. 149 Section 29F and Section 29E(e).

## CONDITIONAL PAYMENT PROVISIONS IN LOWER TIER SUBCONTRACTS

15. The Subcontractor shall not include in any lower tier subcontract, purchase order or other similar document a provision that makes payment to a lower tier subcontractor or supplier conditioned upon receipt of payment from the Contractor or from any other third person (a "Conditional Payment Provision"). The Subcontractor shall provide the Contractor, for its approval, a copy of each proposed lower tier subcontract, purchase order and other similar document at least fourteen (14) days before execution or issuance thereof by the Subcontractor. The Subcontractor's use of a Conditional Payment Provision in violation of this Section shall be grounds for any one or more of the following: (a) termination of the Agreement; (b) the Contractor requiring, in contemporaneous exchange for any payment under the Agreement, a notice of dissolution of any lien document filed by the Subcontractor or any lower tier subcontractor or supplier to the Subcontractor in recordable form satisfactory to the Contractor; and (c) back charging the Subcontractor for any amount(s) that the Contractor pays to record any such notice(s) of dissolution, and/or any loss, cost, damage or expense the Contractor incurs to discharge, or as a result of discharging, a lien created by the Subcontractor, including but not limited to premiums for or liability incurred to obtain a lien dissolution bond under applicable law, and related attorneys' fees and costs.

16. Within fourteen (14) days after notice from the Contractor that a subcontractor or supplier to the Subcontractor of any tier has given a notice of identification pursuant to Chapter 254, Section 4 of the Massachusetts General Laws, the Subcontractor shall, at its own expense, file with the Registry of Deeds or Registry District of the Land Court, as applicable, for the county(ies) in which the Project lies a lien prevention bond complying with the provisions of Section 12 of such Chapter 254 in the full amount of the Subcontract Sum. In the event the Subcontractor fails, refuses, neglects or is unable to obtain such a lien prevention bond within such fourteen (14) days, in addition to any rights of the Contractor under the Agreement, the Contractor may, in its sole discretion, cause the proceeds of any payment payable under the Agreement to the Subcontractor to be applied to the payment of any indebtedness owed or claimed or asserted by the party giving such notice of identification to be owed to it by the Subcontractor, or by a subcontractor or vendor of any tier to the Subcontractor, by either paying such party directly or by means of check(s) payable jointly to the Subcontractor and such party, if, in the reasonable judgment of the Contractor, such work or such materials or equipment have been furnished on or related to the Project, unless the Subcontractor provides definitive documentary evidence satisfactory to the Contractor that it has previously paid such party therefor. Any and all payments made under this Section shall be deemed to have been paid for and on behalf of the Subcontractor, and for the purpose of eliminating any bond, lien and/or other claims arising from the Project. The exercise or refraining from exercise of such right by the Contractor on any one occasion shall not obligate the Contractor to exercise such right on any other occasion or waive the right to exercise such right on any other occasion; nor shall such exercise or anything herein constitute or be deemed a guarantee or assumption by the Contractor of any obligation of the Subcontractor.

## REQUESTS FOR INCREASES IN SUBCONTRACT SUM

17. The Contractor shall approve or reject a written request by the Subcontractor seeking an increase in the Subcontract Sum, in whole or in part, within thirty-seven (37) days after the later of (a) commencement of the performance of the work on which the request is based or (b) submission of the written request. In the event the Prime Contract is not with the actual project owner, the foregoing time period shall be increased by seven (7) days for each tier of contracting parties that separates the Contractor from the project owner. Notwithstanding the foregoing, in the event the Contractor does not notify the Subcontractor of its approval or rejection within the stated time period, the Contractor may nevertheless reject it, in whole or in part, before the date payment of any part of the amount of the requested increase is due, if ever.

18. Submission of a request by the Subcontractor seeking an increase in the Subcontract Sum shall constitute a certification by the Subcontractor that the request contains or is accompanied by all supporting documents required by the Agreement and is submitted in good faith. A written request for an increase in the Subcontract Sum shall not be deemed submitted unless and until actually received (a) by the person to whom the Contractor directs in writing that such requests be submitted, or (b) if the Contractor has not directed that such requests be submitted to a specific person, by the Contractor.

19. Any request by the Contractor for an increase in the price of the Prime Contract that includes amounts in a Subcontractor's request for increase in the Subcontract Sum shall not constitute or be evidence of approval by

the Contractor of the Subcontractor's request unless the Contractor expressly notifies the Subcontractor in writing that the Subcontractor's request is approved.

20. A Subcontractor's request for increase in the Subcontract Sum shall be subject to rejection, in whole or in part, at any time until payment of the approved amount is due, regardless of whether such approval is express, implied or "deemed to be approved" pursuant to the Massachusetts Statute.

21. In addition to any other grounds that may be applicable under the Agreement or applicable law, it shall be grounds for rejection of a request by the Subcontractor seeking an increase in the Subcontract Sum:

    a. to the extent the Owner rejects a request by the Contractor seeking an increase in the price of the Prime Contract on account of the same conditions or basis as the Subcontractor's request;
    b. to the extent a request is not the subject of a fully executed change order;
    c. if the request is not accompanied by a copy of a written direction by the Contractor to make changes in the work to which the request relates;
    d. if the request is not submitted within the time or in the form or manner required under the Agreement;
    e. if the request does not expressly state that it is a claim for a specified and exact dollar adjustment to the Subcontract Sum;
    f. if the request does not otherwise comply with the requirements of the Agreement;
    g. if the Subcontractor does not either (i) submit with the request a copy of a written direction by the Contractor to commence the work that is the subject of the request, or (ii) state in the written request that it has not commenced the work on which the request is based at the time the request is submitted;
    h. if the Subcontractor commences the work that is the subject of the request without having first received a written direction by the Contractor to commence such work; or
    i. if the Subcontractor fails to notify the Contractor in writing of the date on which it commences such work within two (2) business days of such date of commencement.

22. Nothing in this Rider shall be deemed to modify the requirements of the Agreement as to the time within which the Subcontractor must submit any claim for adjustment to the Subcontract Sum or Subcontract Time or for damages of any kind, or any notices, documentation or information in connection therewith.

## DISPUTE RESOLUTION

23. To the extent that any provision of the Agreement is deemed to require the Subcontractor to delay commencement of the dispute resolution procedure provided under the Agreement until a date later than sixty (60) days after the rejection of (a) an application for a periodic progress payment or (b) a written request of the Subcontractor seeking an increase in the Subcontract Sum, such provision is amended to require that the commencement of such dispute resolution procedure shall be delayed until the time required by such provision or sixty (60) days after such rejection, whichever occurs sooner.

## MISCELLANEOUS

24. In the case of a conflict between applicable provisions of this Rider and the Agreement, the provisions of this Rider shall take precedence.

25. If any of the provisions of this Rider or of the Agreement are or shall be deemed invalid or unenforceable, such invalidity or unenforceability shall not invalidate or render unenforceable the entire Rider and/or the Agreement, but rather the entire Rider and Agreement shall be construed as if not containing the particular invalid or unenforceable provision or provisions.

**D.F. Pray, Inc. Subcontract - Exhibit J**

**CALIFORNIA RIDER AND RELEASE FORMS**

This Rider shall apply where any Work is performed on a Project located in the State of California and shall for such purpose be an integral part of the Agreement and deemed fully incorporated therein. Unless otherwise defined herein, defined terms of the Agreement and the Contract Documents shall apply to this Rider. To the extent that there are any conflicts or ambiguities between the provisions of the Agreement and this Rider, this Rider shall apply.

Page 1 - After "D.F. Pray - West, Inc. insert "CSLB License Number 938105."

In addition to the other requirements under the Agreement, Subcontractor shall provide a conformed "Conditional Waiver and Release Upon Progress Payment" to Contractor in conjunction with its first Application for Payment in the form attached hereto, and each such Application thereafter. In addition to the other requirements under the Agreement, Subcontractor shall provide a conformed "Unconditional Waiver and Release Upon Progress Payment" in the form attached hereto after receipt of its first progress payment and upon receipt of each progress payment thereafter. In addition to the other requirements under the Agreement, in conjunction with its final Application for Payment, Subcontractor shall provide a conformed "Conditional Waiver and Release Upon Final Payment" in the form attached hereto and in conjunction with receipt of its final payment, a conformed "Unconditional Waiver and Release Upon Final Payment" in the form attached hereto.

**4.1.16.1**      Replace the second sentence with the following: Subcontractors must be licensed by the California Contractors State License Board and must be a corporation, partnership or limited liability company.

**4.6.1**      Replace the existing language with the following: To the fullest extent permitted by law, the Subcontractor shall defend, indemnify and hold harmless the Owner, Contractor, Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Subcontractor's Work caused, in whole or in part, by the negligent acts or omissions of the Subcontractor, the Subcontractor's sub-contractors, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, except for a loss determined to have arisen through the sole negligence of a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or otherwise reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Paragraph 4.6.

**6.4**      Replace the existing language with the following: Notwithstanding the foregoing, and in consideration of $100 paid to the Subcontractor, the receipt whereof is acknowledged as part of the Subcontract Sum, any controversy, dispute or claim between the Contractor and the Subcontractor related in any way to this Agreement or the Project will be determined by 1) filing of a lawsuit in Superior Court for the County in which the Project is located or 2) filing a claim with the American Arbitration Association, to be heard in the County in which the Project is located and to be governed by the Construction Industry Arbitration Rules of the American Arbitration Association in effect at the time of filing a claim. Subcontractor agrees that Contractor shall have the exclusive right to select the forum, be it Superior Court or Arbitration. In the event that arbitration is used to resolve a dispute, any award rendered by the arbitrator(s) shall be final and judgment may be entered according to California Code of Civil Procedure Section 1285 et seq.

**11.3**      Replace the existing language with the following: Provided an application for a progress payment is received by the Contractor not later than the 25th day of a month, the Contractor shall include the Subcontractor's Work covered by that application in the next application for payment that the Contractor is entitled to submit to the Architect or Owner. The Subcontractor shall not be entitled to progress payments from the Contractor, until the earlier of 1) 10 days after Contractor receives payment from Owner or 2) 90 days after Contractor's submission of an application for payment to the Owner that includes a request for payment to the Subcontractor based upon a fully completed application for payment received and approved by Contractor. The Subcontractor, on behalf of itself and its assignees, sureties and agents, if any, agrees that the terms of this subparagraph 11.3 shall inure to the benefit of, and be enforceable by, any of the Contractor's surety or sureties and assignees and that such terms shall be deemed to be incorporated into any payment, labor and material or other similar bond issued by or for the Contractor by any surety or sureties regarding the Project.

**11.9**    Replace the existing language with the following: Final payment, constituting the entire unpaid balance of the Subcontract Sum (including Retainage withheld pursuant to subparagraph 11.7), shall be made by the Contractor to the Subcontractor when the Subcontractor's Work is fully performed in accordance with the requirements of the Contract Documents, when all close-out requirements have been fulfilled, including but not limited to record drawings, as-builts, O&M manuals, punchlist items complete, commissioning, start-up, etc. (to the extent applicable to the Subcontractor's Work), and 1) 10 days after Contractor receives payment from Owner or 2) 90 days after Contractor's submission of an application for final payment to the Owner that includes a request for final payment to the Subcontractor based upon a fully completed application for payment received and approved by Contractor. The Subcontractor, on behalf of itself and its assignees, sureties and agents, if any, agrees that the terms of this subparagraph 11.9 shall inure to the benefit of, and be enforceable by, any of the Contractor's surety or sureties and assignees and that such terms shall be deemed to be incorporated into any payment, labor and material or other similar bond issued by or for the Contractor by any surety or sureties regarding the Project. In its sole discretion, the Contractor may cause the proceeds of any payment payable hereunder to the Subcontractor to be applied to the payment of any indebtedness owed by the Subcontractor to any party who has performed Work or supplied materials or equipment used in or in connection with the performance of this Subcontract, either directly or by means of checks payable jointly to the Subcontractor and such party, provided such work or such materials or equipment have been included in any Subcontractor's application for payment previously submitted hereunder and approved for payment under the Prime Contract, unless the Subcontractor provides credible documentary evidence that is has previously paid such party therefor.

**14.2**    This paragraph is stricken from the Agreement.


END OF RIDER - SEE RELEASE FORMS ATTACHED

**CONDITIONAL WAIVER AND RELEASE UPON PROGRESS PAYMENT**
**Civil Code 8132**

**NOTICE: THIS DOCUMENT WAIVES THE CLAIMANT'S LIEN, STOP PAYMENT NOTICE, AND PAYMENT BOND RIGHTS EFFECTIVE ON RECEIPT OF PAYMENT. A PERSON SHOULD NOT RELY ON THIS DOCUMENT UNLESS SATISFIED THAT THE CLAIMANT HAS RECEIVED PAYMENT.**

**Identifying Information**

Name of Claimant: _____

Name of Customer: _____

Job Location: _____

Owner: _____

Through Date: _____

**Conditional Waiver and Release**

This document waives and releases lien, stop payment notice, and payment bond rights the claimant has for labor and service provided, and equipment and material delivered, to the customer on this job through the Through Date of this document. Rights based upon labor or service provided, or equipment or material delivered, pursuant to a written change order that has been fully executed by the parties prior to the date that this document is signed by the claimant, are waived and released by this document, unless listed as an Exception below. This document is effective only on the claimant's receipt of payment from the financial institution on which the following check is drawn:

Maker of Check: _____

Amount of Check: _____

Payable to: _____

**Exceptions**

This document does not affect any of the following: (1) Retentions; (2) Extras for which the claimant has not received payment; (3) The following progress payments for which the claimant has previously given a conditional waiver and release but has not received payment: Date(s) of waiver and release: enter a date. and amount(s) of unpaid progress payment(s): $ .; and (4) Contract rights, including (A) a right based on rescission, abandonment, or breach of contract, and (B) the right to recover compensation for work not compensated by the payment.

Claimant's Signature: _____

Claimant's Title: _____

Date of Signature: _____

**CONDITIONAL WAIVER AND RELEASE UPON FINAL PAYMENT**
**Civil Code 8136**

**NOTICE: THIS DOCUMENT WAIVES THE CLAIMANT'S LIEN, STOP PAYMENT NOTICE, AND PAYMENT BOND RIGHTS EFFECTIVE ON RECEIPT OF PAYMENT. A PERSON SHOULD NOT RELY ON THIS DOCUMENT UNLESS SATISFIED THAT THE CLAIMANT HAS RECEIVED PAYMENT.**

**Identifying Information**

Name of Claimant: _____

Name of Customer: _____

Job Location: _____

Owner: _____

Through Date: _____

**Conditional Waiver and Release**

This document waives and releases lien, stop payment notice, and payment bond rights the claimant has for labor and service provided, and equipment and material delivered, to the customer on this job. Rights based upon labor or service provided, or equipment or material delivered, pursuant to a written change order that has been fully executed by the parties prior to the date that this document is signed by the claimant, are waived and released by this document, unless listed as an Exception below. This document is effective only on the claimant's receipt of payment from the financial institution on which the following check is drawn:

Maker of Check: _____

Amount of Check: _____

Payable to: _____

**Exceptions**

This document does not affect any of the following:

Disputed claims for extras in the amount of: $_____

Claimant's Signature: _____

Claimant's Title: _____

Date of Signature: _____

D.F. PRAY, INC. SUBCONTRACT NO. 2329-016-001

**UNCONDITIONAL CONDITIONAL WAIVER AND RELEASE UPON PROGRESS PAYMENT**
**Civil Code 8134**

**NOTICE TO CLAIMANT: THIS DOCUMENT WAIVES AND RELEASES LIEN, STOP PAYMENT NOTICE, AND PAYMENT BOND RIGHTS UNCONDITIONALLY AND STATES THAT YOU HAVE BEEN PAID FOR GIVING UP THOSE RIGHTS. THIS DOCUMENT IS ENFORCEABLE AGAINST YOU IF YOU SIGN IT, EVEN IF YOU HAVE NOT BEEN PAID. IF YOU HAVE NOT BEEN PAID, USE A CONDITIONAL WAIVER AND RELEASE FORM**

**Identifying Information**

Name of Claimant: _____

Name of Customer: _____

Job Location: _____

Owner: _____

Through Date: _____

**Unconditional Waiver and Release**

This document waives and releases lien, stop payment notice, and payment bond rights the claimant has for labor and service provided, and equipment and material delivered, to the customer on this job through the Through Date of this document. Rights based upon labor or service provided, or equipment or material delivered, pursuant to a written change order that has been fully executed by the parties prior to the date that this document is signed by the claimant, are waived and released by this document, unless listed as an Exception below.

The claimant has received the following progress payment: $_____

**Exceptions**

This document does not affect any of the following: (1) Retentions; (2) Extras for which the claimant has not received payment; and (3) Contract rights, including (A) a right based on rescission, abandonment, or breach of contract, and (B) the right to recover compensation for work not compensated by the payment.

Claimant's Signature: _____

Claimant's Title: _____

Date of Signature: _____

**UNCONDITIONAL WAIVER AND RELEASE UPON FINAL PAYMENT**
**Civil Code 8138**

**NOTICE TO CLAIMANT: THIS DOCUMENT WAIVES AND RELEASES LIEN, STOP PAYMENT NOTICE, AND PAYMENT BOND RIGHTS UNCONDITIONALLY AND STATES THAT YOU HAVE BEEN PAID FOR GIVING UP THOSE RIGHTS. THIS DOCUMENT IS ENFORCEABLE AGAINST YOU IF YOU SIGN IT, EVEN IF YOU HAVE NOT BEEN PAID. IF YOU HAVE NOT BEEN PAID, USE A CONDITIONAL WAIVER AND RELEASE FORM.**

**Identifying Information**

Name of Claimant: _____

Name of Customer: _____

Job Location: _____

Owner: _____

Through Date: _____

**Unconditional Waiver and Release**

This document waives and releases lien, stop payment notice, and payment bond rights the claimant has for all labor and service provided, and equipment and material delivered, to the customer on this job. Rights based upon labor or service provided, or equipment or material delivered, pursuant to a written change order that has been fully executed by the parties prior to the date that this document is signed by the claimant, are waived and released by this document, unless listed as an Exception below. The claimant has been paid in full.

**Exceptions**

This document does not affect any of the following:

Disputed claims for extras in the amount of: $_____

Claimant's Signature: _____

Claimant's Title: _____

Date of Signature: _____



**D.F. Pray, Inc.**

**ALL SUBCONTRACTORS / VENDORS:** PURSUANT TO OUR CORPORATE SAFETY PROGRAM AND REQUIREMENTS, ALL CONTRACTORS ENTERING THIS SITE MUST PROVIDE THE FOLLOWING INFORMATION PRIOR TO PERFORMING ANY WORK.

PROJECT NAME: 89 Brighton Ave., Allston

PROJECT LOCATION: 89 Brighton Avenue, Allston, Massachusetts 02134

JOB #: DF-02329

COMPANY NAME: Amps Electric Inc.

CONTACT INFORMATION:

COMPETENT PERSON _____ HAS READ, UNDERSTANDS AND WILL CONFORM TO OUR SAFETY PROGRAM AND ALL OSHA REQUIREMENTS.

SCOPE OF WORK: See Exhibit "A" – Scope of Work

SIGNATURE: _____

PRINT NAME: _____

DATE: _____

***PLEASE RETURN THIS FORM WITH YOUR CONTRACT***

Revised 8-18-09

# EXHIBIT B

## FACTORING AND SECURITY AGREEMENT

THIS FACTORING AND SECURITY AGREEMENT is made as of 6/4/2020 by and between **Amps Electric, Inc.** ("Seller") and **FK CONSTRUCTION FUNDING, LLC** ("Purchaser").

1. **Definitions and Index to Definitions.** The following terms used herein shall have the following meaning. All capitalized terms not herein defined shall have the meaning set forth in the Uniform Commercial Code:

1.1. **"Advance Rate"** – **80%** or such other rate as Purchaser may determine in its sole discretion.

1.2. **"Affiliate"** – Any person or entity (i) which directly or indirectly controls, or is controlled by or is under common control with Seller or a subsidiary of Seller; (ii) which directly or indirectly beneficially owns 10% or more of any class of voting stock of Seller or a subsidiary of Seller; (iii) 10% or more of the voting stock of which is directly or indirectly beneficially owned by Seller or any subsidiary of Seller.

1.3. **"Avoidance Claim"** - any claim that any payment received by Purchaser is avoidable under the Bankruptcy Code or any other debtor relief statute.

1.4. **"Business Day"** – any day which is not a Saturday, Sunday, or other day on which national banks are authorized or required to be closed.

1.5. **"Chosen State"** - Florida.

1.6. **"Clearance Days"** - three banking days.

1.7. **"Closed"** - a Purchased Account is closed upon receipt of full payment by Purchaser from a Payor or from the Seller or on the Insolvency Date.

1.8. **"Collateral"** - all Seller's now owned and hereafter acquired Accounts, Chattel Paper, Inventory, Equipment, Instruments, Investment Property, Documents, Letter of Credit Rights, Commercial Tort Claims, and General Intangibles.

1.9. **"Complete Termination"** – Complete Termination occurs upon satisfaction of the following conditions:

1.9.1. Payment in full of all Obligations of Seller to Purchaser;

1.9.2. If Purchaser has issued or caused to be issued guarantees, promises, or letters of credit on behalf of Seller, acknowledgement from any beneficiaries thereof that Purchaser or any other issuer has no outstanding direct or contingent liability therein.

1.9.3. Seller has executed and delivered to Purchaser a general release in the form of Exhibit 1.9.3. attached hereto.

1.10. **"Depository Agent"** – An entity that has a contractual arrangement with Purchaser and is engaged to provide "lock box" services for the Purchaser

1.11. **"Due Diligence Deposit Amount"** – $10,000.00.

1.12. **"Due Diligence Deposit Amount Threshold"** - $10,000.00.

1.13. **"Early Termination Fee"** – The greater of:

    1.13.1. The average of the two highest months of Factoring Fees earned by Purchaser during the twelve month period preceding the Termination Date,

    1.13.2. $5,000.00, or

    1.13.3. 2% of the Maximum Amount.

1.14. **"Eligible Account"** - an Account that is acceptable for purchase as determined by Purchaser in the exercise of its reasonable sole credit or business judgment.

1.15. **"Events of Default"** - see Section 17.1.

1.16. **"Expedited Funding Fee"** – The greater of (i) .5% of the Purchase Price paid by Purchaser to Seller or (ii) $50.00.

1.17. **"Exposed Payments"** - With respect to an Account which Seller has repurchased or could be required to repurchase hereunder, payments received by Purchaser from or for the account of a Payor that has become subject to a bankruptcy proceeding, to the extent such payments cleared the Payor's deposit account within ninety days of the commencement of said bankruptcy case.

1.18. **"Face Amount"** - the face amount due from the Account Debtor to the Seller on an Account at the time of purchase.

1.19. **"Factored Job"** – A construction project for which Seller has delivered Goods and/or rendered services, and such delivery of Goods and/or rendition of services has given rise to at least one Account which has been sold by Seller to Purchaser hereunder.

1.20. **"Factoring Fee"** - For each Factoring Fee Period, or portion thereof, during which any portion of a Purchased Account remains unpaid, computed from the Purchase Date to and including the date on which a Purchased Account is Closed, the greater of (i) the Factoring Fee Percentage multiplied by the Face Amount of the Purchased Account, and (ii) $25.00.

1.21. **"Factoring Fee Percentage"** – See Exhibit 1.21.

1.22. **"Factoring Fee Period"** – See Exhibit 1.21.

1.23. **"Failed Sale Fee"** – 3% multiplied by the Face Amount of each Account that Seller offers for purchase pursuant to Section 2.1.1. which does not become a Purchased Account because Seller withdraws its offer to sell such Account.

1.24. **"Initial Purchase Price"** – The product of the Face Amount of a Purchased Account and the Advance Rate.

1.25. **"Insolvency Date"** – The date on which Purchaser has reasonably determined that an Account Debtor has become Insolvent.

1.26. **"Insolvent"** – An Account Debtor has become Insolvent if it fails to pay a Purchased Account solely as a result of its financial inability to pay. The burden of proof as to the insolvency of an Account Debtor shall rest solely on the Seller, with it being presumed that at all relevant times an Account Debtor is not Insolvent.

1.27. **"Invoice"** - the document that evidences or is intended to evidence an Account. Where the context so requires, reference to an Invoice shall be deemed to refer to the Account to which it relates.

1.28. **"Late Charge"** – 0.2 percent per day.

1.29. **"Late Payment Date"** – ninety days from the date on which a Purchased Account was purchased.

1.30. **"Maximum Amount"** – **$500,000.00.**

1.31. **"Minimum Advance Amount"** – $1,000.00.

1.32. **"Minimum Funding Fee"** – $25.00.

1.33. **"Misdirected Payment Fee"** - 15% of the amount of any payment (but in no event less than $1,000) on account of a Notified Account (and, after the occurrence of an Event of Default, payments on accounts of any Account) which has been received by Seller and not delivered in kind to Purchaser on the next business day following the date of receipt by Seller, or, with respect to any action taken by Seller to cause such payment to be made to Seller, 30% of the amount of any such payment which has been received by Seller or which was or could have been the subject of such action.

1.34. **"Missing Notation Fee"** – 15% of the Face Amount.

1.35. **"Non-Factored Account"** – An Account of Seller which is not a Purchased Account

1.36. **"Non-Factored Account Proceeds"** – Cash proceeds of a Non-Factored Account.

1.37. **"Non-Factored Cash Proceeds Fee"** – (i) with respect Non-Factored Accounts Proceeds arising from a Non-Factored Job, the greater of (a) .5% of the amount of Non-Factored Account Proceeds, or (b) $25.00; and (ii) with respect Non-Factored Accounts Proceeds arising from a Factored Job, the greater of (a) 3.5% of the amount of Non-Factored Account Proceeds, or (b) $25.00.

1.38. **"Non-Factored Job"** - A construction project for which Seller has delivered Goods and/or rendered services, other than a Factored Job.

1.39. **"Notified Account"** – An Account to which Purchaser has sent a notice as described in Section 10.1.6.

1.40. **"Obligations"** - all present and future obligations owing by Seller to Purchaser whether arising hereunder or otherwise, and whether arising before, during or after the commencement of any bankruptcy case in which Seller is a Debtor.

1.41. **"Non-Recourse Account"** – A Purchased Account other than a Recourse Account.

1.42. **"Parties"** - Seller and Purchaser.

1.43. **"Payor"** - An Account Debtor or other obligor on an Account, or entity making payment thereon for the account of such party.

1.44. **"Purchase Date"** - the date on which Seller has been advised in a Record that Purchaser has agreed to purchase an Account.

1.45. **"Purchase Price"** - the Face Amount of a Purchased Account.

1.46. **"Purchased Accounts"** - Accounts purchased hereunder which have not been Closed.

1.47. **"Recourse Accounts"** – Either:

   1.47.1. Accounts purchased by Purchaser with full recourse to Seller, or

   1.47.2. Purchased Accounts which have been repurchased by Seller at Seller's request.

1.48. **"Repurchased"** - an Account has been repurchased when Seller has paid to Purchaser the then unpaid Face Amount.

1.49. **"Repurchased Account"** See Section 5.1.2.

1.50. **"Restructuring Fee"** - 20% of the amount of any reduction in Seller's debt owing to a third party, which reduction was negotiated and/or facilitated by Purchaser before or after the date hereof.

1.51. **"Schedule of Accounts"** - a Record, in such form as Purchaser shall from time to time provide wherein Seller lists such of its Accounts as it requests that Purchaser purchase under the terms of this Agreement.

1.52. **"UCC"** – The Uniform Commercial Code as adopted in the Chosen State.

2. **Sale; Purchase Price; Billing**

   2.1. **Assignment and Sale.**

      2.1.1. Seller shall offer to sell to Purchaser as absolute owner certain of Seller's Accounts as are listed from time to time on Schedules of Accounts. Upon purchase, Purchaser will assume the risk of non-payment on Purchased Accounts up to the Initial Purchase Price, so long as (i) the

cause of non-payment is **solely** due to an Account Debtor becoming Insolvent, and (ii) the Account Debtor is not an Affiliate of Seller.

2.1.2. In the event that Purchaser declines to purchase an Account pursuant to Section 2.1.1. Purchaser may offer to purchase such Account without any assumption of non-payment risk. If such offer is accepted by Seller, such Purchased Account shall be deemed to be a Recourse Account.

2.1.3. Purchaser shall be automatically relieved of such non-payment risk as to all then unpaid Accounts in the event that Seller incurs any Misdirected Payment Fee or Missing Notation Fee.

2.1.4. Each Schedule of Accounts shall be accompanied by (i) a contractor's payment affidavit, in form and substance satisfactory to Purchaser in its sole discretion, identifying all of Seller's subcontractors, sub-subcontractors, suppliers and vendors, individuals on Seller's payroll, individuals and entities to whom Seller owes any union dues, and any other third party who has lien rights against a Factored Job, and the amount of money, if any, owed to each, and (ii) such documentation supporting and evidencing the Account as Purchaser shall from time to time request.

2.1.5. Purchaser may, but need not purchase from Seller such Accounts as Purchaser determines to be Eligible Accounts.

2.1.6. Purchaser does not intend to purchase any Account which will cause the unpaid balance of Purchased Accounts to exceed the Maximum Amount.

2.1.7. Purchaser shall pay the Initial Purchase Price, of any Purchased Account, less any amounts due to Purchaser from Seller, within two Business Days of the Purchase Date, whereupon the Accounts shall be deemed purchased hereunder. In the event that Seller requests payment of the Purchase Price on the Purchase Date, Seller shall immediately pay the Expedited Funding Fee to Purchaser.

2.1.8. Purchaser shall pay any unpaid portion of the Purchase Price of a Purchased Account at the time that the Purchased Account is Closed.

2.1.9. Notwithstanding anything to the contrary contained herein, Purchaser shall not make any payment to Seller in an amount less than the Minimum Advance Amount, except upon the request of Seller, whereupon Seller shall pay the Minimum Funding Fee to Purchaser.

2.2. Purchaser shall pay to Seller any amount due by Purchaser to Seller on the last Business Day of each week.

2.3. Purchaser may send a monthly statement to all Payors itemizing their account activity during the preceding billing period. All Payors will be instructed to make payments to Purchaser.

2.4. On the Insolvency Date, Purchaser shall pay to Seller the Initial Purchase Price of a Purchased Account (other than a Repurchased Account) owed by an Insolvent Account Debtor.

2.5. If Seller paid the Due Diligence Deposit Amount to Purchaser prior to the date hereof, upon Purchaser having collected Factoring Fees in an amount greater than or equal to the Due Diligence Deposit Amount Threshold, Purchaser shall refund the Due Diligence Deposit Amount to Seller.

2.6. Notwithstanding anything to the contrary contained herein, Purchaser may, in its sole discretion, pay all or any portion of the Purchase Price of a Purchased Account and the proceeds of any Non-Factored Account to any of Seller's subcontractors, sub-subcontractors, suppliers and/or vendors for work performed or materials supplied in connection with a Factored Job by, at Purchaser's election, joint check or a check issued to one of Seller's subcontractors, sub-subcontractors, suppliers and/or vendors. Upon Purchaser's request, Seller shall endorse all such joint checks.

3. **Authorization for Purchases.** Subject to the terms and conditions of this Agreement, Purchaser is authorized to purchase Accounts upon telephonic, electronic or other instructions received from anyone purporting to be an officer, employee or representative of Seller.

4. **Fees and Expenses.** Seller shall pay to Purchaser:

4.1. **Factoring Fee.** The Factoring Fee on the date on which a Purchased Account is Closed.

4.2. **Misdirected Payment Fee.** Any Misdirected Payment Fee immediately upon its accrual. It is recognized that the costs imposed upon Purchaser by the Seller's action or inaction resulting in the imposition of this fee are difficult to ascertain, and this fee represents the good faith effort to compensate Purchaser without imposing upon the parties the expensive burden of litigating that cost, and is the agreed liquidated damages with result therefrom.

4.3. **Failed Sale Fee.** The Failed Sale Fee, on demand by Purchaser.

4.4. **Missing Notation Fee.** The Missing Notation Fee on any Invoice that is sent by Seller to a Payor that does not contain the notice as required by Section 12.3. hereof. It is recognized that the costs imposed upon Purchaser by the Seller's action or inaction resulting in the imposition of this fee are difficult to ascertain, and this fee represents the good faith effort to compensate Purchaser without imposing upon the parties the expensive burden of litigating that cost, and is the agreed liquidated damages with result therefrom.

4.5. **Non-Factored Cash Proceeds Fee.** The Non-Factored Cash Proceeds Fee, computed on the Face Amount of Non-Factored Cash Proceeds received by Purchaser, on the day of receipt.

4.6. **Early Termination Fee"** -- The Early Termination Fee, if any, on the Termination Date.

4.7. **Late Charge.** The Late Charge, on demand, on all past due amounts due from Seller to Purchaser hereunder.

4.8. **Restructuring Fee.** The Restructuring Fee, on (i) with respect to any reduction in Seller's debt owing to a third party negotiated and/or facilitated by Purchaser before the date hereof, the date hereof, and (ii) with respect to any reduction in Seller's debt owing to a third

party negotiated and/or facilitated by Purchaser after the date hereof, the date such third party agrees to such reduction. The Restructuring Fee shall be due and owing by Seller regardless of whether (i) the amount of reduction in the Seller's debt is dependent on the payment or performance of any obligation by Seller or Purchaser owing to the third party creditor ("Third Party Creditor Obligation"), and (ii) whether any portion of the reduction in Seller's debt is lost due to any failure of Purchaser or Seller to perform any Third Party Creditor Obligation.

4.9. **Out-of-pocket Expenses**. The out-of-pocket expenses directly incurred by Purchaser in the administration of this Agreement such as wire transfer fees, postage and audit fees. Seller shall not be required to pay for more than four audits per twelve-month period.

5. **Repurchase Of Accounts.**

5.1. At the request of Purchaser, Seller shall immediately repurchase, by payment of the then unpaid Face Amount thereof together with any unpaid fees relating to the Purchased Account:

5.1.1. **Notwithstanding Insolvency**. Notwithstanding an Account Debtor becoming Insolvent:

(a) Any Purchased Account:

(i) The payment of which has been disputed by the Payor obligated thereon, Purchaser being under no obligation to determine the bona fides of such dispute;

(ii) For which Seller has breached any warranty as set forth in the Section 14.4.

(iii) Which is outstanding beyond the Late Payment Date,

(b) Purchased Accounts upon the occurrence of an Event of Default, or upon the termination date of this Agreement.

5.1.2. **Absent Insolvency of an Account Debtor.** If an Account Debtor has not become Insolvent prior to the Late Payment Date, any Purchased Account which remains unpaid on the Late Payment Date ("Repurchased Account").

5.1.3. **Purchase of Repurchased Account**. Purchaser shall purchase from Seller any Repurchased Account on the Insolvency Date relating thereto, unless the repurchase was at the request of Seller.

5.1.4. **Recourse Account**. Any Recourse Account which remains unpaid beyond the Late Payment Date.

6. **Exposed Payments.**

6.1. Upon termination of this Agreement Seller shall pay to Purchaser (or Purchaser may retain), to hold in a non-segregated non-interest bearing account the amount of all Exposed Payments (the "Preference Reserve").

6.2. Purchaser may charge the Preference Reserve with the amount of any Exposed Payments that Purchaser pays to the bankruptcy estate of the Payor that made the Exposed Payment, on account of a claim asserted under Section 547 of the Bankruptcy Code.

6.3. Purchaser shall refund to Seller from time to time that balance of the Preference Reserve for which a claim under Section 547 of the Bankruptcy Code can no longer be asserted due to the passage of the statute of limitations, settlement with the bankruptcy estate of the Payor or otherwise.

## 7. Application of Payments.

7.1. Any payments received from or for the account of an Account Debtor which owes both Recourse Accounts and Non-Recourse Accounts to Purchaser, shall be, at the option of the Purchaser, first applied by Purchaser to Non-Recourse Accounts.

7.2. Any and all payments received from Purchaser hereunder and any Proceeds of Collateral received by Seller are expressly held in trust by Seller, its principals and guarantor(s) for the benefit of Seller's subcontractors, sub-subcontractors, suppliers and vendors, until Purchaser has been paid in full. Use of any payments received from Purchaser or Proceeds of Collateral received by Seller in violation of this Section 7.2. shall constitute a breach of the trust and fiduciary duty of the Seller, its principals and guarantors. Seller warrants that it and its employees and officers will comply with all state laws requiring any proceeds, funds, or payments received by Seller from jobs, projects, or business be used to first pay Purchaser and Seller's subcontractors, sub-subcontractors, suppliers and vendors. Seller acknowledges its fiduciary duty to use any proceeds, funds, or payments received from jobs, projects, or business to first pay Purchaser and Seller's subcontractors, sub-subcontractors, suppliers and vendors and that failure to do so constitutes defalcation and conversion of trust funds. Any debt that arises out of the breach of the trust and/or defalcation of the material, equipment, services, and/or any proceeds, funds, or payments received by Seller, is non-dischargeable in bankruptcy. Seller acknowledges and warrants that it and its employees and officers will comply with all state, local and federal laws requiring building contract funds/trust funds laws and any violation of said laws is a breach of fiduciary duty.

## 8. Security Interest.

8.1. As collateral securing the Obligations, with respect to the Collateral, Seller:

8.1.1. Assigns same to Purchaser, and

8.1.2. Grants to Purchaser a continuing first priority security interest in the Collateral.

8.2. Notwithstanding the creation of this security interest, the relationship of the parties shall be that of Purchaser and Seller of accounts, and not that of lender and borrower.

## 9. Clearance Days.

9.1. For all purposes under this Agreement, Clearance Days will be added to the date on which Purchaser receives any payment.

10. **Authorization to Purchaser.**

10.1. Seller irrevocably authorizes Purchaser at Seller's expense, to exercise at any time any of the following powers until all of the Obligations have been paid in full:

10.1.1. Receive, take, endorse, assign, deliver, accept and deposit, in the name of Purchaser or Seller, proceeds of any Collateral;

10.1.2. Take or bring, in the name of Purchaser or Seller, all steps, actions, suits or proceedings deemed by Purchaser necessary or desirable to effect collection of or other realization upon Purchaser's Accounts;

10.1.3. With respect to any of the following established or issued for the benefit of Seller, either individually or as a member of a class or group, file any claim under (i) any bond or (ii) under any trust fund.

10.1.4. Pay any sums necessary to discharge any lien or encumbrance which is senior to Purchaser's security interest in any assets of Seller, which sums shall be included as Obligations hereunder, and in connection with which sums the Late Charge shall accrue and shall be due and payable;

10.1.5. File in the name of Seller or Purchaser or both:

(a) Mechanics liens or related notices, and terminate any such liens without Seller's consent, or

(b) Claims under any payment bond, in connection with goods or services sold by Seller in connection with the improvement of realty;

10.1.6. Notify any Payor obligated with respect to any Account, that the underlying Account has been assigned to Purchaser by Seller and that payment thereof is to be made to the order of and directly and solely to Purchaser;

10.1.7. Communicate directly with Seller's Payors and any related third party to verify the amount and validity of any Account created by Seller.

10.1.8. Disclose all relevant information relating to Seller to Seller's Payors.

10.1.9. After an Event of Default:

(a) Change the address for delivery of mail to Purchaser and to receive and open mail addressed to Seller;

(b) Extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all Accounts and discharge or release any Account Debtor or other obligor (including filing of any public record releasing any lien granted to Seller by such Account Debtor), without affecting any of the Obligations;

10.1.10. File any initial financing statements and amendments thereto that:

(a) Indicate the collateral as all assets of the Seller or words of similar effect, regardless of whether any particular asset comprised in the collateral falls within the scope of Article 9 of the UCC, or as being of an equal or lesser scope or with greater detail;

(b) Contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Seller is an organization, the type of organization, and any organization identification number issued to the Seller and, (ii) in the case of a financing statement filed as a fixture filing or indicating collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the collateral relates; and

(c) Contain a notification that the Seller has granted a negative pledge to the Purchaser, and that any subsequent lienor may be tortuously interfering with Purchaser's rights;

10.1.11. Advise third parties that any notification of Seller's Account Debtors will interfere with Purchaser's collection rights.

10.1.12. File any Correction Statement in the name of Seller under Section 9-518 of the Uniform Commercial Code that Purchaser reasonably deems necessary to preserve its rights hereunder.

10.1.13. Furnish to any Account Debtor any financial or other information concerning Seller reasonably requested by such Account Debtor regarding Seller's relationship with Purchaser or such Account Debtor.

10.2. Seller authorizes Purchaser to accept, endorse and deposit on behalf of Seller any checks tendered by an Account Debtor "in full payment" of its obligation to Seller. Seller shall not assert against Purchaser any claim arising therefrom, irrespective of whether such action by Purchaser effects an accord and satisfaction of Seller's claims, under §3-311 of the Uniform Commercial Code, or otherwise.

10.3. Depository Agent.

10.3.1. Seller acknowledges that Purchaser may inter into one or more lock box agreements with a Depository Agent for the remittance of payments of Accounts from Seller. Seller. The Depository Agent may receive remittance payments drawn to the order of the Purchaser and apply same to the Purchaser's account with the Depository Agent.

10.3.2. Seller hereby agrees that with respect to all payments instructed by Purchaser to be made to its Depository Agent that the Depository Agent shall not be responsible for any claims, losses or damage for any payments made into the depository account of Purchaser. The Depository Agent shall not be responsible for loss, theft or disappearance of remittance payments of any kind or description while such payments are in possession of the United States Postal Service, Courier Dispatch, Federal Express or any other independent courier.

10.3.3. The Depository Agent shall not be liable for any direct, indirect, special or consequential damages to same by the Seller and the Seller assumes all risk for delivery of payments to the Depository Agent.

10.3.4. Seller hereby releases, quitclaims and holds harmless Depository Agent from any and all claims that they may have now or have in the future against Depository Agent and shall indemnify the Depository Agent from any claims made by Seller, including all costs and attorneys' fees associated with defense of said claims.

11. **ACH Authorization**. In order to satisfy any of the Obligations, Seller authorizes Purchaser to initiate electronic debit or credit entries through the ACH system to any deposit account maintained by Seller.

12. **Covenants By Seller.**

12.1. Seller shall not (a) grant any extension of time for payment of any of its Accounts, (b) compromise or settle any of its Accounts for less than the full amount thereof, (c) release in whole or in part any Payor, or (d) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the Accounts.

12.2. From time to time as requested by Purchaser, at the sole expense of Seller, Purchaser or its designee shall have access, during reasonable business hours if prior to an Event of Default and at any time if on or after an Event of Default, to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Seller's books and records, and Seller shall permit Purchaser or its designee to make copies of such books and records or extracts therefrom as Purchaser may request. Without expense to Purchaser, Purchaser may use any of Seller's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the collection of Accounts and realization on other Collateral as Purchaser, in its sole discretion, deems appropriate. Seller hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Purchaser at Seller's expense all financial information, books and records, work papers, management reports and other information in their possession relating to Seller.

12.3. Before sending any Invoice to an Account Debtor, Seller shall mark same with the following notice, or such notice as Purchaser may require:

> NOTICE OF ASSIGNMENT
> ASSIGNED AND PAYABLE ONLY TO:
> FK CONSTRUCTION FUNDING, LLC
> Acct of: Amps Electric, Inc.
> PO Box 160298
> Altamonte Springs, FL 32716-0298
>
> Any claims, offsets, or disputes
> must be reported immediately to:
> FK CONSTRUCTION FUNDING, LLC (800) 913-8090

12.4. Seller shall pay when due all payroll and other taxes, and shall provide proof thereof to Purchaser in such form as Purchaser shall reasonably require.

12.5. Seller shall not create, incur, assume or permit to exist any lien upon or with respect to any assets in which Purchaser now or hereafter holds a security interest.

12.6. Notwithstanding Seller's obligation to pay the Misdirected Payment Fee, Seller shall pay to Purchaser on the next banking day following the date of receipt by Seller the amount of:

12.6.1. Any payment on account of a Purchased Account.

12.6.2. After the occurrence of an Event of Default, any payment on account of any Account.

12.7. Avoidance Claims.

12.7.1. Seller shall indemnify Purchaser from any loss arising out of the assertion of any Avoidance Claim other than such claims that relate to Purchased Accounts that are owed by an Account Debtor which was Insolvent at the time the subject payment was received by Purchaser, and shall pay to Purchaser on demand the amount thereof.

12.7.2. Seller shall notify Purchaser within two Business Days of it becoming aware of the assertion of an Avoidance Claim.

12.7.3. This provision shall survive termination of this Agreement.

12.8. In the event that Purchaser sends a notice of assignment to a Payor obligated with respect to any Account pursuant to Section 10.1.6.

12.8.1. Seller shall not direct such Payor to pay such Account to Seller or any other entity or individual, or undermine or interfere with such notice of assignment in any manner.

12.8.2. Seller agrees that a violation of this Section 12.8. will put the value of the Collateral at risk and will cause irreparable harm to Purchaser and, therefore, Purchaser shall be entitled to temporary and permanent injunctive relief to prevent such violation without the necessity of proving that actual damages are not an adequate remedy and Purchaser will be entitled to any proceeds of Accounts received by Seller as a result of such violation.

12.9. In the event that Purchaser fails to collect Factoring Fees in an amount equal to or greater than the Due Diligence Deposit Amount Threshold within 180 days of the date of this Agreement, Seller shall pay the Due Diligence Deposit Amount to Purchaser; provided, however, that Purchaser shall credit any amount of the Due Diligence Deposit Amount received by Purchaser prior to the date hereof to Seller's obligation to pay the Due Diligence Deposit Amount under this Section 12.9.

12.10. Upon Purchaser's request, Seller shall obtain, or cooperate with Purchaser to enable Purchaser to obtain, partial or final lien releases from Seller's subcontractors, sub-subcontractors, suppliers and/or vendors with respect to any Factored Job.

12.11. Without Purchaser's consent, Seller shall not incur debt or contingent obligations, or guaranty the debt of any other entity or individual.

13. **Account Disputes**.

13.1. Seller shall notify Purchaser promptly of and, if requested by Purchaser, will settle all disputes concerning any Purchased Account, at Seller's sole cost and expense. Purchaser may, but is not required to, attempt to settle, compromise, or litigate (collectively, "Resolve") the dispute upon such terms, as Purchaser in its sole discretion deem advisable, for Seller's account and risk and at Seller's sole expense. Upon the occurrence of an Event of Default Purchaser may Resolve such issues with respect to any Account of Seller.

14. **Representation and Warranties**. Seller represents and warrants that:

14.1. It is fully authorized to enter into this Agreement and to perform hereunder;

14.2. This Agreement constitutes its legal, valid and binding obligation; and

14.3. Seller is solvent and in good standing in the jurisdiction of its organization.

14.4. The Purchased Accounts are and will remain:

14.4.1. Bona fide existing obligations created by the sale and delivery of goods or the rendition of services in the ordinary course of Seller's business;

14.4.2. To the best of Seller's knowledge, unconditionally owed and will be paid to Purchaser without defenses, disputes, offsets, counterclaims, or rights of return or cancellation other than Accounts owed by an Account Debtor which was Insolvent;

14.4.3. Not sales to any entity that is affiliated with Seller or in any way not an "arms length" transaction.

14.5. Seller has not received notice or otherwise learned of actual or imminent bankruptcy, insolvency, or material impairment of the financial condition of any applicable Account Debtor regarding Purchased Accounts.

15. **Indemnification**.

15.1. Seller agrees to indemnify Purchaser against and save Purchaser harmless from any and all manner of suits, claims, liabilities, demands and expenses (including reasonable attorneys' fees and collection costs) resulting from or arising out of this Agreement, whether directly or indirectly, including the transactions or relationships contemplated hereby (including the enforcement of this Agreement), and any failure by Seller to perform or observe its obligations under this Agreement.

16. **Disclaimer of Liability**.

16.1. In no event will Purchaser be liable to Seller for any lost profits, lost savings or other consequential, incidental or special damages resulting from or arising out of or in connection with this agreement, the transactions or relationships contemplated hereby or purchaser's

performance or failure to perform hereunder, even if purchaser has been advised of the possibility of such damages.

17. **Default**.

17.1. **Events of Default**. The following events will constitute an Event of Default hereunder: (a) Seller defaults in the payment of any Obligations or in the performance of any provision hereof or of any other agreement now or hereafter entered into with Purchaser, or any warranty or representation contained herein proves to be false in any way, howsoever minor, (b) Seller or any guarantor of the Obligations becomes subject to any debtor-relief proceedings, (c) any such guarantor fails to perform or observe any of such Guarantor's obligations to Purchaser or shall notify Purchaser of its intention to rescind, modify, terminate or revoke any guaranty of the Obligations, or any such guaranty shall cease to be in full force and effect for any reason whatever, (d) Purchaser for any reason, in good faith, deems itself insecure with respect to the prospect of repayment or performance of the Obligations.

17.2. Waiver of Notice. PURCHASER'S FAILURE TO CHARGE OR ACCRUE INTEREST OR FEES AT ANY "DEFAULT" OR "PAST DUE" RATE SHALL NOT BE DEEMED A WAIVER BY PURCHASER OF ITS CLAIM THERETO.

17.3. Effect of Default.

17.3.1. Upon the occurrence of any Event of Default, in addition to any rights Purchaser has under this Agreement or applicable law, Purchaser may immediately terminate this Agreement, at which time all Obligations shall immediately become due and payable without notice.

17.3.2. The Late Charge shall accrue and is payable on demand on any Obligation not paid when due.

18. **Account Stated**.

18.1. A current statement setting forth the transactions arising hereunder is continuously available to Seller through Seller's access thereto at Purchaser's web site. The transactions reflected therein shall be considered correct and binding upon Seller as an account stated, except to the extent that Purchaser receives, within thirty days after the posting of a transaction thereto, written notice from Seller of any specific exceptions by Seller to that statement.

19. **Amendment and Waiver**.

19.1. Only a Record Authenticated by all parties hereto may amend this Agreement. No failure or delay in exercising any right hereunder shall impair any such right that Purchaser may have, nor shall any waiver by Purchaser hereunder be deemed a waiver of any default or breach subsequently occurring. Purchaser's rights and remedies herein are cumulative and not exclusive of each other or of any rights or remedies that Purchaser would otherwise have.

20. **Termination; Effective Date**.

20.1. Either Party may terminate this Agreement by giving the other Party sixty days prior written notice of termination, whereupon this Agreement shall terminate on the date of termination set forth in the termination notice ("Termination Date").

20.2. All Obligations shall be due and payable on the Termination Date.

21. **No Lien Termination without Release**.

21.1. In recognition of the Purchaser's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Seller, Purchaser shall not be required to record any terminations or satisfactions of any of Purchaser's liens on the Collateral unless and until Complete Termination has occurred. Seller understands that this provision constitutes a waiver of its rights under §9-513 of the UCC.

22. **Conflict**.

22.1. Unless otherwise expressly stated in any other agreement between Purchaser and Seller, if a conflict exists between the provisions of this Agreement and the provisions of such other agreement, the provisions of this Agreement shall control.

23. **Severability**.

23.1. In the event any one or more of the provisions contained in this Agreement is held to be invalid, illegal or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

24. **Enforcement**.

24.1. This Agreement and all agreements relating to the subject matter hereof is the product of negotiation and preparation by and among each party and its respective attorneys, and shall be construed accordingly.

25. **Relationship of Parties**.

25.1. The relationship of the parties hereto shall be that of Seller and Purchaser of Accounts, and Purchaser shall not be a fiduciary of the Seller, although Seller may be a fiduciary of the Purchaser.

26. **Attorneys' Fees**.

26.1. Seller agrees to reimburse Purchaser on demand for:

26.1.1. The actual amount of all costs and expenses, including attorneys' fees, which Purchaser has incurred or may incur in:

      (a) Negotiating, preparing, or administering this Agreement and any documents prepared in connection herewith;

      (b) Any way arising out of or in connection with this Agreement, and whether or not arising out of a dispute which does not involve Purchaser;

      (c) Protecting, preserving or enforcing any lien, security or other right granted by Seller to Purchaser or arising under applicable law, whether or not suit is brought, including but not limited to the defense of any Avoidance Claims or the defense of Purchaser's lien priority;

    26.1.2. The actual costs, including photocopying (which, if performed by Purchaser's employees, shall be at the rate of $.10/page), travel, and attorneys' fees and expenses incurred in complying with any subpoena or other legal process in any way relating to Seller. This provision shall survive termination of this Agreement.

    26.1.3. The actual amount of all costs and expenses, including attorneys' fees, which Purchaser may incur in enforcing this Agreement and any documents prepared in connection herewith, or in connection with any federal or state insolvency proceeding commenced by or against Seller, including those (i) arising out the automatic stay, (ii) seeking dismissal or conversion of the bankruptcy proceeding or (ii) opposing confirmation of Seller's plan there under.

## 27. Successor Entities.

    27.1. In the event Seller's principal(s), officer(s) or director(s), during the term of this Agreement or while Seller remains liable to Purchaser for any obligations under this Agreement, directly or in conjunction with any other person, causes to be formed a new entity or otherwise become associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise such entity shall be deemed to have expressly assumed the obligations due Purchaser by Seller under this Agreement. With respect to each such entity, Purchaser shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity, a new UCC-1 financing statement naming such entity as Debtor, and to have it filed with any and all appropriate secretaries of state or other UCC filing offices.

## 28. Entire Agreement.

    28.1. No promises of any kind have been made by Purchaser or any third party to induce Seller to execute this Agreement. No course of dealing, course of performance or trade usage, and no parole evidence of any nature, shall be used to supplement or modify any terms of this Agreement.

## 29. Choice of Law.

    29.1. This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the Chosen State.

30. Jury Trial Waiver.

30.1. IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING HEREUNDER, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

31. Venue; Jurisdiction.

31.1. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if Purchaser so elects, be instituted in any court sitting in the Chosen State, in the city in which Purchaser's chief executive office is located, or if none, any court sitting in the Chosen State (the "Acceptable Forums"). Seller agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Seller waives any right to oppose any motion or application made by Purchaser to transfer such proceeding to an Acceptable Forum.

32. Time of the Essence.

32.1. It is agreed that time is of the essence in all matters herein.

33. Service of Process.

33.1. Seller agrees that Purchaser may effect service of process upon Seller by regular mail at the address set forth herein or at such other address as may be reflected in the records of Purchaser, or at the option of Purchaser by service upon Seller's agent for the service of process.

34. Assignment

34.1. Purchaser may assign its rights and delegate its duties hereunder. Upon such assignment, Seller shall be deemed to have attorned to such assignee and shall owe the same obligations to such assignee and shall accept performance hereunder by such assignee as if such assignee were Purchaser.

35. Counterparts.

35.1. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement, and any party delivering such an executed counterpart of the signature page to this Agreement by facsimile to any other party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

36. **Notice.**

36.1. All notices required to be given to any party other than Purchaser shall be deemed given upon the first to occur of (i) deposit thereof in a receptacle under the control of the United States Postal Service, (ii) transmittal by electronic means to a receiver under the control of such party, or (iii) actual receipt by such party or an employee or agent of such party. All notices to Purchaser shall be deemed given upon actual receipt by a responsible officer of Purchaser.

36.2. For the purposes hereof, notices hereunder shall be sent to the following addresses, or to such other addresses as each such party may in an Authenticated Record hereafter indicate:

SELLER

86 west st, Waltham . MA 02451

| | |
|---|---|
| Address: | ~~42 Felton Street Suite 6R~~ Waltham, MA ~~02453~~ |
| Officer: | John J Bianchi |
| Email: | jbianchi@amps-elec.com |

## PURCHASER

| | |
|---|---|
| Address: | 218 S US Hwy 1 Suite 101 |
| | Tequesta, FL 33469 |
| Officer: | Frank Skelly |
| Email: | fskelly@FKConstructionFunding.com |

IN WITNESS WHEREOF, the Parties have executed this agreement on the day and year first above written.

SELLER:

Amps Electric Inc

By: _____

Name: John J Bianchi

Title: President

PURCHASER:

FK CONSTRUCTION FUNDING, LLC

By: _____

Frank Skelly, Manager

The foregoing instrument was acknowledged before me by means of ____ physical presence or ____ online notarization, this 10th day of June, 20__, by John J Bianchi, as President of Amps Electric, Inc., who is personally known to me or who has produced N/A as identification and who did (did not) take an oath.

Notary Public (Sign)

My Commission Expires:

DENISE QUINTILIANI
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
September 3, 2021

Denise Quintiliani

Notary Public (Print)

Page 19 of 21

EXHIBIT 1.9.3.

### GENERAL RELEASE

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and adequacy of which are hereby acknowledged, the undersigned and each of them (collectively "Releasor") hereby forever releases, discharges and acquits **FK CONSTRUCTION FUNDING, LLC** ("Releasee"), its parent, directors, shareholders, agents and employees, of and from any and all claims of every type, kind, nature, description or character, and irrespective of how, why, or by reason of what facts, whether heretofore existing, now existing or hereafter arising, or which could, might, or may be claimed to exist, of whatever kind or name, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, each as though fully set forth herein at length, to the extent that they arise out of or are in way connected to or are related to that certain Factoring and Security Agreement dated May 6, 2020

Releasor acknowledges that factual matters now unknown to it may have given or may hereafter give rise to Claims which are presently unknown, unanticipated and unsuspected, and it acknowledges that this Release has been negotiated and agreed upon in light of that realization and that it nevertheless hereby intends to release, discharge and acquit the Releasee from any such unknown Claims.

Acceptance of this Release shall not be deemed or construed as an admission of liability by any party released.

In the event of any litigation arising out of or related to this Release, the prevailing party shall recover its reasonable attorney's fees and expenses from the unsuccessful party. It shall be presumed (subject to rebuttal only by the introduction of competent evidence to the contrary) that the amount recoverable is the amount billed to the prevailing party by its counsel and that such amount will be reasonable if based on the billing rates charged to the prevailing party by its counsel in similar matters.

Releasor acknowledges that either (a) it has had advice of counsel of its own choosing in negotiations for and the preparation of this release, or (b) it has knowingly determined that such advice is not needed.

DATED: ____

Individual Releasor:

_____**EXHIBIT ONLY**_____
John J Bianchi, individually

Entity Releasor:

Amps Electric, Inc.

By: _____**EXHIBIT ONLY**_____
Name: John J Bianchi
Title: President

## EXHIBIT 1.21

| Factoring Fee Period | Factoring Fee Percentage |
|---|---|
| 0 to 30 days | 3.5% |
| 31 to 60 days | .65% per 5 day period or portion thereof |
| 61 to 90 days | .15% per day |

**EXHIBIT C**

## NOTICE OF CONTRACT -- SUBCONTRACTOR
### M.G.L. c. 254 §§ 1, 2, 4

Notice is hereby given that by virtue of a written contract between Amps Electric, Inc.

("Amps"), contractor, and the International Brotherhood of Electrical Workers Local 103 ("Local

103"), under which Amps agreed to be bound to the terms of the Restated Agreements and

Declarations of Trust establishing the Electrical Workers Health and Welfare, Pension, Deferred

Income, Joint Apprenticeship and Training, Electrical Industry Labor Management Cooperation

Trust, and National Electrical Benefit Funds (collectively "Local 103 Trust Funds") and to the

current collective bargaining agreement, said Local 103 has furnished labor for Amps in the

erection, alteration, repair or removal of a building, structure or other improvement of real property

for **Brighton Gardner Properties LLC,** owner and/or **D.F. Pray, Inc.,** owner, on a lot of land or

other interest in real property located at **89 Brighton Avenue, Allston, MA 02134**, more

particularly described in a Quitclaim Deed recorded with the Suffolk County Registry of Deeds in

Book 53962, Page 225 ("Property"). By virtue of its contract, Amps was obligated to pay fringe

benefit contributions and remit working dues, holiday and vacation amounts deducted from

employees' wages to the Local 103 Trust Funds and Local 103. The Local 103 Trust Funds are

third-party beneficiaries to whom amounts are due on the basis of labor performed at the Property

under the above-described written contracts.

**TITLE REFERENCE: Deed recorded at Book 53962, Page 225.**

As of the date of this notice, under the written contracts described above, Amps owes

$498,787.79 in unpaid fringe benefit contributions and working dues, holiday and vacation

amounts deducted from employees' wages for the period May 1, 2021 through the present, and

agreed penalties.

<div style="margin-left:auto; text-align:left;">

Return Address:
Kathryn S. Shea, Esq.
Law Office of Kathryn S. Shea
108 Trowbridge Street, Third Floor
Cambridge, MA 02138

</div>

Property Address: 89 Brighton Avenue, Allston, MA 02134

Total Document Pages: 2

vacation amounts deducted from employees' wages for the period May 1, 2021 through the present, and agreed penalties.

SIGNED AND SWORN TO THIS _16_ DAY OF JULY, 2021.

> I.B.E.W. LOCAL 103 AND I.B.E.W.
> LOCAL 103 TRUST FUNDS,
>
> Michael P. Donovan, Administrator,
> I.B.E.W. Local 103 Trust Funds

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                          July _16_, 2021

Then personally appeared the within named Michael P. Donovan, Administrator of the I.B.E.W. Local 103 Trust Funds, before me, and acknowledged to me that he executed the foregoing instrument as his free act and deed, and that of the Local 103 Trust Funds, and that the statements in it are true.

Notary Public                               My Commission expires: _12/26/25_

**ATIYA FARAH CHARLEY**
**Notary Public**
**Commonwealth of Massachusetts**
**My Commission Expires**
**December 26, 2025**

The regular mailing address of the party recording or filing this notice is as follows:

Kathryn S. Shea, Esq.
Law Office of Kathryn S. Shea
108 Trowbridge Street, Third Floor
Cambridge, MA 02138

Return Address:
Kathryn S. Shea, Esq.
Law Office of Kathryn S. Shea
108 Trowbridge Street, Third Floor
Cambridge, MA 02138

# EXHIBIT D

Fill in this information to identify the case:

United States Bankruptcy Court  for the:

_____ District of _____
                         (State)

Case number (if known): _____   Chapter _____

☐ Check if this is an amended filing

## Official Form 205

# Involuntary Petition Against a Non-Individual

12/15

Use this form to begin a bankruptcy case against a non-individual you allege to be a debtor subject to an involuntary case. If you want to begin a case against an individual, use the *Involuntary Petition Against an Individual* (Official Form 105). Be as complete and accurate as possible. If more space is needed, attach any additional sheets to this form. On the top of any additional pages, write debtor's name and case number (if known).

**Part 1:   Identify the Chapter of the Bankruptcy Code Under Which Petition Is Filed**

| 1. | Chapter of the Bankruptcy Code | *Check one:* |
|---|---|---|
| | | ☑ Chapter 7 |
| | | ☐ Chapter 11 |

**Part 2:   Identify the Debtor**

| 2. | Debtor's name | AMPS ELECTRIC, INC. |
|---|---|---|

| 3. | Other names you know the debtor has used in the last 8 years | _____ |
|---|---|---|
| | Include any assumed names, trade names, or *doing business as* names. | _____ |

| 4. | Debtor's federal Employer Identification Number (EIN) | ☑ Unknown |
|---|---|---|
| | | EIN ___ – ___ ___ ___ ___ ___ ___ ___ |

**5. Debtor's address**

| Principal place of business | Mailing address, if different |
|---|---|
| 86 West Street | |
| Number    Street | Number    Street |
| | P.O. Box |
| Waltham          MA   02455 | |
| City          State   ZIP Code | City          State   ZIP Code |
| | **Location of principal assets, if different from principal place of business** |
| Middlesex | |
| County | Number    Street |
| | City          State   ZIP Code |

| Debtor | AMPS ELECTRIC, INC. | Case number (if known) |
|---|---|---|
| | Name | |

**6. Debtor's website (URL)** _____

**7. Type of debtor**

☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other type of debtor. Specify: _____

**8. Type of debtor's business**

*Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☑ None of the types of business listed.

☐ Unknown type of business.

**9. To the best of your knowledge, are any bankruptcy cases pending by or against any partner or affiliate of this debtor?**

☑ No

☐ Yes. Debtor _____ Relationship _____

District _____ Date filed _____ Case number, if known_____
MM / DD / YYYY

Debtor _____ Relationship _____

District _____ Date filed _____ Case number, if known_____
MM / DD / YYYY

---

**Part 3:** **Report About the Case**

**10. Venue**

*Check one:*

☑ Over the last 180 days before the filing of this bankruptcy, the debtor had a domicile, principal place of business, or principal assets in this district longer than in any other district.

☐ A bankruptcy case concerning debtor's affiliates, general partner, or partnership is pending in this district.

**11. Allegations**

Each petitioner is eligible to file this petition under 11 U.S.C. § 303(b).

The debtor may be the subject of an involuntary case under 11 U.S.C. § 303(a).

*At least one box must be checked:*

☑ The debtor is generally not paying its debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount.

☐ Within 120 days before the filing of this petition, a custodian, other than a trustee, receiver, or an agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

**12. Has there been a transfer of any claim against the debtor by or to any petitioner?**

☑ No

☐ Yes. Attach all documents that evidence the transfer and any statements required under Bankruptcy Rule 1003(a).

---

Debtor  AMPS ELECTRIC, INC.
Name

Case number (if known)

| 13. Each petitioner's claim | Name of petitioner | Nature of petitioner's claim | Amount of the claim above the value of any lien |
|---|---|---|---|
| | IBEW Local 103 Health Fund | Unpaid benefit contributions | $ 515,131.50 |
| | IBEW Local 103 Pension Fund | Unpaid benefit contributions | $ 401,887.60 |
| | IBEW Local 103 Deferred Income Fund | Unpaid benefit contributions | $ 225,629.01 |
| | | Total of petitioners' claims | $ 1,142,648.11 |

If more space is needed to list petitioners, attach additional sheets. Write the alleged debtor's name and the case number, if known, at the top of each sheet. Following the format of this form, set out the information required in Parts 3 and 4 of the form for each additional petitioning creditor, the petitioner's claim, the petitioner's representative, and the petitioner's attorney. Include the statement under penalty of perjury set out in Part 4 of the form, followed by each additional petitioner's (or representative's) signature, along with the signature of the petitioner's attorney.

| Part 4: | Request for Relief |
|---|---|

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

Petitioners request that an order for relief be entered against the debtor under the chapter of 11 U.S.C. specified in this petition. If a petitioning creditor is a corporation, attach the corporate ownership statement required by Bankruptcy Rule 1010(b). If any petitioner is a foreign representative appointed in a foreign proceeding, attach a certified copy of the order of the court granting recognition.

I have examined the information in this document and have a reasonable belief that the information is true and correct.

**Petitioners or Petitioners' Representative**

**Attorneys**

Name and mailing address of petitioner

IBEW Local 103 Health Fund
Name

256 Freeport St. Second Floor
Number   Street

Boston                MA        02122
City                  State     ZIP Code

Name and mailing address of petitioner's representative, if any

Michael P. Donovan, Fund Administrator
Name

256 Freeport St. Second Floor
Number   Street

Boston                MA        02122
City                  State     ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 08/13/2021
MM / DD / YYYY

X _Nicole P. Donovan_
Signature of petitioner or representative, including representative's title

Kathryn S. Shea
Printed name

Law Office of Kathryn S. Shea
Firm name, if any

108 Trowbridge St., Third Floor
Number   Street

Cambridge             MA        02138
City                  State     ZIP Code

Contact phone  617-945-9621  Email  kate@kateshealaw.com

Bar number     547188

State          MA

X _____
Signature of attorney

Date signed _____
MM / DD / YYYY

Official Form 205                Involuntary Petition Against a Non-Individual                page 3

Debtor  AMPS ELECTRIC, INC.
_____
Name

Case number (if known)_____

---

**Name and mailing address of petitioner**

IBEW Local 103 Pension Fund
_____
Name

256 Freeport St. Second Floor
_____
Number    Street

Boston            MA        02122
_____
City              State     ZIP Code

**Name and mailing address of petitioner's representative, if any**

Michael P. Donovan, Fund Administrator
_____
Name

256 Freeport St. Second Floor
_____
Number    Street

Boston            MA        02122
_____
City              State     ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 08/13/2021
MM / DD / YYYY

X _____
Signature of petitioner or representative, including representative's title

---

Kathryn S. Shea
_____
Printed name

Law Office of Kathryn S. Shea
_____
Firm name, if any

108 Trowbridge St. Third Floor
_____
Number   Street

Cambridge         MA        02138
_____
City              State     ZIP Code

Contact phone  617945-9621   Email kate@kateshealaw.com

Bar number    547188

State         MA

X _____
Signature of attorney

Date signed _____
MM / DD / YYYY

---

**Name and mailing address of petitioner**

IBEW Local 103 Deferred Income Fund
_____
Name

256 Freeport St., Second Floor
_____
Number    Street

Boston            MA        02122
_____
City              State     ZIP Code

**Name and mailing address of petitioner's representative, if any**

Michael P. Donovan, Fund Administrator
_____
Name

256 Freeport St. Second Floor
_____
Number    Street

Boston            MA        02122
_____
City              State     ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 08/13/2021
MM / DD / YYYY

X _____
Signature of petitioner or representative, including representative's title

---

Kathryn S. Shea
_____
Printed name

Law Office of Kathryn S. Shea
_____
Firm name, if any

108 Trowbridge St. Third Floor
_____
Number   Street

Cambridge         MA        02122
_____
City              State     ZIP Code

Contact phone  617945-9621   Email kate@kateshealaw.com

Bar number    547188

State         MA

X _____
Signature of attorney

Date signed _____
MM / DD / YYYY

---